**MARK BRNOVICH**
**ATTORNEY GENERAL**
Joseph A. Kanefield (No. 15838)
  *Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
  *Division Chief*
Drew C. Ensign (No. 25463)
Michael S. Catlett (No. 25238)
  *Deputy Solicitors General*
Jennifer J. Wright (No. 27145)
Robert J. Makar (No. 33579)
Anthony R. Napolitano (No. 34586)
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for State of Arizona*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, et al.,<br><br>                    Plaintiffs,<br><br>vs.<br><br>Katie Hobbs, et al.,<br><br>                    Defendants,<br><br>                    and<br><br>State of Arizona,<br><br>                    Intervenor-Defendant. | Case No: 2:20-cv-01143-DLR<br><br>**STATE'S COMBINED (1) RESPONSE TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND (2) RULE 12(C) MOTION FOR JUDGMENT ON THE PLEADINGS** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................... iv

INTRODUCTION ............................................................................... 1

LEGAL STANDARD .......................................................................... 6

BACKGROUND ................................................................................. 6

ARGUMENT ..................................................................................... 7

I.    PLAINTIFFS LACK ARTICLE III STANDING ...................................... 7

      A.    Plaintiffs' Complaint Fails To Adequately Allege Standing ........... 8

            1.    Plaintiffs Lack Associational Standing ................................. 8

            2.    Plaintiffs Lack Organizational Standing ............................. 10

      B.    Plaintiffs Have Not Submitted Evidence That Could Support
            Standing......................................................................... 11

II.   PLAINTIFFS' DUE PROCESS CLAIM FAILS ..................................... 12

      A.    Plaintiffs Cannot Bring A Freestanding Due Process Claim Outside
            Of The *Anderson-Burdick* Framework........................................ 12

      B.    Plaintiffs' Due Process Claim Is *Substantive* In Character—And
            Fails As A Substantive Due Process Claim ................................... 13

      C.    Plaintiffs Do Not Have A Cognizable Liberty Interest................... 14

      D.    *Mathews* Balancing Does Not Require A Post-Election Cure Period
            ............................................................................... 14

            1.    Private Interest ......................................................... 15

            2.    Risk Of Error........................................................... 16

            3.    Value Of Additional Process.......................................... 17

            4.    Governmental Interests. ............................................... 19

      E.    Plaintiffs' Reliance On Signature Mismatch Cases Is Unsound—
            And Often Actually Supports The State........................................ 19

III.  PLAINTIFFS' *ANDERSON-BURDICK* CLAIM FAILS .......................... 21

A.     Overview Of The *Anderson-Burdick* Framework ............................ 21

B.     The Acts Do Not Impose A Severe Burden ..................................... 21

    1.     *Lemons* and *Rosario* Control This Case ............................... 21

    2.     Neither *Lemons* Nor *Rosario* Are Distinguishable .............. 22

    3.     The Burden Imposed By The Acts Is Minimal ................... 23

    4.     Other Circuits Agree That The Burden Is Miniscule .......... 25

    5.     Plaintiffs' Arguments Conflate The Burden Of Compliance

       With Remedy For Non-Compliance .................................... 26

C.     The Acts Survive Exacting Scrutiny ............................................... 26

    1.     The Acts Serve Important State Interests ............................ 27

    2.     The Acts Are "Reasonably Related" To These Interests ..... 28

D.     The Acts Survive Even Strict Scrutiny .......................................... 29

E.     Plaintiffs Have Not Satisfied The Requirements For Facial Claims

    ....................................................................................................... 30

IV.    THE REMAINING *WINTER* FACTORS PRECLUDE RELIEF ............. 30

A.     Plaintiffs Are Not Likely To Suffer Cognizable Irreparable Harm  31

B.     The Balance Of Equities Disfavors Plaintiffs' Motion—Particularly

    Because Of Their Monumental Delay .............................................. 31

C.     The Public Interest And Purcell Doctrine Preclude Plaintiffs' Relief

    ....................................................................................................... 33

V.     PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS FOR

    MANDATORY INJUNCTIVE RELIEF .................................................... 34

CONCLUSION ....................................................................................................... 34

1

<b>TABLE OF AUTHORITIES</b>

2

**CASES**

3

*Alonzo v. Akal Sec., Inc.*,

4
 No. 17-00836, 2017 WL 5598227 (D. Ariz. Nov. 21, 2017) ...................................... 12

5

*Angle v. Miller*,
 673 F.3d 1122 (9th Cir. 2012) ..................................................................................... 21

6

*Ariz. Libertarian Party v. Hobbs*,

7
 925 F.3d 1085 (9th Cir. 2019) ..................................................................................... 13

8

*Ariz. Libertarian Party v. Reagan*,
 798 F.3d 723 (9th Cir. 2015) ................................................................................. 13, 28

9

*Arizonans for Fair Elections v. Hobbs*,

10
 __ F. Supp. 3d __, 2020 WL 1905747 (D. Ariz. Apr. 17, 2020)................................ 33

11

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ....................................................................................................... 6

12

*Brittain v. Hansen*,

13
 451 F.3d 982 (9th Cir. 2006) ................................................................................. 15, 17

14

*Carver v. Lehman*,
 558 F.3d 869 (9th Cir. 2009) ....................................................................................... 14

15

*City of Los Angeles v. David*,

16
 538 U.S. 715 (2003) ..................................................................................................... 16

17

*Clapper v. Amnesty Int'l USA*,
 568 U.S. 398 (2013) ....................................................................................................... 9

18

*Coalition for Econ. Equity v. Wilson*,

19
 122 F.3d 718 (9th Cir. 1997) ................................................................................... 5, 32

20

*Crawford v. Marion Cty. Election Bd.*,
 553 U.S. 181 (2008) ............................................................................................... 23, 27

21

*Democratic Exec. Comm. of Fla. v. Detzner*,

22
 347 F. Supp. 3d 1017 (N.D. Fla. 2018) ................................................................. 22, 29

23

*Democratic Exec. Comm. of Fla. v. Lee*,
 915 F.3d 1312 (11th Cir. 2019) ............................................................................. 20, 22

24

*Dudum v. Arntz*,

25
 640 F.3d 1098 (9th Cir. 2011) ....................................................................... 2, 13, 21, 24

26

*Gill v. Whitford*,
 138 S. Ct. 1916 (2018).................................................................................................. 10

27

28

iv

*Havens Realty Corp. v. Coleman,*
   455 U.S. 363 (1982) ........................................................................ 10

*Hunt v. Washington State Apple Advert. Comm'n,*
   432 U.S. 333 (1977) .......................................................................... 9

*Jacobson v. Fla. Sec'y of State,*
   957 F.3d 1193 (11th Cir. April 29, 2020)...................................... 2, 8, 9, 10

*Kaley v. United States,*
   571 U.S. 320 (2014) ........................................................................ 17

*Kendall v. Balcerzak,*
   650 F.3d 515 (4th Cir. 2011) .......................................................... 26

*La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest,*
   624 F.3d 1083 (9th Cir. 2010) .................................................... 11, 12

*LaRouche v. Fowler,*
   152 F.3d 974 (D.C. Cir. 1998).......................................................... 13

*Lemons v. Bradbury,*
   538 F.3d 1098 (9th Cir. 2008) ............................... 3, 21, 22, 23, 26, 27

*Little v. Reclaim Idaho,*
   __ U.S. __, 2020 WL 4360897 (U.S. July 30, 2020) .......................... 32, 34

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ...................................................................... 11, 12

*Mackey v. Montrym,*
   443 U.S. 1 (1979) ............................................................................ 17

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) .................................................................... 15, 17

*Mays v. LaRose,*
   951 F.3d 775 (6th Cir. 2020) ...................................................... 14, 24, 25

*Mecinas v. Hobbs,*
   __ F. Supp. 3d __, 2020 WL 3472552 (D. Ariz. June 25, 2020)............. 2, 8, 9

*Mendez v. Freeport-McMoRan, Inc.,*
   No. 16- 00548, 2016 WL 6577064 (D. Ariz. Nov. 7, 2016) .................... 6

*Mendia v. Garcia,*
   768 F.3d 1009 (9th Cir. 2014) .......................................................... 9

*Miracle v. Hobbs,*
   808 F. App'x 470 (9th Cir. 2020) ................................................... 5, 32

*Nader v. Brewer,*
   531 F.3d 1028 (9th Cir. 2008) .......................................................... 21

*National Family Planning and Reprod. Health Ass'n, Inc. v. Gonzales,*
    468 F.3d 826 (D.C. Cir. 2006) ................................................................ 9

*Northeastern Ohio Coalition for Homeless v. Husted,*
    696 F.3d 580 (6th Cir. 2012) ......................................................... 20, 25

*Oakland Tribune, Inc. v. Chronicle Pub. Co.,*
    762 F.2d 1374 (9th Cir. 1985) ........................................................ 5, 32

*Obama for America v. Husted,*
    697 F.3d 423 (6th Cir. 2012) ................................................................ 25

*Ohio Democratic Party v. Husted,*
    834 F.3d 620 (6th Cir. 2016) ................................................................ 27

*Prete v. Bradbury,*
    438 F.3d 949 (9th Cir. 2006) .......................................... 21, 26, 27, 28

*Provenz v. Miller,*
    102 F.3d 1478 (9th Cir. 1996) ............................................................. 12

*Purcell v Gonzalez,*
    549 U.S. 1 (2006) ........................................................... 5, 27, 32, 33

*Raetzel v. Parks/Bellemont Absentee Election Bd.,*
    762 F. Supp. 1354 (D. Ariz. 1990) ...................................................... 14

*Rosario v. Rockefeller,*
    410 U.S. 752 (1973) ................................................................... 22, 25

*Saucedo v. Gardner,*
    335 F. Supp. 3d 202 (D.N.H. 2018) ...................................... 13, 15, 16, 20, 22

*Short v. Brown,*
    893 F.3d 671 (9th Cir. 2018) ................................................................ 23

*Soltysik v. Padilla,*
    910 F.3d 438 (9th Cir. 2018) ................................................................ 13

*Stanley v. Univ. of S. Cal.,*
    13 F.3d 1313 (9th Cir. 1994) ................................................................ 34

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................. 2, 8, 9, 10

*Sunburst Minerals, LLC v. Emerald Copper Corp.,*
    300 F. Supp. 3d 1056 (D. Ariz. 2018) .................................................. 12

*Tedards v. Ducey,*
    951 F.3d 1041 (9th Cir. 2020) .............................................................. 28

*Timmons v. Twin Cities Area New Party,*
    520 U.S. 351 (1997) ............................................................................ 21

vi

*Townley v. Miller*,
   722 F.3d 1128 (9th Cir. 2013) ................................................................ 11

*United States v. Locke*,
   471 U.S. 84 (1985) ............................................................................... 29

*United States v. Salerno*,
   481 U.S. 739 (1987) .......................................................................... 4, 30

*Veterans for Common Sense v. Shinseki*,
   678 F.3d 1013 (9th Cir. 2012) ............................................................... 16

*Walters v. Nat'l Ass'n of Radiation Survivors*,
   473 U.S. 305 (1985) ...................................................................... 16, 19

*Washington State Grange v. Washington State Republican Party*,
   552 U.S. 442 (2008) ............................................................................ 30

*Washington v. Glucksberg*,
   521 U.S. 702 (1997) ............................................................................ 14

*Winter v. NRDC*,
   555 U.S. 7 (2008) ................................................................... 1, 4, 6, 31

**STATUTES**

1918 Ariz. Session Laws Ch. 11, §§6-7 ............................................................ 5

3 U.S.C. §5 ................................................................................................ 27

A.R.S. § 16-552 ......................................................................................... 17

A.R.S. § 16-579 ......................................................................................... 18

**INTRODUCTION**

This suit is one of a multitude that Plaintiffs and aligned interests have filed this election cycle to attempt to invalidate or alter duly-enacted laws for their own electoral benefit.  And as Plaintiffs scrape deeper and deeper into the metaphorical barrel, the lack of merit in the suits has become increasingly obvious.  This case continues the trend: as explained below, Plaintiffs' case suffers from at least half a dozen case- or claim-dispositive deficiencies.  This Court should accordingly deny Plaintiffs' request for a preliminary injunction and dismiss their Complaint.

Plaintiffs' suit is based on the faulty premise that Arizona makes it comparatively difficult to vote.  Not so.  Arizona is indisputably a leader amongst states in making it *easier* to vote, and has systematically removed *multiple* barriers to voting that numerous other states continue to maintain (many without *any* suits by Plaintiffs).  From (1) allowing online registration, (2) to eliminating any excuse requirement for voting by mail, (3) to providing easy access to permanent mail-in balloting, (4) to pre-paying postage, (5) to continuing to maintain in-person polling locations despite widespread vote-by-mail utilization, and (6) disavowing any notarization or witness requirements for mail-in ballots, the State has made voting considerably easier in ways that go *far* beyond what the U.S. Constitution requires.  Atkeson Report ¶¶9-24.  But once again, "no good deed goes unpunished." *Winter v. NRDC*, 555 U.S. 7, 31 (2008).  Arizona's extensive efforts to make voting less burdensome have been rewarded by yet another suit by DNC and its allies.

Rather than focusing on the truly minimal burden of simply signing a document on time where prominently indicated—when given *nearly a month* to do so—Plaintiffs' claims about completely-absent signatures is based on an extended analogy to signature-mismatch determinations.  As explained below, that analogy is fundamentally unsound.  In particular, unlike signature mismatches (1) the risk of error for no-signature determinations is extremely low, (2) the resulting disqualification is typically the exclusive fault of the voter, not the government, and (3) the risk of fraud is greater for non-signatures.  But even if the analogy were sound, Plaintiffs would fare no better: the Ninth Circuit has

1

squarely rejected the proposition that the Constitution requires an opportunity to cure a signature mismatch in a binding precedent that Plaintiffs tellingly ignore.

Ultimately, Plaintiffs' claims are flawed from top to bottom.  Not only do Plaintiffs lack Article III standing, they fail to satisfy their burden on even *one* of the four *Winter* requirements for obtaining preliminary injunctive relief.

***Standing.***  As an initial matter, Plaintiffs lack Article III standing.  Unlike most of the cases upon which Plaintiffs rely, Plaintiffs did not join any voters who previously had their ballots rejected, or indeed join any voters *at all*.  Instead, Plaintiffs' Complaint relies on bare probabilities that some of their members—identities unknown and unspecified— will be affected.  *See* Complaint ¶¶18, 22, 25, 55, 67.  But the Supreme Court has repeatedly "required plaintiff-organizations to make specific allegations establishing that *at least one identified member* had suffered or would suffer harm."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added).  But Plaintiffs do not identify *any* of their members, affected or otherwise.  These omissions are particularly astonishing as Plaintiffs DNC and DSCC just lost a case on this *precise* basis in the Eleventh Circuit.  *See Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1204-05 (11th Cir. April 29, 2020).  And, shortly after this suit was filed, in this Court too, *see Mecinas v. Hobbs*, __ F. Supp. 3d __, 2020 WL 3472552 at *8-12 (D. Ariz. June 25, 2020) (citing *Summers* and *Jacobson*)— with the Ninth Circuit denying DNC an injunction pending appeal in *Mecinas* on July 22.

Moreover, even if Plaintiffs' Complaint adequately *alleged* Article III standing, Plaintiffs have not provided any *record evidence* that could *prove* their standing.  Indeed, the entirety of their record evidence to date consists of a single attorney declaration, which plainly fails to establish Plaintiffs' Article III standing.

***Due Process Claim.***  Even if Plaintiffs have standing, their claims lack merit.  Their due process claim fails first because *all* constitutional challenges to electoral regulations are analyzed under "a single analytic framework"—*i.e.*, the *Anderson-Burdick* framework. *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011).  Plaintiffs' attempt to bring a freestanding due process claim outside of the *Anderson-Burdick* thus necessarily fails.

2

1    Plaintiffs' independent due process claim further fails for several additional
2    reasons.  Plaintiffs' claim is actually *substantive* in nature—*i.e.*, the "right" to have a vote
3    counted notwithstanding violation of legal requirements.  And Plaintiffs cannot satisfy—
4    indeed do not even attempt to satisfy—the standard for a substantive due process claim.

5    For similar reasons, Plaintiffs have no cognizable liberty interest.  While they might
6    have a liberty interest in voting generally, they have no protectable interest in casting a
7    vote despite flouting easily satisfied requirements.  And even if Plaintiffs had a cognizable
8    liberty interest, there is no meaningful value in additional *procedures*—*i.e.*, hearings on
9    whether election officials correctly disqualified a ballot for lacking a signature—since the
10   likelihood of initial error in a no-signature determination is exceedingly low.

11   ***Anderson-Burdick Claim.***  Plaintiffs' *Anderson-Burdick* claim fails because the
12   statutes and regulations that they challenge (collectively, the "Acts") do not impose a
13   "severe burden" on voting rights and Plaintiffs offer no meaningful argument that they can
14   prevail if strict scrutiny does not apply (*i.e.*, if the burden is not "severe").

15   Arizona law makes it extremely easy to vote.  In essence, the State eliminates all
16   barriers to voting by mail except for two exceptionally *un*burdensome requirements:
17   (1) signing the absentee affidavit and (2) return it by poll-close time.  That is the *bare*
18   *minimum* necessary to conduct an orderly and secure election.  And neither requirement is
19   remotely burdensome, let alone "severely" so.  Indeed, Plaintiffs do not dispute the State's
20   right to insist upon signatures generally.  They simply quibble with the timing of signing.

21   Plaintiffs' argument conflates the actual *burden* imposed by Arizona law with the
22   *remedies* for non-compliance.  It is not even a modest burden for most voters to sign their
23   ballots.   The remedy for non-compliance—*if* paired with returning the ballot with
24   insufficient time to cure the deficiency before polls close—might be a vote not counting.
25   But the same is true for showing up to a polling place at 8pm on election day, and the
26   State's poll closing time has never been deemed a "severe" burden.  *All* deadlines have an
27   inherent level of arbitrariness.  But *no* election can be held successfully without them.

28   Nor does the burden question arise on an empty slate.  Notably, the Ninth Circuit

1    has considered an *Anderson-Burdick* challenge to election laws that (unlike here) *entirely*

2    denied an opportunity to cure signature deficiencies (there mismatches) in *Lemons v.*

3    *Bradbury*, 538 F.3d 1098 (9th Cir. 2008).  That court explicitly rejected the challenge.  Its

4    holding was neither equivocal nor gentle: expressly holding that the burden at issue was

5    "*minimal*," and repeating that "minimal" characterization a remarkable *five times*.  *Lemons*

6    thus explained, for example, that "the absence of notice and an opportunity to rehabilitate

7    rejected signatures imposes only a *minimal burden* on plaintiffs' rights," and further that

8    "the state's important interests *justify the minimal burden* on plaintiffs' rights." *Id.* at 1102,

9    1104 (emphasis added).  And that case notably dealt with signature mismatches, where the

10   constitutional claims are stronger.  The same result should obtain here *a fortiorari*.

11         Given *Lemons* obvious relevance, Plaintiffs' failure to acknowledge *Lemons* is

12   inexplicable—*if* they had any good answer to it.  And Plaintiffs could hardly have been

13   unaware of it: their own case law cites *Lemons* extensively.  *Infra* at 23 & n.9.

14         In addition, even if Plaintiffs could establish that the Acts violate the Constitution

15   in *some* instances, their claim is necessarily a facial claim.  And Plaintiffs cannot establish

16   that "no set of circumstances exists under which the Act[s] would be valid." *United States*

17   *v. Salerno*, 481 U.S. 739, 745 (1987).  Indeed, they do not even try.

18         ***Irreparable Harm.***  Plaintiffs have also failed to demonstrate that *they*—rather than

19   non-parties—are "*likely* to suffer irreparable harm in the absence of preliminary relief."

20   *Winter*, 555 U.S. at 20 (emphasis added).  Plaintiffs are not individual voters and do not

21   suffer any direct harm from disqualified votes not affecting electoral outcomes.  Indeed, if

22   more Republican votes are disqualified, Plaintiffs would *benefit*.

23         Plaintiffs would thus only suffer irreparable harm if their relief were *likely* to swing

24   an election in their favor—a proposition for which there is no evidence, or *even allegation*.

25   That victory-specific interest is underscored by the fact that Plaintiffs have not sought

26   injunctive relief specifically for the upcoming August primary, where any disqualified

27   votes will only affect distributions *amongst* Democratic candidates.  This confirms the

28   obvious: Plaintiffs' interests are in winning elections against other parties, not "counting

1   every vote"—whether material or not, and whether Democratic or not.   Plaintiffs are

2   perfectly fine with "unconstitutionally disenfranchis[ing]" (Mot. at 2) *their own voters* as

3   long as candidates of other parties do not benefit in the process.

4   ***Balance of Harms and Public Interest.***   The remaining *Winter* factors further do

5   not support Plaintiffs' requested relief.   The State has numerous interests that would be

6   directly harmed by the injunction Plaintiffs seek.   More generally, "a state suffers

7   irreparable injury whenever an enactment of its people or their representatives is enjoined."

8   *Coalition for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

9   The State's potential harms dwarf Plaintiffs' alleged harms, which are substantially

10   undercut by their epic procrastination.   Since World War I—*i.e.*, for 102 years—Arizona

11   has both (1) allowed votes to be cast by *signed* absentee ballots *and* (2) declined to provide

12   a process for curing non-signatures *after* polls close.   1918 Ariz. Session Laws Ch. 11,

13   §§6-7.   Plaintiffs have slept on their putative rights *for over a century* until now.   That

14   immense delay properly "implies a lack of urgency and irreparable harm."   *Oakland*

15   *Tribune, Inc. v. Chronicle Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985).   Indeed, the

16   Ninth Circuit recently faulted plaintiffs for delay between "the enactment of the

17   [challenged Arizona law] in 2014 to filing suit in July 2019."   *Miracle v. Hobbs*, 808 F.

18   App'x 470, 473 (9th Cir. 2020).   But the delay here is more than *twenty times as great*.

19   Plaintiffs' delay also implicates the public interest, as it is not merely *too long*, but

20   also *too close* to the 2020 general election.   It is well established that "[c]ourt orders

21   affecting elections, especially conflicting orders, can themselves result in voter confusion"

22   with the risk increasing "[a]s an election draws closer."   *Purcell v Gonzalez,* 549 U.S. 1,

23   4-5 (2006).   That risk is manifest here due to Plaintiffs' dilatory conduct.   Moreover,

24   Plaintiffs' post-election cure period is actually likely to *increase*—not decrease—the

25   number of disqualified votes, which is not in the public interest.

26   For all of these reasons, Plaintiffs request for a preliminary injunction should be

27   denied and their Complaint dismissed.

28

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right," but instead "upon a clear showing that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22, 24.  To obtain such relief, Plaintiffs "must establish that [(1) they are] likely to succeed on the merits, that [(2) they are] likely to suffer irreparable harm in the absence of preliminary relief, that [(3)] the balance of equities tips in [their] favor, and that [(4)] an injunction is in the public interest." *Id.* at 20.

"Because 'Rules 12(b)(6) and 12(c) are substantially identical,' a motion for judgment on the pleadings is assessed under the standard applicable to a motion to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6)." *Mendez v. Freeport-McMoRan, Inc.*, No. 16- 00548, 2016 WL 6577064, at *1 (D. Ariz. Nov. 7, 2016) (citations omitted).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

## BACKGROUND

***Voting in Arizona.***  As Professor Atkeson explains in greater detail, Arizona is a leader among states in making it easy for its citizens to cast votes.  Atkeson Report ¶¶9-24.  Arizona does so through a variety of means, including (1) online registration, (2) not requiring any excuse to obtain an absentee/mail-in ballot, (3) making it easy to sign up for permanent mail-in balloting, (4) pre-paying postage, (5) maintaining polling places despite high vote-by-mail usage, (6) placing voting drop boxes in areas with limited mail service, and (7) requiring nothing more than a timely signature to vote by mail (unlike other states that require witnesses or notarization).  *Id.*  That last requirement is directly at issue here.

***Absentee/Mail-In Balloting.***  For most of its history as a state (all but 1912-17) Arizona has permitted absentee balloting.  *Supra* at 5.  During the entirety of that time, *i.e.*, 1918-2020, Arizona has (1) always required a signature to cast a vote by mail/absentee and (2) never permitted "curing" of non-signatures after election day.  This suit tests the constitutionality of that unbroken 102 years of history.

***Signature Mismatches.***  In 2019, the Arizona Legislature enacted a bill that permits curing of signature mismatches up to 5 business days after the relevant election.  Atkeson Report ¶¶25-26.  The statute did not provide an equivalent cure period for non-signatures. "County Recorders historically viewed these two types of ballot problems differently," however, *id.* ¶27, and have long had different procedures for them.  *Id.* ¶¶27-39.

Although Arizona law does not permit post-election curing of non-signatures, it does permit curing up until polls close.  *Id.* ¶¶22, 36-39.  Its Election Procedure Manual affirmatively mandates that county recorders take efforts to facilitate such curing.  *Id.* ¶37. County officials further expend considerable efforts to assist voters in curing non-signatures in time.  *Id.* ¶¶27-39; Roads Decl. ¶¶9-14; Napolitano Decl. Exs. F, H at 2-4.

The signature requirement is the subject of extensive notice.  Example and pictures of notices provide to Maricopa County voters are included.  Atkeson Report ¶¶43-46. Notably, the requirement of signing the ballot is provided on the front and back of the envelope, as well as the instructions, and is alternatively in **bold**, ALL CAPS, <u>underlined</u> and/or in red color text.  *Id.*  The adequacy of the notice provided is not contested here.

Although Arizona law has precluded post-election curing of non-signatures for 102 years and the statute providing post-election curing only for signature mismatches was signed into law on April 1, 2019, Plaintiffs did not bring this suit until June 10, 2020. Plaintiffs have not sought a preliminary injunction for the August 4, 2020 primary election.

## ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III STANDING

Unlike virtually all of the cases upon which they rely, Plaintiffs have not joined any individual voters here.  Instead, Plaintiffs consist solely of organizations that have no right to vote.  They thus have no conceivable direct "disenfranchisement" injury.

Although Plaintiffs' Complaint is silent as to whether they have Article III standing, it appears likely that Plaintiffs will rely on associational and/or organizational standing theories.  That is what they tried in *Jacobson* and *Mecinas*—and the Eleventh Circuit (unanimously) and this Court emphatically rejected the attempts.  *Jacobson*, 957 F.3d at

1204-05; *Mecinas*, 2020 WL 3472552 at \*8-10.  And the Ninth Circuit has further denied a DNC-sought injunction pending appeal in *Mecinas* on July 22.

Plaintiffs could not have been unaware of the dispositive deficiencies that plague their standing proffers here and elsewhere.  The Eleventh Circuit attempted to educate them, and did so at length.  *Jacobson*, 957 F.3d at 1204-07.  Plaintiffs were similarly—and amply—aware of the same standing objections from *Mecinas*, which were successful in obtaining dismissal there too.  But Plaintiffs refused to make any ameliorative adjustments.  Instead, their standing efforts are *even more perfunctory here*—unlike either *Jacobson* or *Mecinas*, they do not even bother to join individual voters.

Although, as the venerable adage goes, "there is no education in the second kick of a mule" (or here third), Article III nonetheless compels its deliverance.  Again.

Moreover, even if the Complaint adequately *alleged* standing, Plaintiffs have submitted no record evidence to *prove* it.  And their reply brief would be too late to do so.  Section I.A. thus explains why Plaintiffs' Complaint should be dismissed on standing grounds under Rule 12(c), and I.B. explains why a preliminary injunction is precluded.

### A.    Plaintiffs' Complaint Fails To Adequately Allege Standing

#### 1.    Plaintiffs Lack Associational Standing

Plaintiffs' associational standing theory flouts the Supreme Court's decision in *Summers*.  Nor could Plaintiffs have been unaware of what *Summers* requires: DNC lost unanimously in the Eleventh Circuit on *Summers* grounds a few weeks before filing this suit.  Plaintiffs again lack associational/representational standing for two reasons.

*First*, Plaintiffs have failed to identify any specific members that would be harmed—thereby directly contravening *Summers*.  The Supreme Court has repeatedly "required plaintiff-organizations to make specific allegations establishing that *at least one identified member* had suffered or would suffer harm."  *Summers*, 555 U.S. at 498 (emphasis added).  "This requirement of naming the affected members has *never been dispensed with in light of statistical probabilities*, but only where *all* the members of the organization are affected by the challenged activity."  *Id.* at 498-99 (first emphasis added).

8

1   The Eleventh Circuit applied this rule specifically to hold that Plaintiff DNC lacked

2   associational standing because "it failed to identify any of its members, much less one who

3   will be injured." *Jacobson*, 957 F.3d at 1204.  And DSCC lacked standing because it

4   "failed to even allege, much less prove, that they have any members." *Id.*

5   DNC and DSCC have either failed to internalize *Jacobson* or are simply ignoring

6   it.  Plaintiffs' Complaint fails to identify *any* affected members.  None of the Plaintiffs

7   *ever* (1) "make specific allegations establishing that at least one identified member had

8   suffered or would suffer harm," *Summers*, 555 U.S. at 498, or (2) "identify any of its

9   members, much less one who will be injured by the [Acts]." *Jacobson*, 957 F.3d at 1204.

10  Indeed, it is impossible to glean from the Complaint even a single member of any

11  Plaintiff, let alone one likely to be affected.  And Plaintiffs have admitted that they cannot

12  identify a single member likely affected.  Napolitano Decl. Ex. B-D (interrogatory 3

13  response).  Instead, Plaintiffs allege only that "it is virtually certain that at least some [of

14  their] members will mail a ballot without a signature in 2020," Complaint ¶18; *accord id*

15  ¶¶22, 25, 55, 67—*i.e.*, precisely the sort of "statistical probabilities" that *Summers* found

16  wanting.  Indeed, it "would make a mockery of [the Court's] prior cases" to find that

17  Plaintiffs have standing here.  555 U.S. at 498; *Mecinas*, 2020 WL 3472552 at *8-10.

18  *Second*, Plaintiffs could only establish associational standing if their "members

19  would otherwise have standing to sue in their own right." *Hunt v. Washington State Apple

20  Advert. Comm'n*, 432 U.S. 333, 343 (1977).  But it is well-established that self-inflicted

21  harm does not suffice.  Such harm "does not amount to an 'injury' cognizable under Article

22  III."[1]  To avoid *all* relevant injury here, Plaintiffs' members simply need to sign their

23  ballots when they return them.  Plaintiffs' members thus have the *absolute ability* to avoid

24  *all* of the harms complained of here.  Their failure to do so is classic self-inflicted injury.[2]

25

26  [1]  *National Family Planning and Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826,
27  831 (D.C. Cir. 2006); *accord Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013)
    (rejecting standing based upon "self-inflicted injuries"); *Mendia v. Garcia*, 768 F.3d 1009,
28  1013 n.1 (9th Cir. 2014).
    [2]  The standing analysis might be different for retrospective injury, where the harm is an
    accomplished fact and no longer preventable.  But Plaintiffs do not allege any such injury

### 2.  Plaintiffs Lack Organizational Standing

Plaintiffs alternatively may try to establish organizational standing.  But such standing is lacking here for three reasons.

*First*, it is well-established that organizational standing cannot be premised on "simply a setback to the organization's abstract social interests." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982).  Instead, injury in fact must be "concrete and particularized." *Summers*, 555 U.S. at 493.

Here, however, Plaintiffs merely allege that the Acts "decreasing the overall likelihood that ADP will be successful in its mission to help elect Democratic candidates." Complaint ¶16; *accord id.* ¶¶20, 24.  That is merely an "abstract social interest," which is unlike a voter's concrete interest in having his/her vote count.  Indeed, "[a]n organization's general interest in its preferred candidates winning as many elections as possible is still a 'generalized partisan preference' that federal courts are 'not responsible for vindicating.'" *Jacobson*, 957 F.3d at 1207 (cleaned up) (quoting *Gill v. Whitford*, 138 S. Ct. 1916, 1933 (2018)).  Moreover, that allegation is not even plausible under *Twombly* without any allegation that more Democratic votes would be disqualified than Republican ones— which the Complaint tellingly does not make, and Plaintiffs further admit that they do not contend "that voters who fail to sign mail-in ballot affidavits have been categorically more likely to vote for Democratic candidates than Republican candidates."  Napolitano Decl. Ex. B-D (interrogatory 20 response).

*Second*, Plaintiffs fail to allege resource diversion sufficiently.  Cognizable resource-diversion-based injury is lacking where—as here—Plaintiffs do not "explain[] what activities [they] would divert resources away from in order to spend additional resources on combatting the [challenged harms]." *Jacobson*, 957 F.3d at 1206.  Here, the activities that Plaintiffs allege resources would be diverted from are so unspecific that they are not remotely "particularized." *Summers*, 555 U.S. at 493

ADP, for example, only alleges that the Acts divert "resources that it would

here, and have not joined or named any affected voter.  Instead, the sole question is whether Plaintiffs' members have the power to avoid prospective injury.  They unequivocally do.

otherwise spend on other efforts to accomplish its mission in Arizona."  Complaint ¶17.  But ADP only operates in Arizona, so that does not provide *any* factual information about the desired activities that the Acts are purportedly shortchanging.  Similarly, DNC alleges only diversion of resources that it would "otherwise spend on efforts to accomplish its mission in Arizona," *id.* ¶21, and DSCC alleges only diversion from "voter persuasion efforts and other activities in Arizona," *id.* ¶24.  That is *far* too lacking in detail to suffice.

*Third*, Plaintiffs admission that they do not contend that the Acts disqualify more Democratic than Republican votes precludes organizational standing.  An organization cannot "manufacture the injury by … simply choosing to spend money fixing a problem that otherwise would not affect the organization at all."  *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010).  And here Plaintiffs' Complaint fails to establish that the Acts are not *benefiting* Democratic candidates on a relative basis.  And if Plaintiffs are expending resources on attempting to enhance a benefit conferred by the Acts, that would not be cognizable injury.[3]

**B.     Plaintiffs Have Not Submitted Evidence That Could Support Standing**

Moreover, even if Plaintiffs' Complaint adequately *alleged* standing, they have failed to *prove* their Article III standing with record evidence.  Because the preliminary injunction has been consolidated with the merits, Plaintiffs must at least "'set forth' by affidavit or other evidence 'specific facts,'" demonstrating standing.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).

Plaintiffs, however, have failed to provide even *one* affidavit establishing their standing and the entirety of their submissions to date (standing or otherwise) consist of a single attorney declaration attaching various documents—none of which name Plaintiffs' specific affected members or establish what activities Plaintiffs' resources have allegedly been diverted away from.  That plainly is insufficient.

The State anticipates that Plaintiffs may attempt to supply standing evidence with

---

[3]  Plaintiffs may also attempt to rely on competitive standing.  But that would be inapposite as it only applies to "challenge[s] to the inclusion of a candidate on the ballot."  *Townley v. Miller*, 722 F.3d 1128, 1136 (9th Cir. 2013).

their reply brief.  That, however, would be too late.  "As the Ninth Circuit has consistently held, evidence submitted for the first time in a reply brief may be stricken." *Alonzo v. Akal Sec., Inc.*, No. 17-00836, 2017 WL 5598227, at *3 n.3 (D. Ariz. Nov. 21, 2017).  And "[i]t would be unfair, and reversible error, for a district court to consider new evidence offered in reply without affording the non-moving party an opportunity to respond." *Sunburst Minerals, LLC v. Emerald Copper Corp.*, 300 F. Supp. 3d 1056, 1060 (D. Ariz. 2018) (citing *Provenz v. Miller*, 102 F.3d 1478, 1483 (9th Cir. 1996)).

Here, there is no reason why Plaintiffs could not have submitted evidence supporting their standing—an issue on which they have the burden of proof, *Lujan*, 504 U.S. at 561—earlier (*i.e.*, with their preliminary injunction motion).  And the calendar here simply will not permit delay to allow the State to respond to new evidence submitted for the first time in reply.  Indeed, this case is already too close to the November general election to permit relief.  *See infra* Section IV.  Thus, this Court should simply strike any new standing evidence submitted in reply.

In addition, Plaintiffs also cannot use evidence submitted in reply to "effectively amend [their] Complaint by raising a new theory of standing." *Lake Forest*, 624 F.3d at 1088-89.  Their reply brief "'is not a procedural second chance to flesh out inadequate pleadings.'" *Id.* (citation omitted).  Thus, even if Plaintiffs produce actual evidence of standing, this suit must be dismissed due to the Complaint's failure to allege it adequately.

## II.   PLAINTIFFS' DUE PROCESS CLAIM FAILS

Plaintiffs' due process claim fails for multiple reasons, including that (1) it wrongly asserts a constitutional challenge outside of the *Anderson-Burdick* framework, (2) it actually seeks a new *substantive* right without meeting the applicable standard, (3) Plaintiffs have no cognizable liberty interest, and (4) the *Mathews* balancing favors the State in any event.  Each of these deficiencies requires dismissal of Count Two.

### A.   Plaintiffs Cannot Bring A Freestanding Due Process Claim Outside Of The *Anderson-Burdick* Framework

Plaintiffs' due process claim (Count Two) fails as a threshold matter because the

12

Ninth Circuit has repeatedly refused to permit freestanding constitutional challenges to electoral regulations outside of the *Anderson-Burdick* framework. Instead, that court has continually held that *all* constitutional challenges to election regulations are governed by "a single analytic framework"—*i.e.*, the *Anderson-Burdick* framework. *Dudum*, 640 F.3d at 1106 n.15. That includes "First Amendment, Due Process, [and] Equal Protection claims." *Id.*; *accord LaRouche v. Fowler*, 152 F.3d 974, 987-88 (D.C. Cir. 1998). All such claims are "folded into the *Anderson/Burdick* inquiry." *Soltysik v. Padilla*, 910 F.3d 438, 449 n.7 (9th Cir. 2018); *accord Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729 n.7 (9th Cir. 2015); *Ariz. Libertarian Party v. Hobbs*, 925 F.3d 1085,1090 (9th Cir. 2019).

Because Plaintiffs' Count Two attempts to plead a freestanding due process claim outside of *Anderson-Burdick*, it necessarily fails.

**B.     Plaintiffs' Due Process Claim Is *Substantive* In Character—And Fails As A Substantive Due Process Claim**

Plaintiffs' due process claim also fails because it is miscast: while styled as a procedural due process claim, Complaint ¶¶65-69, it actually seeks a new right that is *substantive* in nature. Specifically, Plaintiffs do not seek any new *procedures*, such as an administrative or judicial hearing as to whether Defendants' no-signature determinations were actually correct. Instead, Plaintiffs seek a new substantive right to have votes counted notwithstanding their violations of state law (here signing by the election deadline).[4]

Plaintiffs' Count Two readily fails under the substantive due process standard, which requires the asserted right to be "'deeply rooted in this Nation's history and tradition

---

[4] Notably, the right recognized in Plaintiffs' case law regarding signature mismatches is the right to present extrinsic evidence to challenge the initial mismatch determination—not an independent right to (1) violate the law pre-election and then (2) belatedly comply post-election. For example, in *Saucedo*, plaintiffs sought only "[a]dditional procedures would simply allow for more probative extrinsic evidence to be considered." *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 220 (D.N.H. 2018). They did not seek the right to flout the signature requirement by, say, signing ballots "Mickey Mouse" or "Trump Sucks" and "cure" it by signing their real names later (and after knowing whether their protest vote is likely to make a difference). Similarly, if Plaintiffs were claiming a right to vote notwithstanding failing to register by the deadline—*e.g.*, through a new post-registration-deadline "cure" period—Plaintiffs would plainly be seeking a *substantive* right, not a procedural one. So too here.

and implicit in the concept of ordered liberty.'" *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (cleaned up) (citations omitted). But it is well-established that "there is no constitutional right to an absentee ballot" at all, *Mays v. LaRose*, 951 F.3d 775, 792 (6th Cir. 2020), and Plaintiffs' theory runs contrary to 102 years of Arizona history.

### C.   Plaintiffs Do Not Have A Cognizable Liberty Interest

Plaintiffs claim also fails because they have not established that they have a cognizable liberty interest that the Due Process Clause protects. Plaintiffs rely largely (at 10) on *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1357 (D. Ariz. 1990) for the existence of a protectable liberty interest (and all of their other cited cases in turn are premised on *Raetzel*). The entirety of *Raetzel*'s reasoning on this issue is this single sentence: "Because voting is a fundamental right, the right to vote is a 'liberty' interest which may not be confiscated without due process." *Id.*

Respectfully, this is plainly wrong. The right to equal governmental treatment is undoubtedly a "fundamental right" under the Equal Protection Clause. But that does not make that right a "liberty interest" under the Fourteenth Amendment, rather than a distinct right. This is, in many ways, a good thing. The government cannot strip citizens of their right to equal protection no matter how much process is provided. (In contrast, governments can deprive citizens of their liberty interests by criminal convictions after providing the requisite process). For the same reasons, the right to vote is a *distinct* and *independent* constitutional right—not merely a subsidiary facet of the Due Process Clause.

More generally, "A liberty interest may arise from either of two sources: the due process clause itself or state law." *Carver v. Lehman*, 558 F.3d 869, 872 (9th Cir. 2009). Here, no such interest can arise under state law: Plaintiffs concede state law precludes any post-election-day cure. Complaint ¶¶48-50. Nor, given the lack of a "constitutional right to an absentee ballot" *at all*, *Mays*, 951 F.3d at 792, is there any reason that the Due Process Clause itself would protect a subsidiary interest to cure a defective absentee ballot to which the clause supplies no right in the first instance.

1

**D.**   ***Mathews* Balancing Does Not Require A Post-Election Cure Period**

2

Even if Plaintiffs had a protectable liberty interest and the other claim-dispositive

3

barriers did not apply, that would only get Plaintiffs to the balancing test of *Mathews v.*

4

*Eldridge*, 424 U.S. 319 (1976).  *Mathews* requires consideration of three factors:

5

> [F]irst, the private interest that will be affected by the official action; second,
> the risk of an erroneous deprivation of such interest through the procedures
> used, and the probable value, if any, of additional or substitute procedural
> safeguards; and finally, the Government's interest, including the function
> involved and the fiscal and administrative burdens that the additional or
> substitute procedural requirement would entail.'"

6

7

8

9

*Brittain v. Hansen*, 451 F.3d 982, 1000 (9th Cir. 2006) (quoting *Mathews*, 424 U.S. at 334-

10

35) (cited by Plaintiffs at 10).  Under this test, Plaintiffs' claim fails.

11

**1.      Private Interest**

12

Here the affected private interest is weak.  True, at the highest level of generality—

13

*i.e.*, the right of a citizen to vote—the private interest is profound.  But due process claims

14

are analyzed with particularity.  Thus, in *Mathews* the relevant private interest was not in

15

the disability benefits generally, but "the uninterrupted receipt of this source of income

16

pending final administrative decision" *specifically*.  424 U.S. at 340.

17

Here there is no right to cast an absentee ballot *at all*, let alone one that flouts

18

applicable legal requirements.  The private interest in having a *noncompliant* vote count

19

is, at best, weak.  And that is particularly true as the State will permit voters to cure an

20

absent signature pre-election.  Atkeson Report ¶¶36-39.  The private interest here is thus

21

the "right" to have a vote count despite (1) contravening an exceedingly easy-to-comply

22

requirement, and (2) doing so with insufficient time to permit a pre-election cure.  To the

23

extent that such a private interest is cognizable at all, its weight is extraordinarily faint.

24

This weakness in the private interest stands in notable contrast to signature-

25

mismatch cases.   Citizens' interest in not having their votes disqualified through

26

circumstances typically *not their fault at all* is undoubtedly stronger than here.  The same

27

is not true where votes not counting will typically be the *exclusive fault of the voters* in

28

failing to meet simple requirements for which there is ample notice and time to comply.[5]

Moreover, even where private interests are strong, they do not permit flouting of applicable deadlines.  Suits in federal court, for example, often seek to vindicate constitutional rights of enormous importance.  But if a litigant files a notice of appeal just one day late in such a suit, procedural due process provides no escape hatch from the lack of appellate jurisdiction—even if that means complete extinguishment of the right at issue.

### 2.      Risk Of Error

The risk of error here is exceedingly low.  Notably, only 0.10% of total ballots were disqualified for lacking signatures in the 2018 election.  Atkeson Report ¶57.  Even assuming *all* of those no-signature determinations were incorrect (which is exceedingly doubtful), that shows a maximum 0.1% total error rate of wrongly disqualifying ballots.[6] The Ninth Circuit has found a risk of potential error *40 times as high* to be "low."  *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1035-36 (9th Cir. 2012) (agreeing that "the risk of error was low" where "only 4% of veterans who file benefits claims are affected").

But given the exceptional simplicity of "is it signed or not?" determinations, the true error rate is likely far lower than 0.1%.  Atkeson Report ¶¶39, 62.  Indeed, Plaintiffs do not even attempt to quantify the rate, and instead bizarrely contend that "[t]he 'error rate' of 'non-signature determinations' … has minimal, if any, probative worth," Napolitano Decl. Ex. B-D (interrogatory 16 response)—despite that being the second *Mathews* factor.  Plaintiffs' true disagreement is thus with the Supreme Court's standard.

Notably, "procedural due process rules are shaped by the risk of error inherent in the truth-finding process as applied to the generality of cases, not the rare exceptions."  *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 321 (1985).

---

[5]  Indeed, Plaintiffs own case law only provides that "the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted." *Saucedo*, 355 F.Supp. 3d at 217.  But here Plaintiffs do not even allege any deficiencies in how poll workers evaluate whether a ballot is actually signed—*i.e.*, do not dispute ballots are "fairly considered."  And *Saucedo* only requires votes be "counted" "*if eligible*." *Id.* (emphasis added).  But an unsigned ballot is not "eligible" for counting under Arizona law.
[6]  Because 79% of voters cast their ballots by mail, the maximum possible error rate for non-signature determinations for mail-in ballots specifically is about 0.127% (0.1%/.79).

1    Plaintiffs do not offer any argument (let alone evidence) that the risk of wrongful no-

2    signature determinations is material in the "generality of cases."  *See also City of Los*

3    *Angeles v. David*, 538 U.S. 715, 718 (2003) (per curiam) (second *Mathews* factor did not

4    favor additional proceedings given "the straightforward nature of the issue").

5           Instead, Plaintiffs focus almost exclusively on the "risk" that Arizona poll workers

6    will *correctly* follow Arizona law and disqualify unsigned ballots.  Plaintiffs, for example,

7    contend (at 11) that "[i]t is virtually certain that some Democratic voters … will

8    inadvertently fail to sign their mail ballots" and thus have their vote "rejected."  But those

9    speculated disqualifications are not "erroneous deprivation[s]," *Mathews*, 424 U.S. at

10   335—they are *correct* deprivations under Arizona's signature requirement.  Procedural

11   due process does not protect against the "risk" that a state will *correctly* apply its own law

12   to the facts at hand (which again underscores the *substantive* nature of the asserted right).

13                    **3.      Value Of Additional Process**

14          For similar reasons, the value of additional procedures is vanishingly small.  As

15   Plaintiffs' own case explains, where the correct result is straightforward the "value of

16   additional procedures and the risk of erroneous deprivation are *quite minimal*."  *Brittain*,

17   451 F.3d at 1001 (emphasis added).  Plaintiffs do not seriously contend otherwise, but

18   instead again focus (at 12-13) on the "value" of reducing *accurate* disqualifications.  But

19   "a primary function of legal process is to minimize the risk of *erroneous decisions*"—not

20   *correct* ones.  *Mackey v. Montrym*, 443 U.S. 1, 13 (1979) (emphasis added).

21          At its base, Plaintiffs' argument appears to be that if a voter *intended* to sign a ballot

22   affidavit but failed to do so, then it would be an "erroneous deprivation" not to count their

23   vote.  *See* Mot. at 11-12.  Plaintiffs thus argue (at 12) that a post-election cure period could

24   "add significant probative value," presumably as to the voter's intent.  But Arizona law

25   turns on whether the ballot is *actually* signed, not whether the voter intended to do so.

26   A.R.S. § 16-552(B).  And the risk of error must be considered in light of the underlying

27   law as to what is error.  *Kaley v. United States*, 571 U.S. 320, 334 (2014).

28          The value of additional proceedings is further significantly attenuated by three other

                                                17

factors that Plaintiffs ignore.  *First*, Arizona voters receive *ample* notice of the signature requirement.   In Maricopa County, home to about 3/5 of Arizona voters, notice is prominently given in (1) *large, red, bold, capital* letters on the back of the vote-by-mail envelope (*i.e.*, "**SIGNATURE REQUIRED**") along with the consequence (*i.e.*, "**BALLOT WILL NOT BE COUNTED WITHOUT YOUR SIGNATURE**") (Figure 1), (2) listed as one of three simple requirements on the return envelope under *red*, *bold*, *underlined* text *i.e.*, "**To ensure your ballot is valid and counted**") on the return envelope (Figure 2), and (3) specifically discussed in the instructions sent to voters (Figure 3). Atkeson Report at 18-21; *see also* Roads Decl. ¶5.

Plaintiffs do not appear to take issue with the sufficiency of this notice.  And this notice also diminishes the value of any additional procedures: Plaintiffs never explain how a voter that overlooks the three pre-election notices will nonetheless respond to a *fourth* notice that a signature is deficient.  Some undoubtedly may, but for many others the notice of signature deficiency would go exactly as heeded as the multiple pre-election notices: *i.e.*, completely disregarded.

*Second*, the existing Arizona cure procedures further reduce the value of the post-election cure period Plaintiffs seek.  The Election Procedure Manual expressly requires county recorders to "make a reasonable and meaningful attempt to contact the voter … and explain to the voter how they may cure the missing signature or cast a replacement ballot before 7:00pm on Election Day.  Atkeson Report ¶¶22, 36-37.  And County officials will expend (and have expended previously) *considerable* efforts to provide voters with an opportunity to remedy an absent signature *as long as* they do so by poll-close time.  *Id.* ¶¶28-39; Roads Decl. ¶¶9-14; Napolitano Decl. Exs. F, H at 2-4.[7]  Alternatively, affected voters may vote in-person on election day instead.  A.R.S. §16-579(B).

The post-election cure period would thus only provide assistance to those that

---

[7]   In addition, there are typically multiple individuals involved before any no-signature determination can be finalized and a ballot disqualified, further reducing the risk of error. *See* Napolitano Decl. Ex. I at 2; Roads Decl. ¶19.

(1) failed to sign a ballot despite *extensive* notice that they are required to do so on pain of votes not counting and (2) either (a) failed to return their ballot with sufficient time to allow a pre-election cure or (b) declined to cure the non-signature in the available time left before polls close.  Plaintiffs make no effort to quantify or even estimate how many voters that may be.  They thus have not met their burden of establishing material value in the "generality of cases."  *Walters*, 473 U.S. at 321.[8]

*Third*, the recent experience in California's 2020 primary underscores the lack of marginal value for Plaintiffs' proposed remedy.  Even though California permits non-signatures to be cured up to two days before results are certified, it still disqualified nearly 13,000 votes for lacking signatures—roughly 0.18%—materially *greater* than Arizona's 0.1-0.12% rate.  Napolitano Decl. Ex. K.  It also disqualified over 70,000 ballots as late even though California merely requires ballots to be post-marked, rather than received, by election day.  *Id.*  This underscores that no matter how lenient the rules and cure opportunities are, many voters will still fail to take advantage.  And Plaintiffs simply offer no evidence that many voters would actually use their post-election cure opportunity.

### 4.    Governmental Interests

As set forth below, the governmental interests implicated here are strong.  *See infra* at 27-30.  But given Plaintiffs' weak showing on the first two *Mathews* factors, the third need not be belabored here.

### E.    Plaintiffs' Reliance On Signature Mismatch Cases Is Unsound—And Often Actually Supports The State

Notably, Plaintiffs' arguments seem to rest heavily on an extended analogy to cases involving signature *mismatches*, rather than absent signatures.  That foundational premise is unsound for several reasons.  *First*, given the inherent subjectivity in analyzing signatures and a variety of factors that may cause both signatures and determinations to

---

[8]  Notably, if Maricopa County voters follow the instructions provided and mail their ballot "no later than 6 days prior to the election date," Atkeson Report at 19-20, it is very likely that the voters will both receive notice of the deficiency and have an opportunity to cure it *before* the polls close.  Thus, the voters that would benefit from Plaintiffs' relief would largely be those who failed to follow *virtually all* of the directions provided on the ballot.

vary, courts have found the risk of error in signature matching to be material—thus creating value for additional procedural protections.  But the risk of error in ascertaining that a ballot affidavit lacks a signature entirely is miniscule.  *Second*, when votes are disqualified for signature *mismatches*, the voter is often entirely blameless.  But for completely absent signatures, the disqualification will nearly always be the *exclusive fault* of the affected voters—particularly given the clarity of the notice. *Supra* at 17-18.

Ironically, Plaintiffs' *own cases* explain these distinctions quite well.  For example, *Democratic Exec. Comm. of Fla. v. Lee* (cited at 7), expressly contrasts mismatches/no-signatures by explaining: "It is one thing to fault a voter if she fails to follow instructions about how to execute an affidavit to make her vote count."  915 F.3d 1312, 1324-25 (11th Cir. 2019).  But this case actually *is* that "one thing."  In contrast, "signature-match scheme can result in the rejection … *through no fault of the voter*."  *Id.* at 1316 (emphasis added).

Similarly, *Saucedo* (cited at 10, 12, & 14) explains that "handwriting analysis … is fraught with error" and that "Plaintiffs seek no more than to … [allow] evidence from the best source−the voter."  335 F.Supp.3d at 219.  But determining whether a ballot is signed at all is *not* similarly "fraught with error" and Plaintiffs do not merely seek consideration of new evidence here, but rather to supersede the undisputed evidence of non-signature.

*Northeastern Ohio Coalition for Homeless v. Husted ("Husted I")*, 696 F.3d 580 (6th Cir. 2012) (cited at 7) is even worse for Plaintiffs.  It notably *reversed*, as an *abuse of discretion*, an injunction regarding a "deficient-affirmation remedy," such as "missing or misplaced … voter signature[s]"—*i.e.*, a strikingly similar claim to what is presented here.  *Id.* at 584, 587 (citation omitted).  The Sixth Circuit there contrasted "right-place/wrong-precinct ballots" which mostly "result … from poll-worker error," *id.* at 595 (cleaned up) with "voters' failure to follow the form's rather simple instructions" to sign.  *Id.* at 598-99.  As in *Husted I*, a preliminary injunction on that basis would be an abuse of discretion.

In addition, the potential risk of fraud is greater with non-signatures.  Many would-be cheaters may hesitate before signing hundreds of fraudulent ballots because doing so would both provide extensive handwriting samples that could be traced back to the

20

fraudster.  Atkeson Report ¶70; *see generally* Napolitano Decl. Exs. P-U.  But submission of unsigned ballots runs much less risk of being traced back to the perpetrator, given the absence of evidence for investigators.

**III.     PLAINTIFFS' *ANDERSON-BURDICK* CLAIM FAILS**

Plaintiffs' *Anderson-Burdick* claim fails because the challenged Acts do not impose a "severe burden," and Plaintiffs barely attempt to argue that they are invalid under "less exacting review."  But even if strict scrutiny applies, the Acts satisfy it.

**A.     Overview Of The *Anderson-Burdick* Framework**

As discussed above, all challenges to electoral statutes and regulations are governed by *Anderson-Burdick* framework.  That framework recognizes that "'States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'"  *Prete v. Bradbury*, 438 F.3d 949, 961 (9th Cir. 2006) (quoting *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997)).

Under the *Anderson-Burdick* framework, "an election regulation that imposes a severe burden is subject to strict scrutiny."  *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008).  In contrast, "*Lesser burdens* trigger less exacting review, and a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions."  *Angle v. Miller*, 673 F.3d 1122, 1132 (9th Cir. 2012) (quoting *Prete*, 438 F.3d at 961) (cleaned up).  Notably, "voting regulations are rarely subjected to strict scrutiny."  *Dudum*, 640 F.3d at 1106.  Moreover, "Elaborate, empirical verification of weightiness is not required."  *Timmons*, 520 U.S. at 352.

**B.     The Acts Do Not Impose A Severe Burden**

The severity of the burden here is controlled by the Ninth Circuit's decision in *Lemons* and the Supreme Court's decision in *Rosario*.  But even on a blank slate, the burden here is manifestly not severe.

**1.     *Lemons* and *Rosario* Control This Case**

The Ninth Circuit's decision in *Lemons v. Bradbury* is squarely controlling here. *Lemons* specifically considered an *Anderson-Burdick* challenge to election laws that

21

denied an opportunity to cure signature mismatches, 538 F.3d at 1100-01—which Plaintiffs' case is based on extended analogy to.  In *Lemons*, there was *no* opportunity for a voter to cure a signature mismatch *at all*—unlike here where there is merely an election-day deadline to do so.  Because *Lemons* involved mismatches, the constitutional concerns were greater.

The Ninth Circuit's assessment of the applicable burden under *Anderson-Burdick*—where the constitutional claims were stronger—was resounding: it was manifestly "minimal."  Indeed, lest there be any doubt, the court repeated its "minimal" burden holding a total of *five times*.  *Id.* at 1102, 1104.  It is accordingly even more "minimal" here.  *Lemons* explains that "the absence of notice and an opportunity to rehabilitate rejected signatures imposes only a minimal burden on plaintiffs' rights" and further holds that "the state's important interests justify the minimal burden on plaintiffs' rights." *Id.* at 1102, 1104.  And it further held that "[t]he value of additional procedural safeguards"—*i.e.*, any opportunity to cure *at all*—"[wa]s *negligible* and the burden on plaintiffs' interests from the state's failure to adopt their proposed [cure] procedures [wa]s *slight at most*." *Id.* at 1105 (emphasis added).

*Lemons* is thus dispositive of the applicable burden here.

The Supreme Court's decision in *Rosario v. Rockefeller*, 410 U.S. 752 (1973) is similarly controlling here.  *Rosario* held that there is no constitutional violation where a party simply fails to act "prior to the cutoff date," (there registering as a member of a party).  *Id.* at 758.  In those circumstances, "if [plaintiffs'] plight can be characterized as disenfranchisement at all, it was not caused by [the challenged law], but by their own failure to take timely steps." *Id.*  The same result should obtain here: any rejection of a mail-in ballot will result from the voter's "failure to take timely steps," and Plaintiffs' claims should fare no better than the *Rosario* plaintiffs.

## 2.    Neither *Lemons* Nor *Rosario* Are Distinguishable

Plaintiffs' failure to address *Lemons* is astonishing.  Plaintiffs' own case law cites

*Lemons* extensively, so they could not have been unaware of it.[9]  And it is binding precedent for this Court and considers an *Anderson-Burdick* challenge to a signature verification regime that did not permit any cure opportunity.  True, it dealt with signature mismatch rather than complete non-signatures.  But Plaintiffs' central claim is that the Constitution demands that the two must be treated as equivalent.

Plaintiffs may try to distinguish *Lemons* in reply by arguing that it involved qualifying initiatives for the ballot rather than the right to vote.  *Lemons* itself answers any such attempt: "regulations on the referendum process implicate the fundamental right to vote."  538 F.3d at 1102.  To the extent that Plaintiffs might try to reverse course and emphasize the differences between mismatches and absent signatures, their claim would be even weaker.  *Supra* at 15, 19-21.  Similarly, if Plaintiffs attempt to rely upon the State's provision of cure period for signature mismatches, the State reasonably distinguishes between mismatches and absent signatures for these same reasons.  *Id.*

*Rosario*, while somewhat more general, is also indistinguishable.  Its rule is simple: where a party fails to satisfy an easy-to-comply-with deadline after ample notice, the Constitution does not rescue voters from the consequences of their non-compliance.

### 3.    The Burden Imposed By The Acts Is Minimal

Even if this Court were considering this case on a blank slate—*i.e.*, without the benefit and precedential effect of *Lemons* and *Rosario*—the record readily demonstrates that the burden imposed by the Acts is minimal for seven reasons.

*First*, the actual burden imposed by the State is truly minimal: a voter need only sign once where prominently indicated sometime within a month.  This contrasts with the burden in *Crawford*—*i.e.*, "inconvenience of making a trip to the BMV, gathering the required documents, and posing for a photograph"—which the Supreme Court explained "*surely does not qualify as a substantial burden* on the right to vote."  *Crawford v. Marion*

---

[9]  *See Saucedo*, 335 F. Supp. 3d at 216, 218; *Lee*, 915 F.3d at 1322; *see also Democratic Exec. Comm. of Fla. v. Detzner*, 347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018) (suit filed by counsel by Plaintiffs shared here).

1  *Cty. Election Bd.*, 553 U.S. 181, 198 (2008) (emphasis added) (plurality opinion).[10]

2  *Second*, voters are given ample notice of both what is required of them *and* the

3  consequences for non-compliance. *Supra* at 17-18.  Voters need simply read and heed that

4  notice to ensure their vote is not disqualified for failure to sign.

5  *Third*, the relevant burden must be evaluated in context and "considering all

6  available opportunities to vote." *Mays*, 951 F.3d at 785.  As explained above, Arizona is

7  a clear leader in *removing* burdens to voting.  *Supra* at 1, 6.

8  *Fourth*, the Acts are completely neutral in character.  The Ninth Circuit has

9  "repeatedly upheld as 'not severe' restrictions that are generally applicable, even-handed,

10  [and] politically neutral." *Dudum*, 640 F.3d at 1106 (cleaned up).  The Acts are just that:

11  they apply to *all* voters equally, regardless of race, sex, age, or party.  To the extent that

12  they favor anyone, it simply is those that follow applicable rules/clear instructions—*i.e.*,

13  "favoritism" that no legal system can function without.

14  *Fifth*, county recorders affirmatively try to assist voters in curing deficiencies by

15  election day and provide opportunities for them to do so.  *Supra* at 7.  These opportunities

16  would only typically be insufficient if the voter either ignores them pre-election or fails to

17  follow instructions as to when to mail the ballot.  *Supra* at 19 n.8.

18  *Sixth*, the number of voters affected is very small—only about 0.1%.  *Supra* at 16.

19  And, of those, in the vast majority of cases the disqualification will be (1) a correct

20  application of state law and (2) resulting from voters' failure to follow clear instructions.

21  *Seventh*, as Professor Atkeson explains, the availability of post-election cure

22  periods actually tends to *increase* the number of disqualified votes, rather than decrease it

23  (as voters, knowing the results, decline to avail themselves of the cure opportunities).  *See*

24  Atkeson Report ¶¶51-61. And there is no reason to believe that disqualifying *fewer* votes

25

26  [10] *Accord id.* at 204 (Scalia, J., concurring joined by Thomas and Alito, JJ.) ("[T]he burden at issue is minimal and justified").  Similarly, the Ninth Circuit has held that "[t]o the extent that having to register to receive a mailed ballot could be viewed as a burden, *it is an extremely small one*, and certainly not one that demands serious constitutional scrutiny." *Short v. Brown*, 893 F.3d 671, 677 (9th Cir. 2018) (emphasis added).  But the burden of simply signing on time is *even smaller* than the "extremely small" burden of filling out an absentee ballot request form.

1    is a severe burden on voting.

2        *Eighth*, a comparison with other states shows that Arizona is hardly unduly or

3    uniquely restrictive in its election-day cutoff for curing non-signatures.  Of the 31 states

4    that rely upon signatures to validate absentee ballots, nearly half—15 states—do not

5    provide voters with *any* notice of a signature deficiency (mismatch or absence), let alone

6    an opportunity to cure, *ever*.  *Id.* ¶51 & Table 1.  And three (Georgia, Massachusetts, and

7    Michigan) limit the non-signature curing period to pre-poll close, just like Arizona.  *Id.*

8    ¶52 & Table 1.  Thus, under Plaintiffs' theories a whopping 19/31 of relevant states—*more*

9    *than three-fifths*—are imposing unconstitutional severe burdens on their voters.  But such

10   a holding would be unprecedented.

### 4.    Other Circuits Agree That The Burden Is Miniscule

12       Precedents in other circuits—many strangely cited with putative favor by

13   Plaintiffs—support the conclusion that the burden here is minimal at most.  For example,

14   Plaintiffs' cite (at 7) *Husted I* for the proposition that "courts have found a severe burden

15   even where relatively small numbers of votes were not counted."  But as to the deficient

16   affidavit claims—which most closely resemble the claims here and also involved a low

17   number of affected voters—the Sixth Circuit held that the burden was "minimal" and

18   "unspecified."  696 F.3d at 600.  So too here.

19       Plaintiffs similarly rely (at 14) on *Obama for America v. Husted ("Husted II")*, 697

20   F.3d 423, 436 (6th Cir. 2012).  But *Husted II* specifically held that the burden at issue was

21   "not severe" even where "approximately 100,000 Ohio voters" could be denied the ability

22   to vote.  *Id.* at 431, 433.  It defies reason that an effect at least a full order of magnitude

23   less than a "not severe" burden is somehow "severe" itself.[11]

24       The Fourth Circuit has also upheld, as not severe, signature requirements far more

---

[11]   The Sixth Circuit has held that "[s]trict scrutiny is the standard for cases where 'the State totally denied the electoral franchise to a particular class of residents, and there was no way in which the members of that class could have made themselves eligible to vote.'"  *Mays*, 951 F.3d at 786 (citing *Rosario*, 410 U.S. at 758).  Nothing of the sort has occurred here.  There is no class denied the right to vote (save perhaps rule breakers, which is not cognizable) and Arizona voters have an extremely easy way to make their vote count: sign their name by election day.

1  stringent than here, such as notarization mandates.  *Kendall v. Balcerzak*, 650 F.3d 515,
2  525-27 (4th Cir. 2011).

3  **5.    Plaintiffs' Arguments Conflate The Burden Of Compliance
4          With Remedy For Non-Compliance**

5        Fundamentally, Plaintiffs' arguments are flawed because they conflate the burden
6  of the *actual requirement itself* with the *remedy* for non-compliance with the requirement.
7  But that conflation would render vast swaths of election law unconstitutional.   For
8  example, if a voter shows up to the polls one day late, his/her vote will not count.  But that
9  "disenfranchisement" (in Plaintiffs' parlance) does not mean that the requirement of voting
10 by election day is severe.  So too with registering to vote by deadlines or obtaining photo
11 identification.  Or even with voting for a candidate and having second thoughts during the
12 same time span as Plaintiffs'-sought cure period.  But none of these are "severe" burdens
13 on the right to vote.

14       The Supreme Court's opinions in *Crawford* underscore this point.  Of course, the
15 *remedy* for failing to have a photo identification would often be a vote not counting.  But
16 the Supreme Court looked to the actual burden of obtaining an ID—not the remedy for
17 lacking one.  *Supra* at 23-24 & n.10.

18       Here the burden is *trivially* low.  Following minimal, simple directions and signing
19 one's name is about as low as burdens go without being zero.  Thus, as in *Lemons*,
20 "Plaintiffs' argument 'proceeds from the erroneous assumption that a law that imposes any
21 burden upon the right to vote must be subject to strict scrutiny.'  *This premise is flawed*."
22 538 F.3d at 1103 (citation omitted) (emphasis added).

23       **C.    The Acts Survive Exacting Scrutiny**

24       Because the Acts do not impose a "severe burden" under the *Anderson-Burdick*
25 framework, this Court's inquiry into the constitutionality of the Act "is limited to whether
26 the chosen method is reasonably related to [an] important regulatory interest."  *Prete*, 438
27 F.3d at 971.  The Acts easily satisfy these requirements.  Indeed, Plaintiffs barely even
28 argue that their challenge can succeed if the Acts do not impose a "severe burden," instead

26

placing virtually all of their eggs in the "severe burden" basket.  *See* Mot. at 7-9.

### 1.   The Acts Serve Important State Interests

The Acts here serve *multiple* important state interests, any one of which is sufficient to sustain it against constitutional challenge.  Four such interests are readily apparent.

*First*, the Ninth Circuit has recognized that states have an "important regulatory interest in preventing fraud and its appearances in its electoral processes."  *Id.* at 969.  Indeed, that this interest is not merely important, but outright *compelling*.  *See Purcell*, 549 U.S. at 4 (2006) ("'A State indisputably has a compelling interest in preserving the integrity of its election process.'").  Requiring signatures furthers this compelling state interest by providing a form of verification.  And the recent fraud in North Carolina, New Jersey and California underscores the importance of the State's signature requirement in preventing voter fraud.  Atkeson Report ¶¶69-70; Napolitano Decl. Exs. K, P-U.

*Second*, the State has an interest in reducing the administrative burden on poll workers at a time when they are supposed to be busy tabulating ballots.  *See Ohio Democratic Party v. Husted*, 834 F.3d 620, 635 (6th Cir. 2016) (recognizing that "easing administrative burdens … undoubtedly [furthers] 'important regulatory interests'") (quoting *Crawford*, 553 U.S. at 194-96); *Lemons*, 538 F.3d at 1104-05 (recognizing "administrative burden" as important interest).  Because of the prevalent use of voting by mail, Arizona election results already take significant time and effort to calculate.  Atkeson Report ¶¶73-76.  But if poll workers and resources are diverted post-election to effectuate Plaintiffs' proposed remedy, election results will necessarily take *even longer* to process.  *See* Roads Decl. ¶¶18-19.  Indeed, it could potentially even hamper Arizona's ability to satisfy the 35-post-election-day safe harbor for selecting electoral college electors.  *See* 3 U.S.C. §5.  In contrast, by limiting no-signature cure efforts to election day and the weeks before it, the State prevents resource diversion away from tabulation.

*Third*, the State has an interest in "orderly administration" of elections, *Crawford*, 553 U.S. at 196, which is "weighty and undeniable," *Lemons*, 538 F.3d 1104.  And it is manifestly impossible to have elections *at all* without deadlines.  *See also infra* at 28-29.

A single cut-off for signing ballot affidavits (along with any necessary curing of non-signatures), getting absentee ballots delivered, and voting in-person (1) reduces voter confusion by reducing the number of relevant dates to know, (2) provides desirable finality and certainty, and (3) provides clear delineations for poll workers (*i.e.*, pre-election day and election day: focus on getting ballots in and validated/cured, and post-election day: focus on getting ballots counted). But Plaintiffs' aggressive second-guessing of every election deadline would be the antithesis of "orderly administration."

*Fourth*, the State has an interest in promoting voter participation/turnout. *See*, *e.g.*, *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020). And the availability of a post-election cure period actually tends to *increase* the number of disqualified votes. Atkeson Report ¶¶51-61. The State has an important interest in seeing that does not occur.

### 2.    The Acts Are "Reasonably Related" To These Interests

The Acts easily satisfy the tailoring requirement of "less exacting" review. Because the burdens at issue are not severe, this Court's inquiry "is limited to whether the chosen method is *reasonably related*" to these interests. *Prete*, 438 F.3d at 971 (emphasis added). "'[T]here is no requirement that the rule is the only or the best way to further the proffered interests.'" *Reagan*, 798 F.3d at 732 (citation omitted).

Plaintiffs notably do not dispute either that (1) the State may require a signature as a condition of voting by mail or (2) that the State may insist upon some deadline for doing so, either by initial compliance or cure. Plaintiffs simply contest that timing for the cure period. But since the poll-close deadline need not be "the only or the best way to further the" State's interests, *id.*, Plaintiffs' challenge necessarily fails. Poll-close is an eminently reasonable time to demand a voter either sign a ballot initially or cure a failure to do so. Indeed, three other states use the same election-day deadline and fifteen others provide no cure period at all. *Supra* at 25. There is no reason to believe that all of these states are acting beyond the bounds of constitutional reason.

More generally, Plaintiffs' arguments fly in the face of the concept of deadlines. As the Supreme Court has recognized, "'deadlines are inherently arbitrary,' while fixed

dates 'are often essential to accomplish necessary results.'" *United States v. Locke*, 471 U.S. 84, 94 (1985) (citation omitted).  In rejecting a shortly-after-the-deadline-should-be-good-enough argument much like Plaintiffs', the Court emphatically explained that "[t]he notion that a filing deadline can be complied with by filing sometime after the deadline falls due is, to say the least, a surprising notion, and it is a notion without limiting principle." *Id.* at 100-01.  Indeed, "If 1-day late filings are acceptable, 10-day late filings might be equally acceptable, and so on in a cascade of exceptions that would engulf the rule….; yet regardless of where the cutoff line is set, some individuals will always fall just on the other side of it." *Id.* at 101.  Plaintiffs' argument that the Constitution demands a five-business-day mulligan period should meet the same fate as in *Locke*.

Ultimately, the Acts' deadlines are at least as tailored as the typical 30-day notice-of-appeal deadline in federal court.  Both require parties to take very simple actions in about a month of time to preserve their rights.  And unlike a notice of appeal, the Acts require neither a filing fee nor substantive content of any sort.  But the concept that denying a "cure period" for late notices of appeal violates the Constitution is absurd.[12]

### D.    The Acts Survive Even Strict Scrutiny

For much the same reasons, the Acts would survive even if they did impose a "severe" burden triggering strict scrutiny.  Because Plaintiffs concede that the State can require signatures by some deadline, they necessarily concede the existence of a compelling state interest (which is plainly present in any event, *supra* at 27-28.

---

[12]  Plaintiffs advance a cursory argument (at 9) that they can prevail under any "level of scrutiny [that] applies."  That argument relies entirely on *Detzner*, which extended a cure period for non-signatures to signature mismatches.  Even assuming *Detzner* is correct, as explained above constitutional claims for signature mismatches are substantially stronger than those for non-signatures.  *Supra* at 15, 19-21.  Moreover, the Eleventh Circuit has specifically distinguished between the two, *supra* at 20, thus necessarily overruling any contrary reasoning of *Detzner*.  Plaintiffs' perfunctory attempt to force perfectly equal treatment of the two thus fails—particularly as the phrase "equal protection" does not even appear anywhere in Plaintiffs' motion.

Moreover, *Detzner*'s reasoning that a distinction between mismatches and non-signatures would "not even survive rational basis review," 2016 WL 6090943, at *7, merely demonstrates that court's grave misconception of constitutional standards given the obvious rational distinctions between the two.  And aside from relying on *Detzner*, Plaintiffs make no effort to explain how they could prevail under less exacting review.

Nor is there any reason to believe an election-day deadline for curing non-signatures is not narrowly tailored. That is, after all, the bedrock rule for in-person voting: do so by poll close or be "disenfranchised." And that deadline is utterly uncontroversial and certainly has never been found unconstitutional. The same should hold true for the State's non-signature cure deadline. That is particularly true as a contrary holding would gravely imperil—and likely doom—the laws of 18 other states. *Supra* at 25.

E.    **Plaintiffs Have Not Satisfied The Requirements For Facial Claims**

Plaintiffs' challenge is *necessarily* facial in nature, since they do not challenge any particular application of the Acts—or indeed join any voters at all. But facial challenges "are disfavored for several reasons," including that they "often rest on speculation," "run contrary to the fundamental principle of judicial restraint," and "threaten to short circuit the democratic process." *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450-51 (2008). For that reason, facial challenges fail unless "no set of circumstances exists under which the [Acts] would be valid." *Salerno,* 481 U.S. at 745.

Here there are obvious circumstances where Plaintiffs' theories fail even under their own terms. For example, if a voter receives notice of an absent signature three weeks before the election and opportunity to cure until election day, there is no reason to believe the absence of a further five-business-day-post-election cure period imposes an unconstitutional burden. Plaintiffs do not even allege as much. Indeed, even Plaintiffs recognize that *some* duration of cure period is constitutionally sufficient. And should those days occur pre-election, that provides constitutional applications of the Acts even if Plaintiffs' constitutional arguments otherwise had merit (and they don't).

Notably, Plaintiffs' Complaint and Motion are entirely silent as to the facial/as-applied distinction and Plaintiffs do not even *allege* that there are "no set of circumstances" under which the Acts would be constitutional. These omissions are fatal.

IV.    **THE REMAINING *WINTER* FACTORS PRECLUDE RELIEF**

Even if Plaintiffs had Article III standing and were likely to succeed on the merits, *but see supra* Sections I-III, their request for a preliminary injunction should still be denied

30

1    because Plaintiffs cannot satisfy any of the three other *Winter* factors.

2    **A.    Plaintiffs Are Not Likely To Suffer Cognizable Irreparable Harm**

3    Plaintiffs notably did not join any voters and thus cannot claim any direct
4    "disenfranchisement."  Moreover, as explained above, Plaintiffs lack Article III standing
5    to assert the rights of their unknown and unspecified members and resource-diversion
6    injury.  *Supra* at 7-12.  And, as their litigation strategy belies (*supra* at 4-5), Plaintiffs'
7    organizational interests are not to "count every vote" but rather to count more Democratic
8    votes than the votes for candidates of other parties.  Plaintiffs even backhandedly admit as
9    much, contending that "it is critical to the DNC's mission that every *Democratic* vote be
10   counted."  Complaint ¶20 (emphasis added).

11   There's nothing inherently wrong with that: that is, after all, is why political parties
12   exist.  But it necessarily means that Plaintiffs would only suffer the requisite harm if they
13   proved that their sought post-election cure period was "likely" to swing the results of an
14   upcoming election.  *Winter*, 555 U.S. at 20.

15   Plaintiffs have not remotely made such a showing.  Indeed, they don't even try: not
16   even alleging that non-signatures/lack of post-election cure opportunities affects more
17   Democratic than Republican voters.  *Supra* at 10.  And even if they had alleged that, the
18   arguments would fail because they are devoid of *any* evidential support and contrary to
19   Plaintiffs' own admissions.  *Id.*

20   Because Plaintiffs have failed to allege any cognizable irreparable harm that is
21   likely to occur absent a preliminary injunction, their motion should be denied.

22   **B.    The Balance Of Equities Disfavors Plaintiffs' Motion—Particularly
         Because Of Their Monumental Delay**
23

24   Even if Plaintiffs could somehow clear the likely-irreparable-harm hurdle, their
25   harms are dwarfed by Defendants'/the State's and the balance of equities therefore
26   precludes injunctive relief.  *Winter*, 555 U.S. at 20.  Even if Plaintiffs asserted harms were
27   actually cognizable, they are both minimal and minimally developed.  In particular:
28   (1) non-signature issues affect only a tiny percentage of voters (~0.10%) and it virtually

1   always is non-cognizable, self-inflicted injury, *supra* at 9 & n.1, (2) Plaintiffs' resource-

2   diversion arguments are skeletally developed and lacking in record support, *supra* at 10-

3   12, and (3) Plaintiffs have not even *alleged*—let alone proved—that their asserted harms

4   are likely to swing an election against a Democratic candidate.

5        The weight to be accorded Plaintiffs' alleged harms is also rightly discounted

6   enormously or entirely due to Plaintiffs' colossal delay in bringing this suit.  As the Ninth

7   Circuit has repeatedly recognized, delay in bringing suit properly "implies a lack of

8   urgency and irreparable harm."  *Oakland Tribune,* 762 F.2d at 1377.  And here the delay

9   is one for the record books: for 102 years Arizona has required absentee ballots to be signed

10  without giving an opportunity for post-election cure, *supra* at 5—without challenge by

11  Plaintiffs that entire time until this June.  The Ninth Circuit recently faulted plaintiffs for

12  delay between "the enactment of the [challenged Arizona law] in 2014 to filing suit in July

13  2019."  *Miracle*, 808 F. App'x at 473.  There is no reason why Plaintiffs' twenty-times-

14  over delay should fare any better.

15       Against Plaintiffs' insubstantial harms—which are further subject to massive

16  discounting on account of delay—Defendants' harms are weighty and clearly cognizable.

17  The State "'indisputably has a compelling interest in preserving the integrity of its election

18  process,'" *Purcell*, 549 U.S. at 4—which would be directly harmed by an injunction

19  directed at the State's single election-integrity requirement for absentee ballots.  Moreover,

20  "a state suffers irreparable injury whenever an enactment of its people or their

21  representatives is enjoined."  *Wilson*, 122 F.3d at 719.

22       Plaintiffs' remedy would also divert scarce resources at a time when they are sorely

23  needed for tabulation.  *Supra* at 27.  As four Justices recently explained, the burden on

24  states is particularly great where "the county clerks must now also learn, under

25  extraordinary time pressures … an entirely new system mandated by the District Court."

26  *Little v. Reclaim Idaho*, ___ U.S. ___, 2020 WL 4360897, at *2 (U.S. July 30, 2020) (Roberts,

27  C.J., concurring in grant of stay, joined by Alito, Gorsuch, and Kavanaugh, JJ.).  Here that

28  burden is particularly acute as Plaintiffs' remedy would require county recorders to

conduct primary and general elections under two different procedures.  Moreover, district courts should give "weight to the State's discretionary judgments about how to prioritize limited state resources across the election system as a whole."  *Id.*  Plaintiffs, however, seek to substitute their judgment for those of the state and county officials.

All of the State's harms thus greatly outweigh Plaintiffs' belatedly asserted and factually unsupported harms, thereby precluding injunctive relief.

## C.   The Public Interest And *Purcell* Doctrine Preclude Plaintiffs' Relief

"The Supreme Court has repeatedly instructed courts to exhibit caution when faced with … requests" that "seek[] to enjoin the State's election rules midway through the election cycle."  *Arizonans for Fair Elections v. Hobbs*, __ F. Supp. 3d __ 2020 WL 1905747, at *15 (D. Ariz. Apr. 17, 2020). "Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls.  *As an election draws closer, that risk will increase*."  *Purcell*, 549 U.S. at 4-5 (emphasis added).

Plaintiffs delay in filing is remarkable not only for its length (100+ years) but its proximity to the November election—*i.e.*, filed less than five months before the election. Because this case is not set for hearing until August 18—and only after breakneck pace of briefing and discovery—any injunction could only be issued with less than three months before the election.  And it would be further subject to stay/reversal by the Ninth Circuit or Supreme Court, thereby risking further conflicting orders and voter confusion.

The risk of confusion is particularly great here as Plaintiffs' delay precludes any possible relief for the August 4, 2020 primary.  Thus, Plaintiffs' proposed relief would require conducting the primary and general elections under two different sets of procedures and, for the general election, directly contrary to the procedures set forth in the Election Procedures Manual, *supra* at 7—*i.e.*, an invitation to confusion and chaos that is entirely avoidable.  In addition, Plaintiffs' proposed remedy is actually likely to *increase* the number of disqualified votes, which is not in the public interest.  *Supra* at 24-25.

*Purcell* doctrine and the public interest thus counsel strongly against issuing any

33

relief.  And that is particularly true as Plaintiffs' delay in bringing this suit so late in the 2020 election cycle is, to date, *entirely unexplained*.  If Plaintiffs had any colorable excuse for their monumental delay, they should have advanced it previously so that the State could contest it in its brief.  They haven't, and a reply brief would be too late to do so.

## V.   PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS FOR MANDATORY INJUNCTIVE RELIEF

Even if Plaintiffs could satisfy *Winter*'s requirements for issuance of *an* injunction, they still are not entitled to the mandatory injunction they seek.  Plaintiffs' requested injunction is necessarily "mandatory" in nature: seeking not just to prohibit ballot disqualification but the affirmative creation of an entirely new cure procedure for non-signatures.  Plaintiffs' request relief thus "'goes well beyond simply maintaining the status quo *pendente lite* and is particularly disfavored.'"  *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (cleaned up).  Plaintiffs seeking mandatory injunctions thus must satisfy a heightened burden; indeed, district courts must "*deny such relief*, 'unless the facts and law *clearly favor* the moving party.'"  *Id.* (emphasis added) (citation omitted)).  And restraint is particularly appropriate where, as here, the remedy sought is "transformative and intrusive [in] nature," *Little*, 2020 WL 4360897, at *2, which upsetting a hundred-plus years of settled law surely would be here.

For all the same reasons that Plaintiffs' arguments lack merit as explained above, the "facts and law" do not favor Plaintiffs at all, let alone "clearly" so.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied and their Complaint dismissed.

34

Respectfully submitted this 3rd day of August, 2020.

MARK BRNOVICH
ATTORNEY GENERAL

By: s/ Drew C. Ensign
Joseph A. Kanefield (No. 15838)
  *Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
  *Division Chief*
Drew C. Ensign (No. 25463)
Michael S. Catlett (No. 25238)
  *Deputy Solicitors General*
Jennifer J. Wright (No. 27145)
Robert J. Makar (No. 33579)
Anthony R. Napolitano (No. 34586)
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for State of Arizona*

# APPENDIX

Table 1.  50 State Absentee Vote-By-Mail Policies

| State | Drop Off at any Early Voting Location | Drop off at any Election Day Voting Location | Ballot Drop-boxes | On-line System to Track VBM ballots | Pays for Post-age | Election Day or Before VBM Receipt Deadline | Signature Matching Problem Cure Period (# of days) | No Signature Cure Period (# of days) |
|---|---|---|---|---|---|---|---|---|
| Alabama | | | | | | ✓ | NA | NA |
| Alaska | ✓ | ✓ | | ✓ | | | NA | NA |
| Arizona | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 5 | ED |
| Arkansas | | | | | | ✓ | NA | NA |
| California | ✓ | ✓ | ✓ | * | ✓ | | 2 days prior to certification | 2 days prior to certification |
| Colorado | ✓ | ✓ | ✓ | ✓ | | ✓ | 8 | 8 |
| Connecticut | | | | | | ✓ | NA | NA |
| Delaware | | | | ✓ | ✓ | ✓ | 0 | 0 |
| Florida | | | | ✓ | | ✓ | 2 | 2 |
| Georgia | | | | | | ✓ | ED | ED |
| Hawaii | ✓ | ✓ | | | ✓ | ✓ | 5 | 5 |
| Idaho | | | | ✓ | ✓ | ✓ | 0 | 0 |
| Illinois | | | | | | | 14 | 14 |
| Indiana | | | | | ✓ | ✓ | 0 | 0 |
| Iowa | | | | ✓ | ✓ | | NA | NA |
| Kansas | ✓ | ✓ | ✓ | | | ✓ | 0 | 0 |
| Kentucky | | | | | | ✓ | 0 | 0 |
| Louisiana | | | | | | ✓ | NA | NA |
| Maine | | | | | | ✓ | 0 | 0 |
| Maryland | | | | ✓ | | | NA | NA |
| Massachusetts | | | | ✓ | | ✓ | ED | ED |
| Michigan | | | | | | ✓ | ED | ED |
| Minnesota | | | | ✓ | ✓ | ✓ | NA | NA |
| Mississippi | | | | | | ✓ | NA | NA |
| Missouri | | | | | ✓ | ✓ | NA | NA |
| Montana | ✓ | ✓ | ✓ | ✓ | | ✓ | 1 | 1 |
| Nebraska | | | ✓ | ✓ | | ✓ | 0 | 0 |
| Nevada | | | | | ✓ | | 7 | 7 |
| New Hampshire | | | | | | ✓ | NA | NA |
| New Jersey | | | | | | | 0 | 0 |
| New Mexico | ✓ | ✓ | ✓ | | ✓ | ✓ | NA | NA |
| New York | | | | | | | 0 | 0 |
| North Carolina | ✓ | ✓ | | | | | NA | NA |
| North Dakota | | | | ✓ | | | 0 | 0 |
| Ohio | | | | ✓ | | | 7 | 7 |
| Oklahoma | | | | | | ✓ | NA | NA |
| Oregon | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 14 | 14 |
| Pennsylvania | | | | | | ✓ | 0 | 0 |
| Rhode Island | | | | ✓ | | ✓ | 7 | 7 |
| South Carolina | | | | ✓ | | ✓ | NA | NA |
| South Dakota | | | | | | ✓ | 0 | 0 |
| Tennessee | | | | | | ✓ | 0 | 0 |
| Texas | | | | | | ✓ | 0 | 0 |
| Utah | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | 7-14 | 7-14 |

36

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Vermont | | | | | | ✓ | NA | NA |
| Virginia | | | | | | ✓ | NA | NA |
| Washington | ✓ | ✓ | ✓ | ✓ | ✓ | | 21 | 21 |
| West Virginia | | | | ✓ | ✓ | | 0 | 0 |
| Wisconsin | | | | | ✓ | ✓ | NA | NA |
| Wyoming | | | | | | ✓ | NA | NA |
| Total State | 12 | 12 | 10 | 19 | 18 | 34 | NA | NA |

Note: ED stands for Election Day, NA stands for Not Applicable, these states do not rely on signature verification or signature verification alone to verify ballot eligibility.
* Some counties have ballot tracking.

Source:  Atkeson Expert Report, filed concurrently

**LOCAL RULE 12.1 CERTIFICATION**

Pursuant to Local Rule 12.1, I certify that before filing the instant motion I contacted opposing counsel on July 29, and informed them of the State's intention to file seek dismissal of the Complaint and the bases for it.  Plaintiffs' counsel indicated that they "don't intend to amend our complaint prior to the August 18 hearing."


 s/ Drew C. Ensign
Attorney for Intervenor-Defendant State of Arizona

38

**CERTIFICATE OF SERVICE**

I hereby certify that on this 3rd day of August, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

 s/ Drew C. Ensign
Drew C. Ensign

*Attorney for State of Arizona*