# EXHIBIT A

## CHAPTER 9.

(Senate Bill No. 20.)

### AN ACT

To Protect the Civil Rights of Arizonans Engaged in the Present War by Aiding in the Enforcement of the Selective Service Laws and Regulations of the United States.

**Be it Enacted by the Legislature of the State of Arizona:**

Section 1. Any person who furnishes or signs or aids or assists in furnishing or signing any false affidavit or certificate relating to the physical or financial or domestic relations condition of any person, which affidavit or certificate is used for the purpose of securing a deferred classification under the selective service regulations of the United States, shall be guilty of a felony and upon conviction thereof shall be punished by imprisonment for not less than one year.

Section 2. All Acts and parts of Acts in conflict with this Act are hereby repealed.

Section 3. Whereas an early operation of this Act is necessary for the protection of the public health, peace and safety of the State, an emergency is hereby declared to exist, and this Act shall be in full force and effect from and after its passage and approval by the Governor.

Approved June 20, 1918.

---

## CHAPTER 10.

(Senate Bill No. 19.)

### AN ACT

To Provide for the Americanization of Non-English Speaking Persons and Illiterates; to Provide and Maintain

Night Schools and Providing an Appropriation Therefor.

**Be it Enacted by the Legislature of the State of Arizona:**

Section 1. In any common school district within the State of Arizona where there are fifteen or more persons over sixteen years of age, who either do not read and write the English language, or who do not speak the English language, and who desire to attend a night school, the Board of Trustees of such district are hereby authorized and empowered to establish a night school, for the teaching of the English language, American ideals and an understanding of American institutions.

Section 2. For defraying the expenses of such night schools until June 30th, 1919, there is hereby appropriated out of the General Fund of the State not otherwise appropriated, the sum of Twenty-Five Thousand ($25,000.00) Dollars. The State Auditor is hereby authorized to draw warrant on the General Fund of the State for Twenty-Five Thousand ($25,000.00) Dollars, payable to the State Superintendent of Public Instruction, and the State Treasurer is hereby authorized to pay said warrants.

The State Superintendent of Public Instruction shall apportion the said sum of Twenty-five Thousand ($25,000 00) Dollars to cover the various counties of the State, according to the daily average of such night schools, which attendance shall be ascertained each month from reports of school trustees to the County School Superintendents, who shall, in turn, transmit the same to the Superintendent of Public Instruction.

Approved June 20, 1918.

---

## CHAPTER 11.

(Substitute House Bill No. 3.)

### AN ACT

To Enable Qualified Electors in the Military or Naval

Establishments of the State of Arizona or of the United States in Any Capacity to Exercise the Right of Suffrage while Absent From the State in Such Military Establishments; to Provide Penalties; to Repeal all Acts in Conflict with the Provisions of This Act; and to Declare an Emergency.

**Be it Enacted by the Legislature of the State of Arizona:**

Section 1. Notwithstanding any more general law respecting the time or manner of voting for candidates for office at any general or primary election, or the time or manner of voting on any question submitted to a popular vote, at a general election, or at any primary or general election where registration of votes is required by law, all qualified electors, in war time or after peace, in the actual military or naval establishments of this State, or of the United States in any capacity as defined by Congress, and by reason thereof absent from the State on any election day, shall be entitled to exercise the right of suffrage and to vote at such elections in the manner and form provided for in this Act and by the general and primary election laws now in effect in this State.

Section 2. The County Recorders of their respective counties shall immediately prepare a military register on which shall be entered the names of voters of his county, who are now absent or may hereafter be absent from their respective election precincts in time of war serving in the army, navy or other part of the military establishment of this State or the United States. The said register of voters shall be arranged in alphabetical order. Such register shall contain the name of the voter, as it appears on the records of the Army or Navy Department, his post office address, the county, precinct or city in which said voter has a legal residence; if he resides in a city, his street or residence number, or such other description as will identify the place of his residence. Said register shall contain the name or number or other designation of the Division, Regiment, Company, Troop, Vessel or other command in which the absent voter is serving at the time of such entry, so far as the Recorder can ascertain the same. If there are military reasons why any of this information should not be

placed on the register, a record of the same shall be kept in the Recorder's office. The Recorder shall obtain from the proper military or naval authorities of the nation, or from any other source that is available and expedient, the information required to carry out the provisions of this Act. In the future the Recorder shall keep a complete military register in accordance with the provisions of this section, which shall be a public record, not only of those who are now in the army or navy of the United States, but also of those who may, in future, enter the military service of the State or of the United States in any capacity. The Recorder shall file with the Clerk of the Board of Supervisors at least fifty (50) days before a statewide general or primary election, a copy of the military register as shown by the records of said office as revised and corrected to the date of its filing. Every public officer and every citizen shall furnish to the Recorder such information as he may possess relating to absent voters who are in the military establishments of the State or of the United States. Any person who shall refuse to furnish said information or shall willfully furnish false information with reference to such absent voter shall be deemed guilty of a felony and shall, on conviction thereof, be punished by imprisonment in the State Penitentiary not less than one nor more than three years.

Section 3. The said Board of Supervisors shall provide all necessary ballots, records, forms, blanks, envelopes, stationery, postage, blank forms, as may be necessary for the proper administration of the provisions of this Act. The said Clerk shall transmit to the proper places and to the proper persons all necessary papers, ballots, and instructions in strict compliance with the provisions of this Act, and the laws of primary and general elections, and shall administer the provisions in such a way as to carry out this Act according to its true intent and purpose; the Clerk shall prepare and print at least one official envelope for each absent voter for each primary or general election. Said envelope shall be

made out of substantial paper of a blue color. Hereafter, in this Act, said envelope shall be referred to as the "blue envelope." Upon one side of the said envelope shall be printed substantially the following:

### OFFICIAL WAR BALLOT FOR PRIMARY OR GENERAL ELECTION.

Date........................................, 19........

Name of voter............................................

Residence ..................................................

County of..................................................

City or Town of..........................................

Precinct or Ward of....................................

Present location..........................................

_____

(Clerk, Board of Supervisors.)

Upon the other side of the said blue envelope shall be printed substantially the following:

INSTRUCTIONS TO VOTERS: Before signing the affidavit read these instructions carefully:

(1) Insert in the blank space the name of the precinct in which the voter resided at the time of his enlistment. If the voter resides inside a city, insert the name of the city in the proper space and give the street number of his residence, or such description as will identify his place of residence.

(2) Insert in the proper space the Division, Regiment, Company, Troop, Vessel or other command to which the voter is attached at the time of signing this affidavit.

(3) The venue of this affidavit may be omitted if there are military reasons why it should be. The acknowledgement of this affidavit must be signed by a commissioned officer of the Army or of the Navy of the United States, who is acquainted with the voter. The officer signing the same shall add the rank of his com-

mission; whether Lieutenant, Captain, etc., and the subdivision to which he belongs.

### OATH OF ABSENT ELECTOR

(VENUE)

I do solemnly swear, or affirm, that I am a citizen of the United States; that I am of age of at least 21 years; that I am a resident of the State of Arizona; that my post office is........................., Arizona; that I have been for more than one year last preceding this election a resident of said State; that immediately prior to my enlistment I resided for more than thirty (30) days in the county of........................in......................... Precinct or City of........................; that I am in the military or naval service of the United States or of the State of Arizona; that I have inclosed in this envelope my ballot and that the same has been marked by me.

I hereby certify that on this day......................... of........................., 19................, the affiant subscribed and swore to the foregoing affidavit in my presence and hearing; that I am personally acquainted with the affiant and know that he is the identical person who signed the foregoing affidavit.

_____

(Officer.)

_____

(Rank.)

Section 4. The said Clerk, at least forty (40) days prior to any statewide primary or general election, shall fill in the proper spaces, in the blanks provided for on the outside of the blue envelope, the information that appears on the general register with reference to the name, residence, county, city, precinct, and home post office address of the absent voter, who at the time is in the naval or military service of the United States in some capacity and also the information with reference to the present address of said absent voter.

The information filled in these blank spaces shall be substantially what appears on the records in the Clerk's

office unless there is some military reason for not giving it in detail, but sufficient information shall be given to identify the residence of the voter in this State and his approximate lacation in the army or navy of the United States. After filling out these blanks on the blue envelope the same shall be signed by the Clerk of the Board of Supervisors, and the official seal of the Board shall be impressed on said envelope.

Section 5. The Clerk of the Board of Supervisors shall mail, by registered mail, taking receipt therefor, to every qualified voter whose name appears on the military register in the Clerk's office at least forty (40) days prior to any statewide primary or general election, one official ballot for each of the various political parties at any primary that polled 10 per cent or more, of the total vote cast at the previous general election and two official ballots for any general election. If the Army or Navy Department make any rules or regulations relating to the right of franchise and to the delivery of mail to persons in the military or naval service of the United States, the said Clerk shall comply with the regulations and be directed by the rulings of said Army or Navy Department. The Clerk shall also enclose with said ballots the blue envelope heretofore referred to, and a second envelope, addressed to "the Clerk, Board of Supervisors,_____, Arizona"; also a letter of instructions in substantially the following form:

## TO THE ABSENT VOTERS OF THE STATE OF ARIZONA in the MILITARY SERVICE OF THE NATION OR STATE:

In accordance with the provisions of the laws of Arizona, I am sending you herewith official primary (or general election, as the case may be), ballots for the following political parties: (Here insert the names of parties whose ballots are inclosed.) I am also enclosing a blue envelope and a second envelope, which is addressed to "the Clerk, Board of Supervisors,_____, Arizona," and this letter of instructions. It is of the utmost importance that you carefully read and understand these instructions and the affidavit on the outside of the blue envelope. In voting at the primary you are to use only one official primary ballot. Destroy the ballots

that are not used. Mark on the ballot of the political party, to which you are affiliated, your preference for office. In voting at a general election you are to use only one official ballot. The extra ballot is sent you to be used by you in case the other is spoiled; destroy the ballot not used by you. Do not return any but the ballot marked. You can write in on these ballots the name of the person for whom you desire to vote and whose name is not printed on the ballot; and you should place a cross in the square to the right of such name so written in. Place the ballot that you have marked in the blue envelope. Subscribe and swear to the affidavit on the outside of said envelope before any commissioned American officer, who is acquainted with you. A FAILURE TO RETURN THE BLUE ENVELOPE WILL PREVENT YOUR VOTE FROM BEING COUNTED. You are at liberty to make inquiry as to the proper may to cast your ballot, but in casting it you should do so privately. No one has any right to see or know how you vote. After enclosing your ballot in the blue envelope, seal said envelope up securely, enclose it in the other envelope which is addressed to the Clerk, Board of Supervisors,_____, _____, Arizona. Seal up said envelope and place the necessary postage thereon. Do not make any identification marks of any kind on the outside of the envelope addressed to the said Clerk. As your vote must be canvassed on the day of election at_____, Arizona, the_____day of_____, 19_____, it is important that you return your ballot immediately.

_____

(Clerk, Board of Supervisors.)

Section 6. The method of voting at a primary or general election under the provisions of this Act shall be the same as that provided for by the general laws of this State. The instructions given to voters with reference to general election, except as modified by this Act, shall govern and control. The voter may write on the ballot the name of any person for whom he desires to vote, making a cross (X) on the square to the right thereof. The general method for marking the ballot, both on candidates and constitutional amendments, laws initiated and laws referred, shall be the same as that provided by the general election laws of this State. A voter shall

have the right to make inquiry of any source he may deem proper for information as to the proper method of casting his ballot. No one has any right to see or know how the voter cast his ballot. He shall not mark his ballot in the presence of anyone unless he is physically unable to mark his ballot. In that instance, he may require assistance. After he marks his official ballot he shall insert it in the blue envelope. Thereafter he shall swear and subscribe to the affidavit on the back of the blue envelope, before an American Commissioned Officer who is acquainted with him. He shall then securely seal the blue envelope, insert in it the envelope addressed to the said Clerk, seal up the outside envelope addressed to the Clerk and place sufficient postage thereon. There shall be no identification marks placed on the outside of the envelope so addressed. The ballot not used shall be destroyed. The said Clerk shall ascertain what postage is necessary to carry said envelope and shall insert the amout in the instructions sent to the voter. All votes cast at a primary or general election held under the provisions of this Act by absent voters, who at the time of the election are in the military service of the United States or of the State of Arizona, must be returned to and received by the said Clerk on election day, before the closing of the polls. The Board of Supervisors shall count and canvass all votes received by it up to the hour of closing of the polls on election day from absent voters, and shall not canvass or count any ballots which are received by said Board after said polls are closed on election day.

Section 7. The Board of Supervisors and Clerk shall sit on primary or general election day as an Election Board for the purpose of depositing the ballots cast under the provisions of this Act; in depositing the votes on the day of election cast under the provisions of this Act the Board of Supervisors shall open, in the presence of each other, the envelope addressed to the Clerk of said Board and shall thereafter examine the name and affidavit of the voter that appears on the blue envelope. If the voter has signed the affidavit in compliance with the provisions of this Act and it appears to the Board that he is entitled to cast his ballot, said Board, in the presence of each other, shall open the blue envelope and examine the ballot, being careful not to open said ballot or disclose the secrecy of the vote, therein inclosed for

the purpose of ascertaining whether or not said ballot is one sent out by said Clerk. If the ballot inclosed is one that has been sent out by the Clerk, the Board shall deposit the same in a suitable sealed ballot box. It is not necessary that all the ballots be placed in the same ballot box, but the Board shall proceed so as to protect the absolute secrecy of the ballot. In canvassing the votes cast under the provisions of this Act, the law relating to the duties and powers of judges, and clerks of election and election boards generally, shall, in so far as applicable, apply to the said Clerk and Board of Supervisors sitting as an election board on said election day. In case there is a conflict, the provisions of this Act shall governor. All envelopes addressed to the Clerk of the Board of Supervisors containing ballots cast at any primary or general election shall be, from the time of delivery until the votes are cast and canvassed, under the absolute and exclusive control of the said Clerk and Board. Said Board shall make whatever provision is necessary to properly care for said ballots and to prevent the loss of any of said ballots or any tampering therewith.

Section 8. No informality in the manner of carrying out the provisions of this Act shall invalidate the election held under the same or rejection of the returns thereof, and this Act shall be liberally construed for the parposes herein expressed. All elections held under the provisions of this Act shall be subject to contest and inquiry in the same manner as elections held within this State.

Section 9. All the provisions of the penal laws relating to crimes against the elective franchise shall be deemed to apply to all elections held under the provisions of this Act. Any person who shall violate any such provisions shall be subject to the penalties prescribed by the laws of this State. The duties imposed upon officers under the provisions of this Act are mandatory and any officer who shall fail or neglect to perform the duties imposed upon him by the provisions of this Act shall be deemed guilty of a misdemeanor and upon conviction shall be fined in any sum not exceeding Five Hundred Dollars ($500). Where no other penalty is imposed, any person violating any of the provisions of this Act shall be fined not to exceed One Hundred Dollars ($100) or

be imprisoned in the County Jail not to exceed three (3) months.

Section 10. All Acts or parts of Acts in conflict with the provisions of this Act are hereby repealed.

Section 11. WHEREAS, in order to preserve the public health, peace and safety, an emergency is hereby declared to exist and the provisions of this Act are hereby exempt from the referendum provision of the State Constitution.

Approved June 20, 1918.

---

## CHAPTER 12.

### (Senate Bill No. 11.)

### AN ACT

Entitled: "An Act to Extend Protection to the Civil Rights of Members of the Military and Naval Establishments of the United States Engaged in the Present War," With an Emergency Clause.

**Be it Enacted by the Legislature of the State of Arizona:**

### ARTICLE I.

#### General Provisions.

Section 1. That for the purpose of enabling the United States the more successfully to prosecute and carry on the war in which it is at present engaged, and for the purpose of enabling the State of Arizona to lend full and vigorous aid to the Federal Government in the prosecution of said war, protection is hereby extended to persons in the military service of the United States, in order to prevent prejudice or injury to their civil rights during their term of service, and to enable them to devote their entire energy to the military needs of the Na-

tion, and to this end the following provisions are made for the temporary suspension of legal proceedings and transactions which may prejudice the civil rights of persons in such service during the continuance of the present war.

Section 2. (a) That the term "persons in military service," as used in this Act, shall include the following persons and no others; all officers and enlisted men of the Regular Army, the Regular Army Reserve, the Officers' Reserve Corps, and the Enlisted Reserve Corps; all officers and enlisted men of the National Guard and National Guard Reserve recognized by the Militia Bureau of the War Department; all forces raised under the Act entitled "An Act to Authorize the President to Increase Temporarily the Military Establishment of the United States", approved May eighteenth, Nineteen Hundred and Seventeen; all officers and enlisted men of the Navy, and Marine Corps, and the Coast Guard; all officers and enlisted men of the Naval Militia, Naval Reserve force, Marine Corps Reserve, and National Naval Volunteers recognized by the Navy Department; all officers of the Public Health Service detailed by the Secretary of the Treasury for duty either with the Army or the Navy; any of the personnel of the Lighthouse Service and of the Coast and Geodetic Survey transferred by the President to the service and jurisdiction of the War Department or of the Navy Department; members of the Nurse Corps; field clerks who have taken the oath as members of the Military forces of the United States; and members of any other body who have heretofore or may hereafter become a part of the military or naval forces of the United States. The term "Military Service", as used in this definition, shall signify active service in any branch of service heretofore mentioned or referred to, but reserves and persons on the retired list shall not be included in the term "persons in military service" until ordered to active service. The term "active service" shall include the period during which a person in military service is absent from duty on account of sickness, wounds, leave, or other lawful cause.

(b) The term "period of military service", as used in this Act, shall include the time between the following dates: For persons in active service at the date of the approval of this Act it shall begin with the date of approval of this Act, for persons entering service after the

# EXHIBIT B

Alexis E. Danneman (SBA #030478)
Joshua L. Boehm (SBA #033018)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona  85012-2788
Telephone:  602.351.8000
Facsimile:  602.648.7000
ADanneman@perkinscoie.com
JBoehm@perkinscoie.com
DocketPHX@perkinscoie.com

Kevin J. Hamilton (Wash. Bar #15648)
KHamilton@perkinscoie.com
Marc Erik Elias (D.C. Bar #442007)*
MElias@perkinscoie.com
William B. Stafford (Wash. Bar #39849)
WStafford@perkinscoie.com
Sarah Langberg Schirack (Alaska Bar #1505075)
SSchirack@perkinscoie.com
Ariel Brynne Glickman (Va. Bar #90751)
AGlickman@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, DC  20005
Telephone:  202.654.6200
Facsimile:  202.654.6211
*Pro Hac Vice Application To Be Filed

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| The Arizona Democratic Party, et al., | No. CV-20-1143-PHX-DLR |
|---|---|
| Plaintiffs, | |
| v. | **PLAINTIFF ARIZONA DEMOCRATIC PARTY'S RESPONSES AND OBJECTIONS TO THE STATE'S FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION AND REQUESTS FOR PRODUCTION** |
| Katie Hobbs, et al., | |
| Defendants, | |
| and | Assigned to the Honorable Douglas L. Rayes |
| State of Arizona, Republican National Committee, Arizona Republican Party, and Donald J. Trump for President, Inc., | |
| Intervenor-Defendants. | |

Notwithstanding this response, ADP objects to this Request to the extent it can be construed as asking ADP to provide—in the guise of a response to an interrogatory—what would amount to a complete legal brief with supporting evidentiary showing on the issue of standing, and seeks to impose obligations or requirements on ADP that are greater than or different from those imposed by the Federal Rules of Civil Procedure and local Court rules. ADP is prepared to submit pre-hearing or post-hearing briefing that may be requested by the Court on relevant issues, including standing, and objects to this Request as overbroad and unduly burdensome.

**INTERROGATORY 2:**

If YOU contend that YOU have any members in Arizona, identify any such member and provide contact information, including name, address, and phone number.

**Response:** Without waiving objections, as noted in response to Interrogatory 1, ADP's members/constituents in Arizona consist of all Democratic voters in the State, who ADP supports, educates, and works to ensure have access to the franchise.

Notwithstanding this response, ADP objects to this Request as overly broad, not reasonably calculated to lead to the discovery of admissible evidence, and information that is already within the State's possession, by virtue of voters selecting their political affiliation when they register to vote. In this lawsuit, ADP challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. The burden of this Request for the specific identities and contact information of ADP members, particularly in light of the expedited nature of discovery, and the minimal (if any) probative value of the information sought, is not proportional to the needs of the case pursuant to Rule 26(b)(1). *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015) (unnecessary to identify members where defendant need not "know the identity of a particular member to understand and respond to an organization's claim of injury"). Further, this overbroad Request seeks confidential information and improperly invades the privacy interests of third-party non-litigants to the extent it purports to require ADP to provide the personal contact information of all ADP members/constituents.

**INTERROGATORY 3:**

If YOU contend that YOU have any members in Arizona, identify any such member who YOU believe is likely to be an absentee voter and who is likely to fail to sign the mail-in ballot, and provide the basis for, and describe any evidence supporting, your belief.

**Response:** Without waiving objections, ADP cannot identify any such voters in advance of an election. However, it is certain that voters will be directly harmed by an inadequate cure period for ballot affidavits that are unable to be remedied after Election Day, given that Democratic Party voters represent nearly one-third of the total registered voters in Arizona, millions of Arizonans vote by mail, and thousands of Arizonans did not

sign their ballot affidavits in recent elections. In Maricopa County alone, the county recorder rejected 1,856 unsigned ballot affidavits in the 2018 general election and 2,209 in the 2016 general election. ADP may not know in advance *which* voters will have ballots rejected due to "missing" signatures but knows that *some* voters will.

Notwithstanding this response, ADP objects to this Request as overly broad, not proportional to the needs of this case, and on the ground that it seeks information that is already within the State's possession, by virtue of county recorders rejecting Democratic voters' unsigned ballot affidavits. In this lawsuit, ADP challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. The burden of this Request for the specific identities of ADP members, particularly in light of the expedited nature of discovery, and the minimal (if any) probative value of the information sought, is not proportional to the needs of the case pursuant to Rule 26(b)(1). Further, this overbroad Request seeks confidential information and improperly invades the privacy interests of third-party non-litigants.

**INTERROGATORY 4:**

If YOU contend that a particular democratic candidate will be negatively impacted by the signature requirement or the lack of a cure period for missing signatures on absentee ballots, identify any such candidate, and provide the basis for, and describe any evidence supporting, your belief.

**Response:**   Without waiving objections, all Democratic candidates are harmed when votes are not counted. ADP's mission is to support the election of Democratic candidates. In particular, in Arizona, some of ADP's constituents—whose ballots will be rejected for missing signatures without the ability to cure them post-election—will inevitably vote for Democratic candidates. This certainty will hurt every Democratic candidate on the ballot in the State.

Notwithstanding this response, ADP objects to this Request as overly broad and information that is already within the State's possession, by virtue of county recorders rejecting voters' unsigned ballot affidavits.

**INTERROGATORY 5:**

If YOU contend that YOU have organizational standing to bring the ACTION, describe the factual and legal basis for that contention.

**Response:**   Without waiving objections, ADP has, among other things, spent, and continues to spend, money in Arizona to support efforts to cure ballot affidavits that have not been signed by its constituents. *See Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002) (noting an organization has "direct standing to sue [when] it show[s] a drain on its resources from both a diversion of its resources and frustration of its mission"). In

-12-

**INTERROGATORY 16:**

If YOU contend that the error rate for non-signature determinations for ballot affidavits by Defendants could exceed 5%, describe the factual and legal basis for that contention.

**Response:**   Without waiving objections, ADP does not advance a contention as to the particular "error rate" for "non-signature determinations" for ballot affidavits by Defendants. ADP does not have access to all early ballot affidavits submitted to county recorders throughout the 23 years in which voters have been able to vote by mail without any excuse (or in the 40 years where mail-in ballots have been authorized for some voters), such that ADP could review them and verify that a given percentage of those ballots was rejected in error for "non-signature determinations" (which ADP presumes means ballots that did in fact bear the signature of the voter in question, contrary to county election officials' determination that such ballots were not signed).

Notwithstanding this response, ADP objects to this Request as vague and ambiguous, as neither "error rate" nor "non-signature determinations" is defined, and the Request fails to provide a time frame to which this Request applies. The Request also seeks largely irrelevant information. *See* Fed. R. Civ. P. 26(b)(1). In this lawsuit, ADP challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. ADP does not advance any argument as to "non-signature determinations." Disenfranchisement of even a single voter imposes a severe burden on the right to vote. The "error rate" of "non-signature determinations" thus has minimal, if any, probative worth and, if anything, a "low" error rate would suggest the burden on the State of implementing the relief ADP seeks would be minimal.

**INTERROGATORY 17:**

If YOU contend that the error rate for non-signature determinations for ballot affidavits by Defendants could exceed 1%, describe the factual and legal basis for that contention.

**Response:**   Without waiving objections, ADP does not advance a contention as to the particular "error rate" for "non-signature determinations" for ballot affidavits by Defendants. ADP does not have access to all early ballot affidavits submitted to county recorders throughout the 23 years in which voters have been able to vote by mail without any excuse (or in the 40 years where mail-in ballots have been authorized for some voters), such that ADP could review them and verify that a given percentage of those ballots was rejected in error for "non-signature determinations" (which ADP presumes means ballots that did in fact bear the signature of the voter in question, contrary to county election officials' determination that such ballots were not signed).

**INTERROGATORY 19:**

If YOU contend that the State of Arizona refusing to permit registered voters that arrive at polling places the day after an election is a "severe burden" under Anderson-Burdick doctrine, describe the factual and legal basis for that contention.

**Response:**   Without waiving objections, in this lawsuit, ADP challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. Necessarily, such voters have cast their mail-in ballots before the applicable Election Day deadline, and what is at issue is the signature verification process—not whether such voters have timely cast their ballots. ADP does not advance any contentions, in this lawsuit, regarding the burdens imposed on voters who arrive at polling places the day after Election Day.

Notwithstanding this response, ADP objects to this Request to the extent it can be construed as asking ADP to opine on the legal standard governing a claim it has not brought. Given the nature of the actual claims presented in this lawsuit, the requested information has minimal, if any, probative worth, and any such probative worth is far outweighed by the cost, burden, and intrusion of identifying such information.

**INTERROGATORY 20:**

If YOU contend that voters who fail to sign their mail-in ballot affidavits are more likely to vote for Democratic candidates than Republican candidates, describe the factual and legal basis for that contention.

**Response:**   Without waiving objections, ADP does not advance the contention that voters who fail to sign mail-in ballot affidavits have been categorically more likely to vote for Democratic candidates than Republican candidates over the course of Arizona state history.

Notwithstanding this response, ADP objects to this Request on the basis that it is irrelevant, vague, and ambiguous. In this lawsuit, ADP challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. ADP does not advance an equal protection or other claim premised on differential treatment of Republican and Democratic voters. The relative burden of the challenged law on voters intending to vote Democratic or Republican in a given election (or throughout Arizona history) is not relevant to ADP's claim. For example, a law that requires Democrats to pay $1,000 to vote would be just as unconstitutional if Republicans had to pay $1,100 to vote. Accordingly, the requested information has minimal, if any, probative worth, and such probative worth is far outweighed by the cost, burden, and intrusion of identifying such information. Moreover, all ballots in Arizona are secret, and thus this information is not publicly available. In addition, the Request is vague to the extent it is unclear whether it seeks information about voters in the upcoming 2020 election or

Dated: July 9, 2020                    By: */s/ William B. Stafford*

Alexis E. Danneman
Joshua L. Boehm
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012
Telephone:  602.351.8000
Facsimile:  602.648.7000
ADanneman@perkinscoie.com
JBoehm@perkinscoie.com

Kevin J. Hamilton
Marc Erik Elias
William B. Stafford
Sarah Langberg Schirack
Ariel Brynne Glickman
PERKINS COIE LLP
700 Thirteenth Street NW, Suite 800
Washington, DC 20005
Telephone:  202.654.6200
Facsimile:  202.654.6211
KHamilton@perkinscoie.com
MElias@perkinscoie.com
WStafford@perkinscoie.com
SSchirack@perkinscoie.com
AGlickman@perkinscoie.com

*Counsel for Plaintiffs*

-32-

**<u>VERIFICATION</u>**

      Herschel Fink

I, _____, state that I am duly authorized by the Arizona Democratic Party ("ADP") to verify the foregoing Responses to the State's First Set of Interrogatories. This verification represents ADP's response and not the response of any particular individual. The facts stated in the foregoing Responses are accurate to the best of my knowledge and belief, based upon ADP's business records, information provided by other employees of ADP, and information provided to ADP.

               July 9, 2020

Signed under the pains and penalties of perjury this \_\_ day of July 2020.

               DocuSigned by:

               *Herschel Fink*

               EF81EED11A58492...

EXHIBIT C

Alexis E. Danneman (SBA #030478)
Joshua L. Boehm (SBA #033018)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
ADanneman@perkinscoie.com
JBoehm@perkinscoie.com
DocketPHX@perkinscoie.com

Kevin J. Hamilton (Wash. Bar #15648)
KHamilton@perkinscoie.com
Marc Erik Elias (D.C. Bar #442007)*
MElias@perkinscoie.com
William B. Stafford (Wash. Bar #39849)
WStafford@perkinscoie.com
Sarah Langberg Schirack (Alaska Bar #1505075)
SSchirack@perkinscoie.com
Ariel Brynne Glickman (Va. Bar #90751)
AGlickman@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: 202.654.6200
Facsimile: 202.654.6211
*Pro Hac Vice Application To Be Filed

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| The Arizona Democratic Party, et al., | No. CV-20-1143-PHX-DLR |
| Plaintiffs, | |
| v. | **PLAINTIFF DEMOCRATIC NATIONAL COMMITTEE'S RESPONSES AND OBJECTIONS TO THE STATE'S FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION AND REQUESTS FOR PRODUCTION** |
| Katie Hobbs, et al., | |
| Defendants, | |
| and | |
| State of Arizona, Republican National Committee, Arizona Republican Party, and Donald J. Trump for President, Inc., | Assigned to the Honorable Douglas L. Rayes |
| Intervenor-Defendants. | |

**INTERROGATORY 3:**

If YOU contend that YOU have any members in Arizona, identify any such member who YOU believe is likely to be an absentee voter and who is likely to fail to sign the mail-in ballot, and provide the basis for, and describe any evidence supporting, your belief.

**Response:**    Without waiving objections, the DNC cannot identify any such voters in advance of an election. However, it is certain that voters will be directly harmed by an inadequate cure period for ballot affidavits that are unable to be remedied after Election Day, given that Democratic Party voters represent nearly one-third of the total registered voters in Arizona, millions of Arizonans vote by mail, and thousands of Arizonans did not sign their ballot affidavits in recent elections. In Maricopa County alone, the county recorder rejected 1,856 unsigned ballot affidavits in the 2018 general election and 2,209 in the 2016 general election. The DNC may not know in advance *which* voters will have ballots rejected due to "missing" signatures but knows that *some* voters will.

Notwithstanding this response, the DNC objects to this Request as overly broad, not proportional to the needs of this case, and on the ground that it seeks information that is already within the State's possession, by virtue of county recorders rejecting Democratic voters' unsigned ballot affidavits. In this lawsuit, the DNC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. The burden of this Request for the specific identities of DNC members, particularly in light of the expedited nature of discovery, and the minimal (if any) probative value of the information sought, is not proportional to the needs of the case pursuant to Rule 26(b)(1). Further, this overbroad Request seeks confidential information and improperly invades the privacy interests of third-party non-litigants.

**INTERROGATORY 4:**

If YOU contend that a particular democratic candidate will be negatively impacted by the signature requirement or the lack of a cure period for missing signatures on absentee ballots, identify any such candidate, and provide the basis for, and describe any evidence supporting, your belief.

**Response:**    Without waiving objections, all Democratic candidates are harmed when votes are not counted. The DNC's mission is to support the election of Democratic candidates. In particular, in Arizona, some of the DNC's constituents—whose ballots will be rejected for missing signatures without the ability to cure them post-election—will inevitably vote for Democratic candidates. Therefore, the fact that there is no post-Election Day cure period will hurt every Democratic candidate on the ballot in the State.

Notwithstanding this response, the DNC objects to this Request as overly broad and information that is already within the State's possession, by virtue of county recorders rejecting voters' unsigned ballot affidavits.

-13-

hearing or post-hearing brief. The DNC further objects to this Request to the extent it seeks to impose obligations or requirements on the DNC that are greater than or different from those imposed by the Federal Rules of Civil Procedure and local Court rules.

**INTERROGATORY 16:**

If YOU contend that the error rate for non-signature determinations for ballot affidavits by Defendants could exceed 5%, describe the factual and legal basis for that contention.

**Response:**   Without waiving objections, the DNC does not advance a contention as to the particular "error rate" for "non-signature determinations" for ballot affidavits by Defendants. The DNC does not have access to all early ballot affidavits submitted to county recorders throughout the 23 years in which voters have been able to vote by mail without any excuse (or in the 40 years where mail-in ballots have been authorized for some voters), such that the DNC could review them and verify that a given percentage of those ballots was rejected in error for "non-signature determinations" (which the DNC presumes means ballots that did in fact bear the signature of the voter in question, contrary to county election officials' determination that such ballots were not signed).

Notwithstanding this response, the DNC objects to this Request as vague and ambiguous, as neither "error rate" nor "non-signature determinations" is defined, and the Request fails to provide a time frame to which this Request applies. The Request also seeks largely irrelevant information. *See* Fed. R. Civ. P. 26(b)(1). In this lawsuit, the DNC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. The DNC does not advance any argument as to "non-signature determinations." Disenfranchisement of even a single voter imposes a severe burden on the right to vote. The "error rate" of "non-signature determinations" thus has minimal, if any, probative worth and, if anything, a "low" error rate would suggest the burden on the State of implementing the relief the DNC seeks would be minimal.

**INTERROGATORY 17:**

If YOU contend that the error rate for non-signature determinations for ballot affidavits by Defendants could exceed 1%, describe the factual and legal basis for that contention.

**Response:**   Without waiving objections, the DNC does not advance a contention as to the particular "error rate" for "non-signature determinations" for ballot affidavits by Defendants. The DNC does not have access to all early ballot affidavits submitted to county recorders throughout the 23 years in which voters have been able to vote by mail without any excuse (or in the 40 years where mail-in ballots have been authorized for some voters), such that the DNC could review them and verify that a given percentage of those ballots was rejected in error for "non-signature determinations" (which the DNC presumes

**INTERROGATORY 19:**

If YOU contend that the State of Arizona refusing to permit registered voters that arrive at polling places the day after an election is a "severe burden" under *Anderson-Burdick* doctrine, describe the factual and legal basis for that contention.

**Response:**    Without waiving objections, in this lawsuit, the DNC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. Necessarily, such voters have cast their mail-in ballots before the applicable Election Day deadline, and what is at issue is the signature verification process—not whether such voters have timely cast their ballots. The DNC does not advance any contentions, in this lawsuit, regarding the burdens imposed on voters who arrive at polling places the day after Election Day.

Notwithstanding this response, the DNC objects to this Request to the extent it can be construed as asking the DNC to opine on the legal standard governing a claim it has not brought. Given the nature of the actual claims presented in this lawsuit, the requested information has minimal, if any, probative worth, and any such probative worth is far outweighed by the cost, burden, and intrusion of identifying such information.

**INTERROGATORY 20:**

If YOU contend that voters who fail to sign their mail-in ballot affidavits are more likely to vote for Democratic candidates than Republican candidates, describe the factual and legal basis for that contention.

**Response:**    Without waiving objections, the DNC does not advance the contention that voters who fail to sign mail-in ballot affidavits have been categorically more likely to vote for Democratic candidates than Republican candidates over the course of Arizona state history.

Notwithstanding this response, the DNC objects to this Request on the basis that it is irrelevant, vague, and ambiguous. In this lawsuit, the DNC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. The DNC does not advance an equal protection or other claim premised on differential treatment of Republican and Democratic voters. The relative burden of the challenged law on voters intending to vote Democratic or Republican in a given election (or throughout Arizona history) is not relevant to the DNC's claim. For example, a law that requires Democrats to pay $1,000 to vote would be just as unconstitutional if Republicans had to pay $1,100 to vote. Accordingly, the requested information has minimal, if any, probative worth, and such probative worth is far outweighed by the cost, burden, and intrusion of identifying such information. Moreover, all ballots in Arizona are secret, and thus this information is not publicly available. In addition, the Request is vague to the extent it is unclear whether it seeks information about voters in the upcoming 2020 election or

1

Dated: July 9, 2020                         By: */s/ William B. Stafford*

2

3                                              Alexis E. Danneman
                                               Joshua L. Boehm
4                                              PERKINS COIE LLP
                                               2901 North Central Avenue, Suite 2000
5                                              Phoenix, Arizona 85012
                                               Telephone:  602.351.8000
6                                              Facsimile:  602.648.7000
                                               ADanneman@perkinscoie.com
7                                              JBoehm@perkinscoie.com

8
                                               Kevin J. Hamilton
9                                              Marc Erik Elias
                                               William B. Stafford
10                                             Sarah Langberg Schirack
                                               Ariel Brynne Glickman
11                                             PERKINS COIE LLP
                                               700 Thirteenth Street NW, Suite 800
12                                             Washington, DC 20005
                                               Telephone:  202.654.6200
13                                             Facsimile:  202.654.6211
                                               KHamilton@perkinscoie.com
14                                             MElias@perkinscoie.com
                                               WStafford@perkinscoie.com
15                                             SSchirack@perkinscoie.com
                                               AGlickman@perkinscoie.com
16

17

18

19                                             *Counsel for Plaintiffs*

20

21

22

23

24

25

26

27

28                                             -33-

## <u>VERIFICATION</u>

Reyna S. Walters-Morgan

I, _____, state that I am duly authorized by the Democratic National Committee ("DNC") to verify the foregoing Responses to the State's First Set of Interrogatories. This verification represents the DNC's response and not the response of any particular individual. The facts stated in the foregoing Responses are accurate to the best of my knowledge and belief, based upon the DNC's business records, information provided by other employees of the DNC, and information provided to the DNC.

July 9, 2020

Signed under the pains and penalties of perjury this __ day of July 2020.

DocuSigned by:

*Reyna S. Walters-Morgan*

D8EDD2A9522146A...

_____

EXHIBIT D

Alexis E. Danneman (SBA #030478)
Joshua L. Boehm (SBA #033018)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
ADanneman@perkinscoie.com
JBoehm@perkinscoie.com
DocketPHX@perkinscoie.com

Kevin J. Hamilton (Wash. Bar #15648)
KHamilton@perkinscoie.com
Marc Erik Elias (D.C. Bar #442007)*
MElias@perkinscoie.com
William B. Stafford (Wash. Bar #39849)
WStafford@perkinscoie.com
Sarah Langberg Schirack (Alaska Bar #1505075)
SSchirack@perkinscoie.com
Ariel Brynne Glickman (Va. Bar #90751)
AGlickman@perkinscoie.com
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 800
Washington, DC 20005
Telephone: 202.654.6200
Facsimile: 202.654.6211
*Pro Hac Vice Application To Be Filed

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| The Arizona Democratic Party, et al., | No. CV-20-1143-PHX-DLR |
| Plaintiffs, | |
| v. | **PLAINTIFF DSCC'S RESPONSES AND OBJECTIONS TO THE STATE'S FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION AND REQUESTS FOR PRODUCTION** |
| Katie Hobbs, et al., | |
| Defendants, | |
| and | Assigned to the Honorable Douglas L. Rayes |
| State of Arizona, Republican National Committee, Arizona Republican Party, and Donald J. Trump for President, Inc., | |
| Intervenor-Defendants. | |

**INTERROGATORY 3:**

If YOU contend that YOU have any members in Arizona, identify any such member who YOU believe is likely to be an absentee voter and who is likely to fail to sign the mail-in ballot, and provide the basis for, and describe any evidence supporting, your belief.

**Response:**   Without waiving objections, DSCC cannot identify any such voters in advance of an election. However, it is certain that voters will be directly harmed by an inadequate cure period for ballot affidavits that are unable to be remedied after Election Day, given that Democratic Party voters represent nearly one-third of the total registered voters in Arizona, millions of Arizonans vote by mail, and thousands of Arizonans did not sign their ballot affidavits in recent elections. In Maricopa County alone, the county recorder rejected 1,856 unsigned ballot affidavits in the 2018 general election and 2,209 in the 2016 general election. DSCC may not know in advance *which* voters will have ballots rejected due to "missing" signatures but knows that *some* voters will.

Notwithstanding this response, DSCC objects to this Request as overly broad, not proportional to the needs of this case, and on the ground that it seeks information that is already within the State's possession, by virtue of county recorders rejecting Democratic voters' unsigned ballot affidavits. In this lawsuit, DSCC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. The burden of this request for the specific identities of DSCC members, particularly in light of the expedited nature of discovery, and the minimal (if any) probative value of the information sought, is not proportional to the needs of the case pursuant to Rule 26(b)(1). Further, this overbroad Request seeks confidential information and improperly invades the privacy interests of third-party non-litigants.

**INTERROGATORY 4:**

If YOU contend that a particular democratic candidate will be negatively impacted by the signature requirement or the lack of a cure period for missing signatures on absentee ballots, identify any such candidate, and provide the basis for, and describe any evidence supporting, your belief.

**Response:** Without waiving objections, all Democratic candidates are harmed when votes are not counted. DSCC's mission is to support the election of Democratic candidates for U.S. Senate. In particular, in Arizona, some of DSCC's constituents—whose ballots will be rejected for missing signatures without the ability to cure them post-election—will inevitably vote for Democratic candidate for Senate Mark Kelly. This certainty will hurt every Democratic candidate on the ballot in the State.

Notwithstanding this response, DSCC objects to this Request as overly broad and information that is already within the State's possession, by virtue of county recorders rejecting voters' unsigned ballot affidavits.

-12-

pre-hearing or post-hearing brief. DSCC further objects to this Request to the extent it seeks to impose obligations or requirements on DSCC that are greater than or different from those imposed by the Federal Rules of Civil Procedure and local Court rules.

**INTERROGATORY 16:**

If YOU contend that the error rate for non-signature determinations for ballot affidavits by Defendants could exceed 5%, describe the factual and legal basis for that contention.

**Response:**    Without waiving objections, DSCC does not advance a contention as to the particular "error rate" for "non-signature determinations" for ballot affidavits by Defendants. DSCC does not have access to all early ballot affidavits submitted to county recorders throughout the 23 years in which voters have been able to vote by mail without any excuse (or in the 40 years where mail-in ballots have been authorized for some voters), such that DSCC could review them and verify that a given percentage of those ballots was rejected in error for "non-signature determinations" (which DSCC presumes means ballots that did in fact bear the signature of the voter in question, contrary to county election officials' determination that such ballots were not signed).

Notwithstanding this response, DSCC objects to this Request as vague and ambiguous, as neither "error rate" nor "non-signature determinations" is defined, and the Request fails to provide a time frame to which this Request applies. The Request also seeks largely irrelevant information. *See* Fed. R. Civ. P. 26(b)(1). In this lawsuit, DSCC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. DSCC does not advance any argument as to "non-signature determinations." Disenfranchisement of even a single voter imposes a severe burden on the right to vote. The "error rate" of "non-signature determinations" thus has minimal, if any, probative worth and, if anything, a "low" error rate would suggest the burden on the State of implementing the relief DSCC seeks would be minimal.

**INTERROGATORY 17:**

If YOU contend that the error rate for non-signature determinations for ballot affidavits by Defendants could exceed 1%, describe the factual and legal basis for that contention.

**Response:**    Without waiving objections, DSCC does not advance a contention as to the particular "error rate" for "non-signature determinations" for ballot affidavits by Defendants. DSCC does not have access to all early ballot affidavits submitted to county recorders throughout the 23 years in which voters have been able to vote by mail without any excuse (or in the 40 years where mail-in ballots have been authorized for some voters), such that DSCC could review them and verify that a given percentage of those ballots was rejected in error for "non-signature determinations" (which DSCC presumes means ballots

1

**INTERROGATORY 19:**

2

3

If YOU contend that the State of Arizona refusing to permit registered voters that arrive at polling places the day after an election is a "severe burden" under *Anderson-Burdick* doctrine, describe the factual and legal basis for that contention.

4

5

**Response:**   Without waiving objections, in this lawsuit, DSCC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. Necessarily, such voters have cast their mail-in ballots before the applicable Election Day deadline, and what is at issue is the signature verification process—not whether such voters have timely cast their ballots. DSCC does not advance any contentions, in this lawsuit, regarding the burdens imposed on voters who arrive at polling places the day after Election Day.

6

7

8

9

10

Notwithstanding this response, DSCC objects to this Request to the extent it can be construed as asking DSCC to opine on the legal standard governing a claim it has not brought. Given the nature of the actual claims presented in this lawsuit, the requested information has minimal, if any, probative worth, and any such probative worth is far outweighed by the cost, burden, and intrusion of identifying such information.

11

12

13

**INTERROGATORY 20:**

14

If YOU contend that voters who fail to sign their mail-in ballot affidavits are more likely to vote for Democratic candidates than Republican candidates, describe the factual and legal basis for that contention.

15

16

17

**Response:**   Without waiving objections, DSCC does not advance the contention that voters who fail to sign mail-in ballot affidavits have been categorically more likely to vote for Democratic candidates than Republican candidates over the course of Arizona state history.

18

19

20

Notwithstanding this response, DSCC objects to this Request on the basis that it is irrelevant, vague, and ambiguous. In this lawsuit, DSCC challenges the State's failure to extend the same cure period, as applied to signature matching requirements, to missing signatures. DSCC does not advance an equal protection or other claim premised on differential treatment of Republican and Democratic voters. The relative burden of the challenged law on voters intending to vote Democratic or Republican in a given election (or throughout Arizona history) is not relevant to DSCC's claim. For example, a law that requires Democrats to pay $1,000 to vote would be just as unconstitutional if Republicans had to pay $1,100 to vote. Accordingly, the requested information has minimal, if any, probative worth, and such probative worth is far outweighed by the cost, burden, and intrusion of identifying such information. Moreover, all ballots in Arizona are secret, and thus this information is not publicly available. In addition, the Request is vague to the extent it is unclear whether it seeks information about voters in the upcoming 2020 election or

21

22

23

24

25

26

27

-22-

28

Dated: July 9, 2020                    By: */s/ William B. Stafford*

                                       Alexis E. Danneman
                                       Joshua L. Boehm
                                       PERKINS COIE LLP
                                       2901 North Central Avenue, Suite 2000
                                       Phoenix, Arizona 85012
                                       Telephone:  602.351.8000
                                       Facsimile:  602.648.7000
                                       ADanneman@perkinscoie.com
                                       JBoehm@perkinscoie.com

                                       Kevin J. Hamilton
                                       Marc Erik Elias
                                       William B. Stafford
                                       Sarah Langberg Schirack
                                       Ariel Brynne Glickman
                                       PERKINS COIE LLP
                                       700 Thirteenth Street NW, Suite 800
                                       Washington, DC 20005
                                       Telephone:  202.654.6200
                                       Facsimile:  202.654.6211
                                       KHamilton@perkinscoie.com
                                       MElias@perkinscoie.com
                                       WStafford@perkinscoie.com
                                       SSchirack@perkinscoie.com
                                       AGlickman@perkinscoie.com

                                       *Counsel for Plaintiffs*

-32-

## **VERIFICATION**

I, ___Sara Schaumburg_____, state that I am duly authorized by DSCC to verify the foregoing Responses to the State's First Set of Interrogatories. This verification represents the DSCC's response and not the response of any particular individual. The facts stated in the foregoing Responses are accurate to the best of my knowledge and belief, based upon DSCC's business records, information provided by other employees of DSCC, and information provided to DSCC.

Signed under the pains and penalties of perjury this __ day of July 2020.

July 9, 2020

DocuSigned by:

*Sara Schaumburg*

37D0F3D6FE63468...

# EXHIBIT E

Roopali H. Desai (024295)
D. Andrew Gaona (028414)
Kristen Yost (034052)
**COPPERSMITH BROCKELMAN PLC**
2800 North Central Avenue, Suite 1900
Phoenix, Arizona  85004
T:  (602) 381-5478
F:  (602) 224-6020
rdesai@cblawyers.com
agaona@cblawyers.com
kyost@cblawyers.com

*Attorneys for Defendant Arizona Secretary of State*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| The Arizona Democratic Party, et al., | No. CV-20-01143-PHX-DLR |
| Plaintiffs, | |
| v. | **DEFENDANT ARIZONA SECRETARY OF STATE'S RESPONSE TO PLAINTIFFS' FIRST SET OF INTERROGATORIES** |
| Katie Hobbs, in her official capacity as Arizona Secretary of State, et al., | |
| Defendants. | |
| State of Arizona, et al. | |
| Intervenor Defendants. | |

Defendant Katie Hobbs, in her official capacity as Arizona Secretary of State ("Secretary") responds to Plaintiff's First Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

These General Objections apply to the Plaintiffs' Interrogatories generally and to each Definition, Instruction, and individual Interrogatory and, unless otherwise stated, shall have the same force and effect as if set forth in full in response to each Definition, Instruction, and individual Interrogatory. The fact that an objection is not listed herein

does not constitute a waiver of that objection or otherwise preclude the Secretary from raising that objection at a later time.

The Secretary objects to the Definitions and Instructions, as well as each individual Interrogatory, to the extent that they are vague, ambiguous, overly broad, lacking in reasonable particularity, unreasonable or seek the discovery of information that is not relevant to the claims or defenses of any party to the action, as well as to the extent that the Interrogatories impose a burden and/or expense on the Secretary that is not proportionate to the needs of the case or that outweighs the benefit of the proposed discovery. Subject to and without waiving this objection, in responding to Plaintiffs' Interrogatories, the Secretary will comply, and construe the Definitions and Instructions consistently with the Federal Rules of Civil Procedure.

The Secretary objects to the Interrogatories to the extent that they seek information that is: (a) protected by the attorney-client privilege, the work-product doctrine, or any other applicable privilege or discovery protection; (b) already in Plaintiffs' possession, custody, or control; and/or (c) publicly available or otherwise equally available to Plaintiffs.

### RESPONSES TO INTERROGATORIES

**1.     Explain why you agreed to include a provision in the draft Election Procedures Manual, dated October 2019, that: "Voters must be permitted to correct or confirm a[] . . . missing signature until 5:00 p.m. on the fifth business day after a primary, general, or special election that includes a federal office or the third business day after any other election" ("Additional Cure Period").**

**RESPONSE:**     The Secretary objects to Interrogatory No. 1 because it is vague and overbroad by making an unqualified request for all reasons "why" the Secretary agreed to include the quoted provision. Subject to that objection, the Secretary interprets Interrogatory No. 1 as requesting any reason that may be relevant to any party's claims or defenses in the above-entitled action.

The Secretary agreed to include the Additional Cure Period[1] in the draft Election Procedures Manual released to the Attorney General and Governor on October 1, 2019 for the following reasons:

In November 2018, the Navajo Nation, Joyce Nez, Denise Johnson, Ashley Atene, Sr., Irene Roy, Bonnie Tsosie, and Dale Smith (collectively, the "Navajo Nation Plaintiffs") filed a voting rights lawsuit in the United States District Court for the District of Arizona against the Secretary's predecessor, Michele Reagan, and elections officials in Apache County, Navajo County, and Coconino County. *Navajo Nation, et al. v. Hobbs, et al.*, Case 3:18-cv-08329-DWL. After taking office in 2019, the Secretary replaced Secretary Reagan as a defendant in the case.

In April 2019, the Secretary resumed discussing potential settlement with the Navajo Nation Plaintiffs, picking up from a discussion with the prior administration in December 2018. Among other requests, the Navajo Nation Plaintiffs asked the Secretary to include a rule in the Elections Procedures Manual that allows voters to "cure" missing signatures on their early ballots until the fifth business day after an election that includes a federal office or the third business day after any other election. The Attorney General's Office [2] represented the Secretary in Navajo Nation lawsuit, and they advised the Secretary regarding her authority to enter the settlement agreement and include the requested cure period in the Elections Procedures Manual.

With the assistance of counsel, the Secretary entered into a Settlement Agreement with the Navajo Nation Plaintiffs effective August 6, 2019 (the "Navajo Nation Settlement"). Pursuant to the Navajo Nation Settlement, the Secretary agreed to "cause the draft Elections Procedures Manual to contain language essentially similar to the following: If a voter fails to sign an early ballot affidavit, the County Recorder or other

---

[1] The Secretary uses "Additional Cure Period" as that term is defined in Interrogatory No. 1.

[2] Specifically, former Assistant Attorney General Joseph LaRue and Assistant Attorney General Kara Karlson.

1   officer in charge of elections shall make reasonable efforts to contact the voter, advise the

2   voter of the missing signature, and allow the voter to cure the deficiency. The County

3   Recorder or other officer in charge of elections shall allow signatures to be corrected not

4   later than the fifth business day after a primary, general, or special election that includes

5   a federal office or the third business day after any other election." [*See Navajo Nation*,

6   Doc. 44-2]

7        United States District Judge Dominic W. Lanza approved the Navajo Nation

8   Settlement and dismissed the plaintiffs' claims against the Secretary "pursuant to . . . the

9   terms of the Settlement Agreement and Joint Stipulation." [*Navajo Nation*, Doc. 51]

10        The Secretary entered into the Navajo Nation Settlement in good faith and with

11   intent to fully perform her obligations. The Secretary agreed to include the Additional

12   Cure Period in the draft Elections Procedures Manual pursuant to her authority to

13   "prescribe rules to achieve and maintain the maximum degree of correctness, impartiality,

14   uniformity and efficiency on the procedures for early voting and voting, and of producing,

15   distributing, collecting, counting, tabulating and storing ballots." A.R.S. § 16-452(A).

16   The Additional Cure Period is a procedure for collecting and counting early voting

17   ballots.

18        The Secretary believed that the Additional Cure Period for ballots with missing

19   signatures was authorized pursuant to A.R.S. § 16-550(A) and A.R.S. § 16-452.  A.R.S.

20   § 16-550(A) allows voters whose ballot signatures are inconsistent with their voter

21   registration records to correct or confirm their inconsistent signatures until the fifth

22   business day after an election that includes a federal office or the third business day after

23   any other election. Because this statute is silent on the cure period for ballots with <u>missing</u>

24   signatures, the Secretary believed that it was within her authority under A.R.S. § 16-452

25   to fill this procedural gap and adopt the same cure period for ballots with missing

26   signatures. A.R.S. § 16-452 specifically directs the Secretary to "prescribe rules" in the

27   Elections Procedures Manual "to achieve and maintain the maximum degree of

28   correctness, impartiality, uniformity and efficiency on the procedures for early voting

and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots." In the Secretary's view, there is no meaningful difference between a ballot with a missing signature and a ballot with a mismatched signature. The voter's signature serves as a means of identity verification, and in both instances, the problem is that the voter's identity cannot be verified—a problem that is resolved by notifying the voter and allowing them to correct the problem and verify their identity.

Further, the Elections Procedures Manual provides for the same cure period for conditional provisional ballots when a voter fails to present identification at a voting location on Election Day. *See* 2019 Elections Procedures Manual Ch. 9 § IV ("A voter who provides no proof of identity (or invalid proof of identity) must be issued a conditional provisional ballot. A.R.S. § 16-579(A)(2). In order for a conditional provisional ballot to count, the voter must present an acceptable form of identification to the County Recorder by 5:00 p.m. on the 5th business day following a primary, general, or special election that includes an election for a federal office, or by 5:00 p.m. on the 3rd business day following any other election."). Forgetting to sign an early ballot is, in the Secretary's view, the functional equivalent of forgetting to bring identification to the polls. Voters who forget to bring identification may still cast votes, but their votes only count if they return during the cure period to verify their identity. The Secretary believed that a consistent cure period should be available for early ballot voters who forget to provide their signature (i.e., identification) on the ballot affidavit.

To that end, the Secretary agreed to include the Additional Cure Period in the Elections Procedure Manual to ensure uniformity, efficiency, and impartiality by adopting identical time periods for voters to "cure" early ballots with "mismatched" signatures, early ballots with "missing" signatures, and conditional provisional ballots. The Secretary believed that adopting uniform cure procedures would benefit Arizona's voters by reducing voter confusion and by ensuring that eligible voters are not excluded from the democratic process simply because they forgot to sign their name or misunderstood the instructions on their ballots. The Secretary also felt that statewide

uniform procedures for curing early ballots with missing signatures would not impose a significant burden on county election officials, because all counties already were required to employ a post-election cure period for mismatched signatures and conditional provisional ballots, *see* 2014 and 2019 Elections Procedures Manuals; A.R.S. § 16-550(A). However, the counties were inconsistent in the way they handled early ballots with missing signatures. Therefore, the Secretary further believed that including the Additional Cure Period for ballots with missing signatures would "achieve and maintain the maximum degree of correctness" by increasing consistency across the counties and ensuring that more eligible voters' ballots are actually counted in the election.

**2.     Explain how you believed that the Additional Cure Period "achieve[d] and maintain[ed] the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots" as required by A.R.S. § 16-452.**

**RESPONSE:**     The Secretary was advised by counsel, the Attorney General's Office, regarding her authority under A.R.S. § 16-452 to include the Additional Cure Period in the Elections Procedures Manual.

The Secretary believed that the Additional Cure Period for ballots with missing signatures was authorized pursuant to A.R.S. § 16-550(A) and A.R.S. § 16-452. A.R.S. § 16-550(A) allows voters whose ballot signatures are inconsistent with their voter registration records to correct or confirm their inconsistent signatures until the fifth business day after an election that includes a federal office or the third business day after any other election. Because this statute is silent on the cure period for ballots with <u>missing</u> signatures, the Secretary believed that it was within her authority under A.R.S. § 16-452 to fill this procedural gap and adopt the same cure period for ballots with missing signatures. A.R.S. § 16-452 specifically directs the Secretary "prescribe rules" in the Elections Procedures Manual "to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and

voting, and of producing, distributing, collecting, counting, tabulating and storing ballots." In the Secretary's view, there is no meaningful difference between a ballot with a missing signature and a ballot with a mismatched signature. In both instances, the problem is that the voter's identity cannot be verified—a problem that is resolved by notifying the voter and allowing them to verify their identity.

Further, the Elections Procedures Manual provides for the same cure period for conditional provisional ballots when a voter fails to present identification at a voting location on an election day. *See* 2019 Elections Procedures Manual Ch. 9 § IV ("A voter who provides no proof of identity (or invalid proof of identity) must be issued a conditional provisional ballot. A.R.S. § 16-579(A)(2). In order for a conditional provisional ballot to count, the voter must present an acceptable form of identification to the County Recorder by 5:00 p.m. on the 5th business day following a primary, general, or special election that includes an election for a federal office, or by 5:00 p.m. on the 3rd business day following any other election."). Forgetting to sign an early ballot is, in the Secretary's view, the functional equivalent of forgetting to bring identification to the polls. Voters who forget to bring identification may still cast votes, but their votes only count if they return during the cure period to verify their identity. The Secretary believed that the same should be true for early ballot voters who forget their signature (i.e., identification).

To that end, the Secretary agreed to include the Additional Cure Period in the Elections Procedure Manual to ensure uniformity, efficiency, and impartiality by adopting identical time periods for voters to "cure" early ballots with "mismatched" signatures, early ballots with "missing" signatures, and conditional provisional ballots. The Secretary believed that adopting uniform cure procedures would benefit Arizona's voters by reducing voter confusion and by ensuring that eligible voters are not excluded from the democratic process simply because they forgot to sign their name or misunderstood the instructions on their ballots. The Secretary also felt that statewide uniform procedures for curing early ballots with missing signatures would not impose a

significant burden on county election officials, because all counties already were required to employ a post-election cure period for mismatched signatures and conditional provisional ballots, *see* 2014 and 2019 Elections Procedures Manuals; A.R.S. § 16-550(A). However, the counties were inconsistent in the way they handled early ballots with missing signatures. Therefore, the Secretary further believed that including the Additional Cure Period for ballots with missing signatures would "achieve and maintain the maximum degree of correctness" by ensuring that more eligible voters' ballots are actually counted in the election.

**3.     Identify what burdens, if any, you anticipated the Additional Cure Period would impose on any election officials or the State of Arizona.**

**RESPONSE:**      The Secretary objects to the term "burdens" as vague and ambiguous. Subject to that objection, and construing the term "burdens" according to its ordinary meaning, the Secretary anticipated that the Additional Cure Period would presumably result in more voters curing their early ballots after an election day, which would require county elections officials to process those cured ballots. However, because the counties already were required to handle the "cure" process for early ballots with mismatched signatures and conditional provisional ballots, the Secretary anticipated that the Additional Cure Period would not cause any significant increase in costs or resources.

Some counties have indicated that the Additional Cure Period would not cause an administrative burden at all. For example, election officials in Apache County, Navajo County, and Coconino County—all of whom entered into their own settlement agreements with the Navajo Nation Plaintiffs—have indicated that they would prefer to adopt the Additional Cure Period. Other county officials have expressed that they would prefer not to adopt the Additional Cure Period. For example, the Secretary is aware that Pima County Recorder F. Ann Rodriguez has publicly opposed the Additional Cure Period.

**4.     Identify why you believed that the benefits of including the Additional Cure Period outweighed any burdens identified in your response to Interrogatory**

1    **No. 3, such that you included the Additional Cure Period in the October 2019 draft**
2    **Elections Procedure Manual.**

3         **RESPONSE:**        The Secretary objects to the terms "benefits," "burdens," and
4    "outweighed" as vague and ambiguous. Subject to that objection, and construing these
5    terms according to their ordinary meanings, the Secretary responds as follows:

6         In the Secretary's view, there is no meaningful difference between a ballot with a
7    missing signature and a ballot with a mismatched signature. The voter's signature serves
8    as a means of identity verification, and whether the voter's signature is missing or deemed
9    a mismatch, the problem is that the voter's identity cannot be verified—a problem that is
10   resolved by notifying the voter and allowing them to resolve the deficiency. Because
11   A.R.S. § 16-550(A) is silent on the cure period for ballots with <u>missing</u> signatures, the
12   Secretary believed that it was within her authority under A.R.S. § 16-452 to adopt uniform
13   cure periods for ballots with missing signatures and ballots with inconsistent signatures.
14   It is also the Secretary's view that forgetting to sign an early ballot is the functional
15   equivalent of forgetting to bring identification to the polls on Election Day. The Secretary
16   thus believed that it was within her authority under A.R.S. § 16-452 to adopt a uniform
17   post-election cure period for early ballot voters who forgot to provide their signature (i.e.,
18   identification) on the early ballot affidavit and conditional provisional ballot voters who
19   forgot to bring identification on Election Day. *See* 2019 Elections Procedures Manual
20   Ch. 9 § IV.

21        The Secretary believed that the Additional Cure Period in the Elections Procedures
22   Manual would ensure uniformity, efficiency, and impartiality by adopting identical time
23   periods for voters to "cure" early ballots with "mismatched" signatures, early ballots with
24   "missing" signatures, and conditional provisional ballots. The Secretary believed that
25   adopting uniform cure procedures would benefit Arizona's voters by reducing voter
26   confusion and by ensuring that eligible voters are not excluded from the democratic
27   process simply because they forgot to sign their name or misunderstood the instructions
28   on their ballots. The Secretary also felt that statewide uniform procedures for curing early

ballots with missing signatures would not impose a significant burden on county election officials, because all counties already were required to employ a post-election cure period for mismatched signatures and conditional provisional ballots, *see* 2014 and 2019 Elections Procedures Manuals; A.R.S. § 16-550(A). However, the counties were inconsistent in the way they handled early ballots with missing signatures. Therefore, the Secretary further believed that the Additional Cure Period for ballots with missing signatures would "achieve and maintain the maximum degree of correctness" by ensuring that more eligible voters' ballots are actually counted in the election.

The Secretary believed that county officials could feasibly implement the Additional Cure Period with existing resources. To be sure, the Secretary anticipated that the Additional Cure Period would presumably result in more voters curing their early ballots after Election Day, which would require county elections officials to process those cured ballots. But the counties already were required to implement a post-election "cure" process for early ballots with mismatched signatures and conditional provisional ballots, so the Secretary anticipated that the Additional Cure Period would not cause any significant increase in costs or resources. Some counties have indicated that the Additional Cure Period would not cause an administrative burden at all. For example, election officials in Apache County, Navajo County, and Coconino County—all of whom entered into their own settlement agreements with the Navajo Nation Plaintiffs—have indicated that they would prefer to adopt the Additional Cure Period.

**5.     Explain why the Additional Cure Period is not included in the final Elections Procedure Manual, which went into effect on December 20, 2019 ("Final Manual").**

**RESPONSE:**     The Secretary objects to Interrogatory No. 5 because it is vague and overbroad by making an unqualified request for all reasons "why" the Additional Cure Period was not included in the final Elections Procedures Manual. Subject to that objection, the Secretary interprets Interrogatory No. 5 as requesting any

1 reason that may be relevant to any party's claims or defenses in the above-entitled action,

2 and responds as follows:

3       Under A.R.S. § 16-452(B), the Elections Procedures Manual must "be issued not

4 later than December 31 of each odd-numbered year immediately preceding the general

5 election," and it must first "be approved by the governor and the attorney general." The

6 Secretary is required to "submit the manual to the governor and the attorney general not

7 later than October 1 of the year before each general election." *Id.* On October 1, 2019, the

8 Secretary sent the Attorney General and the Governor a draft Elections Procedures

9 Manual that included the Additional Cure Period.

10       On November 12, 2020, Evan Daniels, on behalf of the Attorney General's Office,

11 sent a revised draft Elections Procedures Manual to Assistant Secretary of State Allie

12 Bones and Election Services Director Sambo (Bo) Dul. The Attorney General's Office

13 included a spreadsheet explaining the purpose of each revision, and a cover letter that

14 categorized the revisions as "critical," "important," "recommendations," or "discussion

15 items." The "critical" items were described as "[i]nstances where the draft Manual

16 violates or conflicts with statutory provisions, exceeds statutory authority, or fails to

17 address the Manual's statutory requirements." In the revised draft, the Attorney General's

18 Office made the following revisions to the Additional Cure Period:

19
20
21
22
23
24
> If **not satisfied** that the signatures were made by the same person ~~or if the early ballot affidavit is missing a signature~~, the County Recorder shall make a reasonable and meaningful attempt to contact the voter via mail, phone, text message, and/or email, notify the voter of the inconsistent signature, and allow the voter to ~~provide,~~ correct~~,~~ or confirm the signature. The County Recorder shall attempt to contact the voter as soon as practicable using any contact information available in the voter's record and any other source reasonably available to the County Recorder.

25
26
27
28
> Voters must be permitted to correct or confirm an inconsistent ~~or missing~~ signature until 5:00 p.m. on the fifth business day after a primary, general, or special election that includes a federal office or the third business day after any other election. For the purposes of determining the applicable signature cure deadline~~.: (i)~~ the PPE is considered a federal election~~; and (ii) for counties that operate under a four-day workweek, only days on~~

1   which the applicable county office is open for business are considered

2   "business days.".

3   If the early ballot affidavit is not signed, the County Recorder shall reject

4   the ballot.   The County Recorder shall then make a reasonable and
    meaningful attempt to contact the voter via mail, phone, text message,

5   and/or email, to notify the voter the ballot was rejected and provide the voter
    an opportunity to cast a replacement early or provisional ballot before

6   7:00pm on Election Day.  The County Recorder shall attempt to contact the
    voter as soon as practicable using any contact information available in the

7   voter's record and any other source reasonably available to the County

8   Recorder.  Neither replacement ballots nor provisional ballots can be issued
    after 7:00pm on Election Day.

9

10          The Attorney General's Office labeled these revisions as "critical" in the

11   accompanying spreadsheet, and claimed that allowing a voter to "cure" an unsigned early

12   ballot violates Arizona law. The Attorney General's office insisted that the unsigned

13   ballot must be rejected and a "[n]ew ballot must be issued and received before the close

14   of elections."

15          The Secretary believed that the Attorney General's proposed requirement that

16   elections officials automatically "reject" an early ballot with a missing signature would

17   create an unnecessary barrier for voters to ensure their ballot is counted. Refusing to allow

18   voters to cure their unsigned ballots would prevent eligible voters from having their votes

19   counted simply because they misunderstood the instructions or forgot to sign their ballots.

20   The Secretary's Office provided notes in the Attorney General's spreadsheet explaining

21   that: the Additional Cure Period is not prohibited by Arizona law; the relevant statute is

22   silent on the cure period for early ballots with missing signatures; the Secretary has

23   authority to fill in that procedural gap through the Elections Procedures Manual; and the

24   Secretary has an obligation to include the Additional Cure Period under the Navajo Nation

25   Settlement. The Secretary's Office further explained that the Additional Cure Period

26   would establish uniformity among the counties, and the Attorney General's position

27   would needlessly disenfranchise voters.

28

The Additional Cure Period ultimately became one of the final points of disagreement in the Attorney General's review, and he refused to approve the Elections Procedures Manual with the Additional Cure Period.[3] While the Attorney General does not have the final say on the draft, the Secretary cannot issue the final Elections Procedures Manual without his approval. A.R.S. § 16-452(B). Indeed, the Attorney General refused to approve the draft manual in 2018, so the Elections Procedures Manual had not been updated since 2014. The Secretary decided that it was in the best interest of Arizona's voters that their elections officials rely on an updated manual as they head into an important election year.

On December 17, 2019, Allie Bones, Bo Dul, and William Gaona from the Secretary's Office had a final meeting with Joseph Kanefield, Beau Roysden, Evan Daniels, and Jennifer Wright from the Attorney General's Office and Anni Foster and Daniel Ruiz from the Governor's Office to negotiate the final revisions to the Elections Procedures Manual. In the end, to get the Attorney General to approve the manual, the Secretary accepted his removal of the Additional Cure Period, but she revised his new proposed language to instead allow voters to "cure the missing signature or cast a replacement ballot before 7:00pm on Election Day." 2019 Elections Procedures Manual Ch. 2 § VI.A.1. The Secretary believed that an updated Elections Procedures Manual was too important to abandon over a disagreement on the issue, the 7:00pm Election Day cure period was better for voters than no cure period at all as the Attorney General initially insisted, and the availability of a post-election cure period could be further addressed in subsequent litigation by the Navajo Nation or other plaintiffs or through legislation.

---

[3] The Arizona Capitol Times reported that "an aide to [Attorney General] Brnovich said he will provide his approval only if the manual removes the language about voters being able to cure their ballots after Election Day." Howard Fischer, *Navajo Nation threatens AG with lawsuit over elections procedures*, Ariz. Capitol Times (Dec. 18, 2019), https://azcapitoltimes.com/news/2019/12/18/navajo-nation-threatens-ag-with-lawsuit-over-elections-procedures/.

6.      **Aside from anyone in your office, identify the individuals or entities involved in preventing the Additional Cure Period from being included in the Final Manual.**

**RESPONSE:**      The Secretary objects to Interrogatory No. 6 because the term "involved in preventing" is vague, ambiguous, and overbroad. Subject to that objection, the Secretary identifies the following individuals and entities:

The Office of the Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200

Mark Brnovich, Arizona Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200

Joseph Kanefield, Chief Deputy and Chief of Staff
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200

Beau Roysden, Appeals and Constitutional Litigation Division Chief
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200

Evan Daniels, Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200

Jennifer Wright, Assistant Attorney General
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200

These attorneys participated in reviewing the draft Elections Procedures manual, and they refused to approve the Elections Procedures Manual with the Additional Cure Period.

**7.     As to the individuals referenced in Interrogatory No. 6, explain any justifications they provided you for not including the Additional Cure Period in the Final Manual.**

**RESPONSE:**        The attorneys at the Attorney General's Office referenced in Interrogatory No. 6 provided the following justifications for refusing to approve the Elections Procedures Manual with the Additional Cure Period:

They claimed that the Additional Cure Period violates A.R.S. §§ 16-548(A), 16-552(B), and 16-566(B).

They claimed that it "is not possible" for a voter to confirm that a ballot with no signature is the voter's ballot.

They claimed that the Additional Cure Period violates the statutory intent and legislative history of A.R.S. § 16-550(A), because the legislature amended a prior draft of the bill to exclude the word "missing" from the final enacted statute.

DATED this 9th day of July, 2020.

COPPERSMITH BROCKELMAN PLC

By   /s/ Roopali H. Desai
            Roopali H. Desai
            D. Andrew Gaona
            Kristen Yost

*Attorneys for Defendant Katie Hobbs*

1

**VERIFICATION**

2

I, Bo Dul, declare as follows:

3

I am the Election Services Director for the Arizona Secretary of State, a defendant

4

in the above-entitled action, and I am authorized to make this verification on her behalf.

5

I have read the foregoing Responses to Plaintiffs' First Set of Interrogatories to the

6

Secretary of State and, to the best of my knowledge, information, and belief, verify that

7

the statements made therein are true and correct.

8

I declare under penalty of perjury that the foregoing is true and correct.

9

10

EXECUTED this 9th day of July, 2020.

11

12

Sambo (Bo) Dul

13

Election Services Director

Arizona Secretary of State's Office

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT F

MICHAEL B. WHITING
APACHE COUNTY ATTORNEY
Joseph D. Young (024027)
Chief Deputy County Attorney
P.O. Box 637
St. Johns, AZ  85936
Telephone: (928) 337-7560
jyoung@apachelaw.net
groupmail@apachelaw.net

*Attorney for Apache County Recorder, Edison J. Wauneka*

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Arizona Democratic Party, et al., | Case No: 2:20-CV-01143-PHX-DLR |
| Plaintiffs, | |
| vs. | **APACHE COUNTY RECORDER, EDISON WAUNEKA'S RESPONSE TO THE STATE'S FIRST SET OF INTERROGATORIES AND REQUEST FOR PRODUCTION** |
| Katie Hobbs, et al., | |
| Defendant(s), | |

Defendant Apache County Recorder, Edison Wauneka, by and through the undersigned counsel, hereby responds to the State's First Set of Interrogatories and Requests for Production on the above referenced manner as follows:

//

//

//

//

## RESPONSE TO INTERROGATORIES

**INTERROGATORY** 1:

Describe in detail the policies and procedures YOU will use, or the actions YOU will take, for the 2020 general election to address mail-in ballots missing the respective voter's signature.

**RESPONSE TO INTERROGATORY 1:**

Upon receiving a mail-in ballot with a missing signature, the following steps are taken:

1. Highlight the signature region of the back of the affidavit envelope. Place a big red sign here flag on the signature area.
2. Fill out control sheet with phone number and email address and letter sent date.
3. Attempt to call the voter to advise them that they did not sign the ballot affidavit and that the ballot will be sent back to them for signature. Also, inform them that the ballot must be back in our office or an Apache county polling place by 7 pm on election day. Always leave a message if possible. Make a note on the control sheet if you communicated with the voter.
4. Email the voter that they did not sign the ballot affidavit and that we will be sending the ballot back to them to sign. Also, advise them that the ballot must be back in our office or an Apache County polling location by 7 pm on election day. Make a note on the control sheet that you emailed voter on the control sheet.
5. Print out the label and send ballot back to the voter with the letter explaining that they must sign the ballot affidavit and that the ballot must be back in our office not later than 7 pm on election day or dropped off at any Apache County polling location. Make a note on control sheet the date you sent the letter.
6. Seven days before the election, we are unable to send ballots back to the voter. This is due to the mail time and the fact the voter will not receive the ballot in time to sign and to return.  Call and email the voter each day to inform them that they must come in and sign their ballot.
7. Call voters once a week that have not returned a ballot. Make a note on control sheet that you attempted to call voter again.
8. Email voter once a week that has not returned ballot. Make a note on the control sheet that you emailed the voter again.
9. Pull control sheet for voters that have returned their ballot this way we know which voters to keep calling and emailing.

**INTERROGATORY 2:**

Describe in detail the voter assistance programs you have implemented or will implement for the 2020 general election, including for those voters with disabilities or language difficulties.

**RESPONSE TO INTERROGATORY 2:**

1. Voters may be accompanied by a person of the voter's choice during any part of the voting process.

2. Voters may request assistance from a third-party or from members of the election board (two members of opposite party). If a voter requests this assistance the following are the steps:

   a. Jointly accompany the voter to the voting booth or accessible voting equipment.

   b. Audibly read the candidates names for each office, including party designations and the number to elect.

   c. Audibly read the information pertaining to any ballot measures.

   d. Ask the voter what candidates and issues the voter desires to vote for.

   e. If the voter requests, instruct the voter on how to operate the accessible voting equipment, including what to expect from the audio recorded instructions and what keys to use to maneuver through the screens.

      i. Those assisting a voter, upon the voters request, may not attempt to influence a voter in their choice of candidates or issues, or suggest or recommend a vote for a candidate or issue

      ii. Poll Workers should speak loud enough to assist the voter while maintaining the voter's privacy as much as possible.

3. Translators are available for use by the voter.

4. The Accessible Voting equipment is available for use, which assists voters with disabilities or language difficulties. English, Spanish and Navajo Translations are available on the Accessible Voting equipment.

5. Curbside voting is available to voters with disabilities, senior citizens and any other voter that requests this assistance.

## RESPONSE TO REQUESTS FOR PRODUCTION

**REQUEST FOR PRODUCTION 1:**
Produce any DOCUMENTS, including written policies and procedures, YOU relied upon in answering the above Interrogatories.

**RESPONSE REQUEST FOR PRODUCTION 1:**

**DOCUMENTS RELIED ON FOR INTERROGATORY 1:**
1. 2019 Election Procedures Manual
2. Settlement Agreement between Navajo Nation and Apache County.

**DOCUMENTS RELIED ON FOR INTERROGATORY 2:**
1. 2019 Election Procedures Manual

These above listed documents are attached hereto.

RESPECTFULLY SUBMITTED this 22nd day of July, 2020.

Michael B. Whiting
Apache County Attorney


 _/s/ Joseph Young_____
Joseph D. Young
Chief Deputy County Attorney

**CERTIFICATE OF SERVICE**

I hereby certify that the foregoing document was electronically filed and served through the CM/ECF system this 22nd day of July, 2020.

By:  /s/ Joseph D. Young

EXHIBIT G

**PROBLEM BALLOT CONTROL SHEET**

VOTER:_____VR#:_____STAFF:_____DATE:_____

_____**NO AFFIDAVIT**           _____**UNABLE TO VERIFY / 2ND CHECKER INITIALS**_____

_____**NO BALLOT**

_____**NO SIGNATURE**           _____**SPOUSE/HOUSEHOLD MEMBER MIX-UP**      **Date file checked**_____

_____**SIGNED POA**           **NAME:**_____VR#_____

_____**VOTER ASSISTED**      **EARLY BALLOT REQUESTED: Y / N**      **EB RETURNED: Yes  Date:_____ / No**

**PHONE  #1** _____**PHONE #2**_____**PHONE #3**_____

**VOTER EMAIL:**_____**SENT:**_____

CALL 1:DATE/TIME_____CONTACT:  Y / N   MSG LEFT: Y / Not Available   DATE LETTER SENT:_____

_____

CALL 2:DATE/TIME_____CONTACT:  Y / N   MSG LEFT: Y / Not Available

_____

CALL 3:DATE/TIME_____CONTACT:  Y / N   MSG LEFT: Y / Not Available

_____

**RESOLUTION – DATE:_____**

☐SIGNATURE ACCEPTED
☐CONFIRMED SIGNATURE WITH VOTER
☐ASSISTED CONFIRMED WITH VOTER
☐SPOUSE/HOUSEHOLD MATCHED UP
IN PROBLEM BLT TRACKER DATE: _____RESOLVED_____

| **DISQUALFIED** |
| --- |
| REASON_____ |
| _____ |
| _____ |
| SIGN_____DATE_____ |

SIGNATURE OF VOTER STAFF RESOLVING:_____DATE:_____

---

**PROBLEM BALLOT CONTROL SHEET**

VOTER:_____VR#:_____STAFF:_____DATE:_____

_____**NO AFFIDAVIT**           _____**UNABLE TO VERIFY / 2ND CHECKER INITIALS**_____

_____**NO BALLOT**

_____**NO SIGNATURE**           _____**SPOUSE/HOUSEHOLD MEMBER MIX-UP**      **Date file checked**_____

_____**SIGNED POA**           **NAME:**_____VR#_____

_____**VOTER ASSISTED**      **EARLY BALLOT REQUESTED: Y / N**      **EB RETURNED: Yes  Date:_____ / No**

**PHONE  #1** _____**PHONE #2**_____**PHONE #3**_____

**VOTER EMAIL:**_____**SENT:**_____

CALL 1:DATE/TIME_____CONTACT:  Y / N   MSG LEFT: Y / Not Available   DATE LETTER SENT:_____

_____

CALL 2:DATE/TIME_____CONTACT:  Y / N   MSG LEFT: Y / Not Available

_____

CALL 3:DATE/TIME_____CONTACT:  Y / N   MSG LEFT: Y / Not Available

_____

**RESOLUTION – DATE:_____**

☐SIGNATURE ACCEPTED
☐CONFIRMED SIGNATURE WITH VOTER
☐ASSISTED CONFIRMED WITH VOTER
☐SPOUSE/HOUSEHOLD MATCHED UP
IN PROBLEM BLT TRACKER DATE: _____RESOLVED_____

| **DISQUALFIED** |
| --- |
| REASON_____ |
| _____ |
| _____ |
| SIGN_____DATE_____ |

SIGNATURE OF VOTER STAFF RESOLVING:_____DATE:_____

Rev 1/5/16

# EXHIBIT H

1   **WILLIAM P. RING**
    COCONINO COUNTY ATTORNEY

2   State Bar No. 012860
    Rose Winkeler

3   Deputy County Attorney
    State Bar No. 025023

4   110 E. Cherry Ave.
    Flagstaff, Arizona 86001

5   (928) 679-8200
    rwinkeler@coconino.az.gov

6   *Attorney for Coconino County*

7           **IN THE UNITED STATES DISTRICT COURT**

8           **FOR THE DISTRICT OF ARIZONA**

|  |  |
|---|---|
| 9   The Arizona Democratic Party, et al., | No. CV-20-01143-PHX-DLR |
| 10          Plaintiffs, |  |
| 11   v. | **DEFENDANT, COCONINO COUNTY** |
| 12   Katie Hobbs, et al., | **RECORDER'S RESPONSE TO STATE'S FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION AND REQUESTS FOR PRODUCTION** |
| 13          Defendants. |  |
| 14 |  |
| 15 |  |

16         Defendant, Patty Hansen, in her official capacity as the Coconino County Recorder

17   (the "Coconino County Recorder") responds to Defendant, the State of Arizona's "First

18   Set of Interrogatories, Requests For Admission And Requests For Production." Defendant,

19   Coconino County Recorder notes that the requests by the State of Arizona (the "State")

20   only includes Interrogatories and Requests for Production. In accordance with Rule 33.1

21

22

23             1

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

of the Local Rules of Practice and Procedure of the U.S. District Court for the District of Arizona ("LRCiv") and the Federal Rules of Civil Procedure ("FRCP"), Rules 33 and 34, the Coconino County Recorder responds to the State's First Set of Interrogatories and First Set of Request for Production as follows:

## **INTERROGATORIES**

**INTERROGATORY 1:**

Describe in detail the policies and procedures YOU will use, or the actions YOU will take, for the 2020 general election to address mail-in ballots missing the respective voter's signature.

**RESPONSE TO INTERROGATORY 1:**

The Coconino County Recorder responds regarding policies and procedures that will be used or actions she will take for the 2020 general election to address mail-in ballots missing the respective voter's signature as follows:

Staff who process early ballots are instructed to follow the below procedures up to the day of the election as time allows: Early ballots that are unsigned will need follow up. The ballot affidavit envelope must be signed before the ballot may be submitted for counting.

Start with the ballots received earliest and process new unsigned ballots daily.

1) Pull up the voter's record based on the information on the ballot envelope.

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

2

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

2) Fill out a green problem sheet. If there is a phone number on the envelope, use that. Otherwise use the phone number or email on the voter record if there is one.

3) Fill out the unsigned ballot tracking spreadsheet.

4) If there is a phone number, call the voter.

   a. Suggested script if speaking to or emailing the voter: "We are unable to process the early ballot you submitted for the *<date and name of the election>* because the ballot affidavit envelope was not signed. We need your signature before we can submit your ballot for counting. You may make an appointment to come in to our office at 110 East Cherry Avenue to sign your ballot affidavit, or we can mail you a replacement ballot."

   b. Suggested script if leaving a message: "This message is regarding the early ballot you submitted for the *<date and name of the election>*. Please call (your phone #) at your earliest convenience."

5) Fill out the green problem sheet and ballot tracking spreadsheet with your actions.

6) Clip the green problem sheet to the ballot and keep them alphabetized for reference.

7) If a phone message is left, or the phone number is invalid or not provided, email the voter if there is an email address.

8) If the voter does not respond within one business day, send a letter.

3

9) The issue is "resolved" once direct (phone, email, or in person) contact is made with the voter, or a letter is sent.

/ / / /

**INTERROGATORY 2:**

Describe in detail the voter assistance programs you have implemented or will implement for the 2020 general election, including for those voters with disabilities or language difficulties.

**RESPONSE TO INTERROGATORY 2:**

The Coconino County Recorder responds regarding the voter assistance programs that have been implemented or will be implemented for the for the 2020 general election, including for those voters with disabilities or language difficulties as follows:

1. We are utilizing our office's website to provide voting assistance information. Because of the current COVID 19 crisis we have stopped doing in-person presentations.  The Navajo Nation has discontinued their Chapter meetings so we are unable to do Chapter meeting presentations.

2. We have been running radio ads to provide information in the Navajo language to Navajo voters about important election deadlines and information.  We are also running English language radio ads about voting throughout the county.

3. We are purchasing a "Voting Within Reach" trailer that we will be taking to several locations in our county.  This trailer will be a mobile elections office.

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

4

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

We will be providing voter assistance at these locations. We are also providing curbside assistance at these locations so people do not need to get out of vehicles.

4. We are implementing door-to-door voting assistance in the Supai Village on the Havasupai Reservation because they are in a lock down situation because of COVID. We are in the process of hiring two members in the village and training them through Zoom. They will go door-to-door to assist people with voter registration and early voting. We have been working with the legal council to the tribe and the tribal council to implement these activities.

5. The county recorder have done several voter information presentations for meetings and Facebook live events via Zoom. These include special district meetings, neighborhood watch meetings, Lantinx and Native American organizations events.

6. The county recorder has also been having regular Zoom meetings with representatives from several voting advocacy organizations, which include disability rights and Native American rights organizations, to provide up-to-date voting information. They have been disseminating this information to their membership.

7. We have been using Twitter to post voting information. We are also sending press releases to the media about election deadlines and information.

5

1   ////

2   ////

3   ////

4                          **REQUESTS FOR PRODUCTION**

5   **REQUEST FOR PRODUCTION 1:**

6          Produce any DOCUMENTS, including written policies and procedures, YOU

7   relied upon in answering the above Interrogatories.

8   **RESPONSE TO REQUEST FOR PRODUCTION 1:**

9          Please see electronically produced documents attached hereto.

10

11         The executed Declaration of Coconino County Recorder, Patty Hansen in Lieu of

12  Verification, pursuant to 28 U.S.C. § 1746 is attached hereto and incorporated herein.

13         DATED: July 9, 2020

14                                         WILLIAM P. RING
                                           Coconino County Attorney
15
                                           /s/ Rose Winkeler
16                                         Rose Winkeler
                                           Deputy County Attorney
17

18

19

20

21

22

23                                6

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2020, I caused the foregoing document to be electronically transmitted to counsel of record at the following email addresses (with a copy to Plaintiffs' Counsel):

| | |
|---|---|
| Joseph A. Kanefield<br>Brunn ("Beau") W. Roysden III<br>Drew C. Ensign<br>Michael S. Catlett<br>Jennifer J. Wright<br>Robert J. Makar<br>MARK BRNOVICH<br>ATTORNEY GENERAL<br>Drew.Ensign@azag.gov<br>*Attorneys for Defendant*<br>*State of Arizona* | Alexis E. Danneman<br>Joshua L. Boehm<br>PERKINS COIE LLP<br>Phoenix, AZ<br>ADanneman@perkinscoie.com;<br>JBoehm@perkinscoie.com;<br>DocketPHX@perkinscoie.com<br><br>Kevin J. Hamilton<br>William B. Stafford<br>Sarah Langberg Schirack<br>Ariel Glickman<br>PERKINS COIE LLP<br>Washington, DC<br>KHamilton@perkinscoie.com;<br>WStafford@perkinscoie.com;<br>SSchirack@perkinscoie.com;<br>AGlickman@perkinscoie.com<br>*Attorneys for Plaintiff* |
| Roopali H. Desai<br>David Andrew Gaona<br>Kristen Michelle Yost<br>COPPERSMITH BROCKELMAN PC<br>rdesai@cblawyers.com;<br>dgaona@cblawyers.com;<br>kyost@cblawyers.com<br>*Attorneys for Secretary of State Katie Hobbs* | Joseph D. Young<br>APACHE COUNTY ATTORNEY'S OFFICE<br>jyoung@apachelaw.net |
| Jefferson R. Dalton<br>GILA COUNTY ATTORNEY'S OFFICE<br>jdalton@gilacountyaz.gov<br>*Attorneys for Apache County Recorder* | Kenneth Andrew Angle<br>GRAHAM COUNTY ATTORNEY'S OFFICE<br>Kangle@graham.az.gov<br>*Attorneys for Graham County Recorder* |

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

| | |
|---|---|
| Ryan Norton Dooley<br>LA PAZ COUNTY ATTORNEY'S OFFICE<br>rdooley@lapazcountyaz.org<br>*Attorneys for La Paz County Recorder* | Joseph James Branco<br>Joseph Eugene LaRue<br>MARICOPA COUNTY ATTORNEY'S OFFICE<br>brancoj@mcao.maricopa.gov<br>ca-civilmailbox@mcao.maricopa.gov<br>*Attorneys for Maricopa County Recorder* |
| Jeffrey Blane Haws<br>MOHAVE COUNTY ATTORNEY'S OFFICE<br>Jeff.haws@mohavecounty.us<br>*Attorneys for Mohave County Recorder* | Jason Stanley Moore<br>NAVAJO COUNTY ATTORNEY'S OFFICE<br>Jason.moore@navajocountyaz.gov<br>*Attorneys for Navajo County Recorder* |
| Daniel S. Jurkowitz<br>PIMA COUNTY ATTORNEY'S OFFICE<br>Daniel.Jurkowitz@pcao.pima.gov<br>*Attorneys for Pima County Recorder* | Craig Charles Cameron<br>PINAL COUNTY ATTORNEY'S OFFICE<br>Craig.cameron@pinal.gov<br>*Attorneys for Pinal County Recorder* |
| Kimberly Janiece Hunley<br>SANTA CRUZ COUNTY ATTORNEY'S OFFICE<br>khunley@santacruzcountyaz.gov<br>*Attorneys for Santa Cruz County Recorder* | Thomas M. Stoxen<br>YAVAPAI COUNTY ATTORNEY'S OFFICE<br>thomas.stoxen@yavapai.us<br>*Attorneys for Yavapai County Recorder* |
| William J. Kerekes<br>YUMA COUNTY ATTORNEY'S OFFICE<br>YCAttyCivil@yumacountyaz.gov<br>*Attorneys for Yuma County Recorder* | Kory A Langhofer<br>Thomas James Basile<br>STATECRAFT PLLC<br>kory@statecraftlaw.com;<br>tom@statecraftlaw.com<br>*Attorneys for Republican National Committee; Arizona Republican Party; and Donald J. Trump for President* |

By: _____

8

**WILLIAM P. RING**
COCONINO COUNTY ATTORNEY
110 E. CHERRY AVENUE
FLAGSTAFF, ARIZONA 86001-4627
(928) 679-8200

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## DECLARATION OF PATTY HANSEN,
## COCONINO COUNTY RECORDER
(In Lieu of Verification pursuant to 28 U.S.C. § 1746)

I, Patty Hansen, in my official capacity as the Coconino County Recorder hereby state that I am familiar with the above entitled action, and have prepared the foregoing COCONINO COUNTY RECORDER'S RESPONSE TO STATE'S FIRST SET OF INTERROGATORIES, REQUESTS FOR ADMISSION AND REQUESTS FOR PRODUCTION and declare under penalty of perjury that the foregoing is true and correct.

Executed on: 7-9-2020

PATTY HANSEN
COCONINO COUNTY RECORDER

8

EXHIBIT I

GEORGE E. SILVA
SANTA CRUZ COUNTY ATTORNEY

KIMBERLY HUNLEY, SBA #019141
CHIEF CIVIL DEPUTY COUNTY ATTORNEY
Santa Cruz County Attorney's Office
2150 North Congress Drive, Suite 201
Nogales, Arizona  85621
Tel:  (520) 375-7780; Fax: (520) 375-7793
khunley@santacruzcountyaz.gov
Attorney for Defendants Suzanne "Suzie" Sainz,
        Santa Cruz County Recorder

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| The Arizona Democratic Party; et al., | Case No. 2:20-cv-01143-DLR |
| Plaintiffs, | **DEFENDANT SUZANNE SAINZ' ANSWERS TO STATE'S FIRST SET OF INTERROGATORIES, REQUEST FOR ADMISSION, AND REQUESTS FOR PRODUCTION TO SUZANNE SAINZ, SANTA CRUZ COUNTY RECORDER** |
| vs. | |
| KATIE HOBBS, in her official capacity as Secretary of State for the State of Arizona; et. al., | |
| Defendants. | |

COMES NOW Defendant Suzanne Sainz, the Santa Cruz County Recorder, by and through George E. Silva, County Attorney, and his undersigned Chief Civil Deputy, Kimberly J. Hunley, and pursuant to Federal Rules of Civil Procedure 26 and 34, hereby answers the State's First Set of Interrogatories, Request for Admissions[1], and Request for Production.

---

[1] No requests for admissions were propounded as part of this discovery request, however, "Request for Admissions" was listed in the title of the document.

1

## ANSWERS TO INTERROGATORIES

**INTERROGATORY NO. 1:**  Describe in detail the policies and procedures YOU will use, or the actions YOU will take, for the 2020 general election to address mail-in ballots missing the respective voter's signature.

The Santa Cruz County Recorder's procedure for addressing ballots with missing signatures for the 2020 General Election will be as follows:

The ballots will be reviewed by 3 or 4 office staff members.  When a staff member discovers a problem ballot, they will complete a "Problem Ballot Control Sheet" ("PBCS") that includes the voter's name, identification number, and phone number. The staff member locating the problem will initial the form, note the date the ballot was received, and the nature of the problem.

Next, the problem ballot and PBCS will be referred to the Senior Registrar of Voters ("SRV").   The SRV will immediately mail a letter to the voter to notify him/her of the problem with the ballot.  The SRV will stamp the mailing date of the letter on the PBCS. The SRV will then attempt to make contact with the voter by phone.  The dates and times of the calls, the number of attempts, and the details of the calls will be noted on the PBCS.

The voter will be provided an opportunity to correct the error or to cast a replacement ballot.  If the voter does not correct the error by 7:00 p.m. on Election Day, the ballot will be disqualified.  When a ballot is disqualified, the SRV will note the date of the disqualification on the PBCS.  If the voter cures the error, the ballot will be counted.

**INTERROGATORY NO. 2:**  Describe in detail the voter assistance programs you have implemented or will implement for the 2020 general election, including for those voters with disabilities or language difficulties.

The Santa Cruz County Elections Department will set up an "accessible voting device" for voters with disabilities in the Santa Cruz County Recorder's Office.  The device is called an "ExpressVote" and is certified by the Secretary of State and EAS. The accessible voting device allows voting in multiple formats:  visual, audio or synthesized speech, and it will be wheelchair accessible.  A chair will also be provided to allow the voter the option to sit while voting.  The accessible voting device will be clearly marked "Accessible Voting Device."

A minimum of two seats will be provided as a waiting area for voters in the office. There is a wheelchair accessible ramp to enter the building where the office is located.  A magnifying instrument will be available for visually impaired voters.  Paper and pen/pencil will be available for hearing impaired voters. An audio version of the ballot will be available for use by visually impaired voters.  The Santa Cruz County Recorder's Office will also have bilingual staff available who can assist voters in both English and Spanish.

In addition, voters are advised in writing of the availability of a Special Election Board. The Special Election Board is available to travel to the voter's home so that the voter can cast a ballot in their home.

Curbside voting is also available upon request.

## RESPONSE TO REQUEST FOR PRODUCTION

**REQUEST FOR PRODUCTION 1:**  Produce any DOCUMENTS, including written policies and procedures, YOU relied upon in answering the above interrogatories.

*Interrogatory 1*:  Arizona Secretary of State 2019 Elections Procedure Manual, Ch. 2 Early Voting, VI. Processing and Tabulating Early Ballots, A. County Recorder, pp. 68-69; A.R.S. § 16-550(A); and A.R.S. § 16-552(B). The Manual is available at https://azsos.gov/sites/default/files/EPM_2019_FINAL.pdf.

*Interrogatory 2*:  Arizona Secretary of State 2019 Elections Procedure Manual, Ch. 2, IV., Special Election Boards, p. 66;  Ch. 4, Voting Equipment, I., Voting Equipment Certification, A., 2., b., i., 4., pg. 80; and Ch. 5, Accommodating Voters with Disabilities, III., Ensuring Accessibility at the Voting Location, pp. 103-105.  The Manual is available at https://azsos.gov/sites/default/files/EPM_2019_FINAL.pdf.

Dated this 1st day of July, 2020.

GEORGE E. SILVA
SANTA CRUZ COUNTY ATTORNEY


 /s/ *Kimberly J. Hunley*              .
Kimberly J. Hunley
Chief Civil Deputy County Attorney

3

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of July, 2020, I electronically transmitted, or caused

to be electronically transmitted, the foregoing documents by email to the following:

Thomas James Basile
Statecraft PLLC
649 N 4th Ave., Ste. B
Phoenix, AZ 85003
602-571-4275
tom@statecraftlaw.com
representing Arizona Republican Party (Intervenor Defendant), Donald J. Trump for
President, Inc. (Intervenor Defendant), Republican National Committee (Intervenor
Defendant)


Roopali H Desai
Coppersmith Brockelman PLC
2800 N Central Ave., Ste. 1900
Phoenix, AZ 85004
602-381-5478
602-224-6020 (fax)
rdesai@cblawyers.com
representing Katie Hobbs (Defendant)

Alexis Elizabeth Danneman
Joshua Lee Boehm
Perkins Coie LLP - Phoenix, AZ
2901 N Central Ave., Ste. 2000
Phoenix, AZ 85012
602-351-8201/ 602-351-8222
ADanneman@Perkinscoie.com
jboehm@perkinscoie.com
representing Arizona Democratic Party (Plaintiff), DSCC (Plaintiff), Democratic
National Committee (Plaintiff)

Marc E Elias
Ariel Brynne Glickman
Perkins Coie LLP - Washington, DC
700 13th St. NW, Ste. 600
Washington, DC 20005-3960
202-434-1609 / 202-654-6372
202-654-9126 (fax) / 202-624-9570 (fax)
melias@perkinscoie.com
aglickman@perkinscoie.com
representing Arizona Democratic Party (Plaintiff), DSCC (Plaintiff), Democratic
National Committee (Plaintiff)

Drew Curtis Ensign
Office of the Attorney General - Phoenix
2005 N Central Ave.
Phoenix, AZ 85004-1592
602-542-5200
602-542-4377 (fax)
drew.ensign@azag.gov
representing  Arizona, State of (Intervenor Defendant)

David Andrew Gaona
Coppersmith Brockelman PLC
2800 N Central Ave., Ste. 1900
Phoenix, AZ 85004
602-381-5481
Agaona@cblawyers.com
representing  Katie Hobbs (Defendant)

Kevin J Hamilton
Perkins Coie LLP - Seattle, WA
1201 3rd Ave., Ste. 4800
Seattle, WA 98101-3099
206-395-8000
206-359-9000 (fax)
khamilton@perkinscoie.com
representing  Arizona  Democratic  Party  (Plaintiff),  DSCC  (Plaintiff),  Democratic National Committee (Plaintiff)

Kory A Langhofer
Statecraft PLLC
649 N 4th Ave., Ste. B
Phoenix, AZ 85003
602-571-4275
kory@statecraftlaw.com
representing  Arizona Republican Party (Intervenor Defendant), Donald J. Trump for President,  Inc.  (Intervenor  Defendant),  Republican  National  Committee  (Intervenor Defendant)

Robert John Makar
Jennifer Jayne Wright
Office of the Attorney General - Phoenix
2005 N Central Ave.
Phoenix, AZ 85004-1592
602-542-4389 / 602-542-8255
602-542-4377 (fax)/ 602-542-8308 (fax)
Robert.Makar@azag.gov
jennifer.wright@azag.gov
representing  Arizona, State of (Intervenor Defendant)

Sarah Langberg Schirack
Perkins Coie LLP - Anchorage, AK
1029 W 3rd Ave., Ste. 300
Anchorage, AK 99501
907-263-6990
SSchirack@perkinscoie.com
representing Arizona Democratic Party (Plaintiff), DSCC (Plaintiff), Democratic National Committee (Plaintiff)

William B Stafford
Perkins Coie LLP - Seattle, WA
1201 3rd Ave., Ste. 4800
Seattle, WA 98101-3099
206-359-6217
206-359-9000 (fax)
wstafford@perkinscoie.com
representing Arizona Democratic Party (Plaintiff), DSCC (Plaintiff), Democratic National Committee (Plaintiff)

Kristen Michelle Yost
Coppersmith Brockelman PLC
2800 N Central Ave., Ste. 1900
Phoenix, AZ 85004
602-381-5478
602-224-6020 (fax)
kyost@cblawyers.com
representing Katie Hobbs(Defendant)

DATED this 1st day of July, 2020.

By: /s/ *Kimberly J. Hunley*
Kimberly J. Hunley
Chief Civil Deputy

Completed this 1st day of July, 2020, by:

By: /s/ *Pat Luna* .
M. Patricia Luna
Office Manager

6

EXHIBIT J

1  GEORGE E. SILVA
   SANTA CRUZ COUNTY ATTORNEY
2
   KIMBERLY HUNLEY, SBA #019141
3  CHIEF CIVIL DEPUTY COUNTY ATTORNEY
   Santa Cruz County Attorney's Office
4  2150 North Congress Drive, Suite 201
   Nogales, Arizona 85621
5  Tel: (520) 375-7780; Fax: (520) 375-7793
6  khunley@santacruzcountyaz.gov
   Attorney for Defendants Suzanne "Suzie" Sainz,
7       Santa Cruz County Recorder

8          **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE DISTRICT OF ARIZONA**

10

11 | The Arizona Democratic Party; et al., | Case No. 2:20-cv-01143-DLR |

12 |                Plaintiffs,            | **DEFENDANT SUZANNE SAINZ'**
                                            **VERIFICATION OF ANSWERS TO**
13 | vs.                                   | **PLAINTIFFS' FIRST SET OF**
                                            **INTERROGATORIES DATED 7/1/2020** |
14
15 | KATIE HOBBS, in her official capacity as
      Secretary of State for the State of Arizona;
16    et. al.,

17 |                Defendants.            |

18

19     COMES NOW Defendant Suzanne Sainz, the Santa Cruz County Recorder, and upon

20 her oath deposes and states the following:

21     1.  The Santa Cruz County Recorder received a set of interrogatories pursuant to Rule

22         33, Federal Rules of Civil Procedure, from the Plaintiff in the above-referenced

23         matter.

24     2.  The Santa Cruz County Recorder prepared the written responses to those

25         interrogatories and they were served on the Plaintiffs on July 1, 2020.

26                                    1

3. The Santa Cruz County Recorder declares that to the best of her ability and belief, the responses to the answers to interrogatories provided to the Plaintiff on July 1, 2020 are accurate.

DATED this 28 day of July, 2020.

SANTA CRUZ COUNTY RECORDER

SUZANNE SAINZ

SUBSCRIBED AND SWORN before me this 28th day of July, 2020.

Notary Public

My Commission Expires:
05/07/2022

Rachel Bustamante
Notary Public - Arizona
Santa Cruz County
Commission Number 547228
My Comm. Exp. 5/7/2022

2

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of July, 2020, I electronically transmitted, or caused to be electronically transmitted, the foregoing documents by email to the following:

Thomas James Basile
Statecraft PLLC
649 N 4th Ave., Ste. B
Phoenix, AZ 85003
602-571-4275
tom@statecraftlaw.com
representing Arizona Republican Party (Intervenor Defendant), Donald J. Trump for President, Inc. (Intervenor Defendant), Republican National Committee (Intervenor Defendant)

Roopali H Desai
Coppersmith Brockelman PLC
2800 N Central Ave., Ste. 1900
Phoenix, AZ 85004
602-381-5478
602-224-6020 (fax)
rdesai@cblawyers.com
representing Katie Hobbs (Defendant)

Alexis Elizabeth Danneman
Joshua Lee Boehm
Perkins Coie LLP - Phoenix, AZ
2901 N Central Ave., Ste. 2000
Phoenix, AZ 85012
602-351-8201/ 602-351-8222
ADanneman@Perkinscoie.com
jboehm@perkinscoie.com
representing Arizona Democratic Party (Plaintiff), DSCC (Plaintiff), Democratic National Committee (Plaintiff)

Marc E Elias
Ariel Brynne Glickman
Perkins Coie LLP - Washington, DC
700 13th St. NW, Ste. 600
Washington, DC 20005-3960
202-434-1609 / 202-654-6372
202-654-9126 (fax) / 202-624-9570 (fax)
melias@perkinscoie.com
aglickman@perkinscoie.com
representing Arizona Democratic Party (Plaintiff), DSCC (Plaintiff), Democratic National Committee (Plaintiff)

Drew Curtis Ensign
Office of the Attorney General - Phoenix
2005 N Central Ave.
Phoenix, AZ 85004-1592
602-542-5200
602-542-4377 (fax)
drew.ensign@azag.gov
representing  Arizona, State of (Intervenor Defendant)

David Andrew Gaona
Coppersmith Brockelman PLC
2800 N Central Ave., Ste. 1900
Phoenix, AZ 85004
602-381-5481
Agaona@cblawyers.com
representing  Katie Hobbs (Defendant)

Kevin J Hamilton
Perkins Coie LLP - Seattle, WA
1201 3rd Ave., Ste. 4800
Seattle, WA 98101-3099
206-395-8000
206-359-9000 (fax)
khamilton@perkinscoie.com
representing  Arizona Democratic Party (Plaintiff), DSCC  (Plaintiff), Democratic
National Committee (Plaintiff)

Kory A Langhofer
Statecraft PLLC
649 N 4th Ave., Ste. B
Phoenix, AZ 85003
602-571-4275
kory@statecraftlaw.com
representing  Arizona Republican Party (Intervenor Defendant), Donald J. Trump for
President,  Inc.  (Intervenor  Defendant),  Republican  National  Committee  (Intervenor
Defendant)

Robert John Makar
Jennifer Jayne Wright
Office of the Attorney General - Phoenix
2005 N Central Ave.
Phoenix, AZ 85004-1592
602-542-4389 / 602-542-8255
602-542-4377 (fax)/ 602-542-8308 (fax)
Robert.Makar@azag.gov
jennifer.wright@azag.gov
representing  Arizona, State of (Intervenor Defendant)

4

Sarah Langberg Schirack
Perkins Coie LLP - Anchorage, AK
1029 W 3rd Ave., Ste. 300
Anchorage, AK 99501
907-263-6990
SSchirack@perkinscoie.com
representing  Arizona  Democratic  Party  (Plaintiff),  DSCC  (Plaintiff),  Democratic
National Committee (Plaintiff)

William B Stafford
Perkins Coie LLP - Seattle, WA
1201 3rd Ave., Ste. 4800
Seattle, WA 98101-3099
206-359-6217
206-359-9000 (fax)
wstafford@perkinscoie.com
representing  Arizona  Democratic  Party  (Plaintiff),  DSCC  (Plaintiff),  Democratic
National Committee (Plaintiff)

Kristen Michelle Yost
Coppersmith Brockelman PLC
2800 N Central Ave., Ste. 1900
Phoenix, AZ 85004
602-381-5478
602-224-6020 (fax)
kyost@cblawyers.com
representing  Katie Hobbs(Defendant)

DATED this 28th day of July, 2020.

By: /s/ *Kimberly J. Hunley*
Kimberly J. Hunley
Chief Civil Deputy


Completed this 28th day of July, 2020, by:

By: /s/ *Clariza Jimenez*          .
Clariza Jimenez
Legal Assistant

5

# EXHIBIT K

# The Washington Post

*Democracy Dies in Darkness*

# 100,000 mail-in votes went uncounted in California's primary

By **Michael R. Blood | AP**

July 13, 2020 at 9:36 a.m. MST

LOS ANGELES — More than 100,000 mail-in ballots were rejected by California election officials during the March presidential primary, according to data obtained by The Associated Press that highlights a glaring gap in the state's effort to ensure every vote is counted.

---

**Support our journalism. Subscribe today.** →

---

With the coronavirus pandemic raging, California is part of a growing number of states increasing mail-in balloting to avoid crowds at polling places. President Donald Trump is among those questioning the integrity of vote-by-mail elections while supporters say they are just as reliable as polling places and offer greater flexibility for voters.

But while polling places include workers who can assist people who have questions about filling out ballots, a voter doesn't have support at home and so problems can arise.

Support journalism you can trust when it matters most.

**Get one year for $29**

AD

The California secretary of state's election data obtained by the AP showed 102,428 mail-in ballots were disqualified in the state's 58 counties, about 1.5% of the nearly 7 million mail-in ballots returned. That percentage is the highest in a primary since 2014, and the overall number is the highest in a statewide election since 2010.

Two years ago, the national average of rejected mail ballots in the general election was about 1.4% and in the 2016 presidential election year it was 1%, according to a U.S. Election Assistance Commission study.

The most common problem, by far, in California was missing the deadline for the ballot to be mailed and arrive. To count in the election, ballots must be postmarked on or before Election Day and received within three days afterward. Statewide, 70,330 ballots missed those marks.

AD

Another 27,525 either didn't have a signature, or the signature didn't match the one

on record for the voter.

Kim Alexander, president of the nonpartisan California Voter Foundation that seeks to improve elections, called the uncounted figure discouraging.

"The only thing worse than people not voting is people attempting to vote and having their vote uncounted," she said. The tally of nullified votes "can make a difference in a close contest."

The data didn't break down the uncounted ballots by party registration. While the overall number was large in March, if it's the same in November it's unlikely to affect the presidential race — Trump lost to Democrat Hillary Clinton in 2016 by 4.3 million votes.

AD

But there are expected to be at least several tightly contested U.S. House races where a relatively few votes could tip the balance. In 2018, Democrat TJ Cox upset Republican David Valadao by less than 1,000 votes in a Central Valley district. They have a rematch in November.

Local races sometimes are decided by a handful of votes.

California traditionally has offered mail-in voting only to those who request ballots. Over time the number has grown to represent more than half of all cast ballots. In response to the coronavirus outbreak, Democratic Gov. Gavin Newsom in June signed a law requiring county election officials to mail a ballot to all the state's nearly 21 million registered voters for the November election.

AD

He called mail-in voting safe and secure, pointing to a series of studies that found no evidence of significant fraud. States across the political spectrum rely solely on mail ballots, including Colorado, Utah and Washington.

In preparation for November, the state is launching a ballot-tracking tool that will quickly alert voters if they need to take action, such as adding a missing signature. Another change: The state is extending the window for mail ballots to arrive to 17 days after Election Day.

Even though he voted by mail this year, Trump has called mail-in voting "a terrible thing" prone to abuse, warning without evidence that "you get thousands and thousands of people sitting in somebody's living room, signing ballots all over the place."

AD

With the COVID-19 pandemic prompting many states to pursue near-universal mail voting to minimize health risks that come with indoor crowds, national Republicans and Democrats have argued over the safety and security of votes traveling through the U.S. Postal Service.

Washington's Republican Secretary of State, Kim Wyman, is among those who see it as a safe system. So does Alex Padilla, California's Democratic secretary of state, who says there is "no safer … way to exercise your right to vote than from the safety and convenience of your own home."

Research by Alexander's group has found that an average of nearly two of every 100 mail-in ballots were voided in statewide elections between 2010 and 2018. However, over that time, the rate of disqualification has improved, dropping from over 140,000 ballots, or 2.9% in the 2010 general election, to 84,825 ballots, or 1%, in 2018.

AD

Last March, the highest rejection rate in California was in San Francisco, where 9,407 ballots, or nearly 5% of the total, were set aside, mostly because they did not arrive on time. By contrast, in rural Plumas County northeast of Sacramento, all of the 8,207 mail-in ballots received were accepted.

In Los Angeles County, nearly 2,800 ballots were nullified because the voter forgot to sign it, then couldn't be found to fix the error. Statewide, that careless mistake spiked nearly 13,000 ballots.

More than 1,000 ballots were disqualified in Fresno County because the signature didn't match the one on file with election officials. The same problem nixed over 1,300 ballots in San Diego County — and over 14,000 statewide. In some of those cases, voting experts say, a family member might have signed for others in the household, which is illegal.

AD

Some voters apparently filled out their ballots then left them on the kitchen table: In more than 800 instances, envelopes were returned to election officials without the marked ballot inside.

Orange County Registrar of Voters Neal Kelley said ultimately a voter has the responsibility to fill out the ballot correctly and get it in the mail on time. Sometimes, "it's just a product of voters forgetting," Kelley said.

Copyright 2020 The Associated Press. All rights reserved. This material may not be published, broadcast, rewritten or redistributed without permission.

# EXHIBIT L



**AJC**

**Atlanta. News. Now.**

Support Local Journalism.
**Subscribe today for 99¢.**



## Georgia House election do-over separated by just two votes

POLITICAL INSIDER BLOG | Dec 10, 2018

By Greg Bluestein, The Atlanta Journal-Constitution

**'In the end, we just want a fair election.'**

Advertisement

**A Republican incumbent** appears to have lost a rare repeat election for a Georgia House seat by just two votes, but he has yet to concede the race and is considering his legal

options.

After about a dozen outstanding provisional and absentee ballots were tallied, Chris Erwin's lead over state Rep. Dan Gasaway narrowed from three votes to two votes.

Advertisement

The repeat election was ordered by a judge because dozens of voters received ballots for the wrong districts in the May GOP primary. No Democrat was on the ballot, so the winner will represent the district spanning three northeast Georgia counties.

While Erwin has declared victory and said he's ready to "put campaign politics behind us," Gasaway is raising the specter of a court fight as he questioned whether Habersham County officials wrongly accepted two provisional ballots.

"I don't believe the outcome tonight is accurate, and we can prove that," Gasaway told WDUN after the ballots were accepted. "I hated we could not get some kind of resolution with this board when they clearly had illegal votes being cast in Habersham County."

Gasaway's attorney, Jake Evans, said Sunday he was reviewing his client's next steps.

"Two votes is a small margin and virtually any irregularity makes a material difference," said Evans. "In the end, we just want a fair election."

It's the last unsettled state Georgia election after a grueling cycle that included 10 days of confusion over the outcome of the race for governor and a four-week sprint to a runoff that left Republicans in control of every statewide office.

Advertisement

The election do-over played a prominent role in the contest between Stacey Abrams and Brian Kemp. The Democrat frequently invoked the redo as she argued that Republicans also had reason to be concerned about the state's elections policies with Kemp as secretary of state.

## About the Author



**Greg Bluestein**

Greg Bluestein is a political reporter who covers the governor's office and state politics for The Atlanta Journal-Constitution.

# EXHIBIT M

⚖ **EFILED IN OFFICE**
CLERK OF SUPERIOR COURT
BANKS COUNTY, GEORGIA

**18CV358**

**FEB 08, 2019 01:17 PM**

Tim Harper, Clerk
Banks County, Georgia

### IN THE SUPERIOR COURT OF BANKS COUNTY
### STATE OF GEORGIA

| | | |
|---|---|---|
| DAN GASAWAY, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | Civil Action File No.: 18CV358 |
| | ) | |
| HABERSHAM COUNTY BOARD | ) | |
| OF ELECTIONS AND REGISTRATION, | ) | |
| BANKS COUNTY BOARD OF | ) | |
| ELECTIONS AND REGISTRATION, | ) | |
| STEPHENS COUNTY BOARD OF | ) | |
| ELECTIONS  AND REGISTRATION, and | ) | |
| CHRIS ERWIN, Republican Candidate | ) | |
| for Georgia House District 28 – December | ) | |
| 4, 2018, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| BILLY C. SPEED, | ) | |
| | ) | |
| Respondent-Intervenor | ) | |

## ORDER GRANTING PETITIONER DAN GASAWAY'S PETITION TO CONTEST ELECTION RESULTS & REQUEST FOR NEW ELECTION

### Preliminary Findings

After notice to the parties, on January 28, 30, 31 and February 1, 2019, the Court held a

*rule nisi* hearing on Petitioner Dan Gasaway's ("Mr. Gasaway") First Amended Petition contesting

the results of the December 4, 2018 House District 28 Special Election (the "Special Election")

and all other matters pending before the Court.  Counsel for Mr. Gasaway, the Habersham County

Board of Elections and Registration (the "Habersham County Board"), the Stephens County Board

of Elections and Registration (the "Stephens County Board"), the Banks County Board of

1

Elections and Registration (the "Banks County Board"), Chris Erwin ("Mr. Erwin") and Billy C. Speed ("Mr. Speed") appeared at the hearing.

The Court first considered Mr. Speed's Motion to Intervene.  After hearing and considering argument from counsel for Mr. Gasaway and Mr. Speed, the Court permitted Mr. Speed was to intervene for the limited purpose of presenting argument and evidence in defense of his right to vote in the Special Election.  Mr. Speed voluntarily withdrew his counterclaim for declaratory judgment.

## Findings of Fact

The Court heard evidence on the merits of Mr. Gasaway's First Amended Petition.  Based upon the evidence presented, the Court makes the following findings of fact:

1.      The Court has proper venue and jurisdiction over the action;

2.      The Special Election was decided by two votes;

3.       In his Petition, Mr. Gasaway identified 68 votes that he believed to be illegally cast, illegally rejected, or irregular. At the hearing, Mr. Gasaway specifically addressed 21 individual voters, whose votes he believed were illegally cast, illegally rejected, or irregular. The Court's findings on those 21 individual voters are as follows:

4.      Mr. Gasaway presented insufficient evidence to show that Ms. Sandra Denton voted illegally in the Special Election or that her vote was as a result of an irregularity because Ms. Denton's vote was accounted for in the final vote total;

5.      Mr. Gasaway presented **sufficient** evidence to show that two votes were cast in the name of Mr. Michael Burrell.  Mr. Burrell testified that when he went to the early voting center on November 30, 2018, election officials told him that he had already voted on November 28. Mr. Burrell objected and denied the signature on the application for early voting ballot on November

28 was his. Election officials allowed Mr. Burrell to cast a second ballot on November 30, 2018. Mr. Burrell cast his November 30 ballot on a voting machine rather than as a provisional ballot. Therefore, two votes were cast Mr. Burrell's name;

6.     Mr. Gasaway presented insufficient evidence to show that Mr. David Scott Brand voted illegally in the Election because the evidence failed to show that Mr. Brand intended to change his residence more than 30 days before the election;

7.     Mr. Gasaway presented insufficient evidence to show that Ms. Shirlene O'Neal Allen voted illegally in the Special Election because the evidence failed to show that Ms. Allen intended to change her residence more than 30 days before the election;

8.     Mr. Gasaway presented insufficient evidence to show that Mr. James W. Allen voted illegally in the Special Election because the evidence failed to show that Mr. Allen intended to change his residence more than 30 days before the election;

9.     Mr. Gasaway presented insufficient evidence to show that Mr. Benjamin Lifsey voted illegally in the Election because Mr. Gasaway failed to show that Mr. Lifsey intended to change his residence more than 30 days before the election;

10.    Mr. Gasaway presented **sufficient** evidence to show that Ms. Carrie Akers voted illegally in the December 4 Special Election. The evidence showed that Ms. Akers changed her address to an unbuilt property at 360 Garrison Road in Habersham County. She testified that she hoped to reside there at some indefinite time in the future. The evidence showed that Ms. Akers had resided with her parents in Banks County and had resided there prior to the May 22, 2018 election. The evidence showed she cast a ballot in the December Special Election in Habersham County when ineligible to do so;

11.     Mr. Gasaway presented insufficient evidence to show that Mr. Terrance Eyring voted illegally in the Special Election because the evidence failed to show that Mr. Eyring intended to change his residence more than 30 days before the election;

12.     Mr. Gasaway presented **sufficient** evidence to show that Ms. Patricia G. Bower voted illegally in the Special Election. The evidence showed that Ms. Bower changed her residence to an address outside of HD 28 before the May 22, 2018 primary election.  She gave the out of district address to Habersham County election officials when she voted on May 22, 2018.  Ms. Bower was not eligible to cast a ballot in the Special Election;

13.     Mr. Gasaway presented **sufficient** evidence to show that Ms. Constance Franklin voted illegally in the Special Election. The evidence showed that Ms. Franklin changed her residence to an address outside of HD 28 before May 22, 2018. She gave the out of district address to Habersham County election officials when she voted on May 22, 2018. Ms. Bower was not eligible to cast a ballot in the Special Election;

14.     Mr. Gasaway presented insufficient evidence to show that Ms. Mahala M. Moody's vote in the Special Election was rejected because the evidence failed to show that Ms. Moody attempted to vote in the Special Election;

15.     Mr. Gasaway presented insufficient evidence to show that Ms. Jenifer Nicole Vickery's vote in the Special Election was rejected because the evidence failed to show that Ms. Vickery attempted to vote in the Special Election;

16.     Mr. Gasaway presented insufficient evidence to show that Mr. Richard Samuel Vickery's vote in the Special Election was rejected because the evidence failed to show that Mr. Vickery attempted to vote in the Special Election;

4

17. Mr. Gasaway presented insufficient evidence to show that Ms. Nancy B. Treadwell's vote in the Special Election was rejected because the evidence failed to show that Ms. Treadwell attempted to vote in the Special Election;

18. Mr. Gasaway presented insufficient evidence to show that Mr. David Alan Treadwell's vote in the Special Election was rejected because the evidence failed to show that Mr. Treadwell attempted to vote in the Special Election;

19. Mr. Gasaway presented insufficient evidence to show that Ms. Debra Wilbanks's vote in the Special Election was rejected because the evidence failed to show that Ms. Wilbanks attempted to vote in the Special Election;

20. Mr. Gasaway presented insufficient evidence to show that Mr. Jack Lee Stewart voted illegally in the Election. The Court finds that the General Assembly used the political boundary of Banks County in its description of HD 28 in 2011 H.B. 1EX and its subsequent amendments rather than the U.S. Census designation of the boundary of Banks County.[1]   The evidence showed that Mr. Stewart's residence was located in Banks County, although it was not located in a census block designated to Banks County;

21. Mr. Gasaway presented insufficient evidence to show that Ms. Peggy F. Stewart voted illegally in the Election. The Court finds that the General Assembly used the political boundary of Banks County in its description of HD 28 in 2011 H.B. 1EX and its subsequent amendments rather than the U.S. Census designation of the boundary of Banks County.  The

---

[1] Plaintiff's evidence showed that the General Assembly's Legislative Reapportionment Office uses census tract boundaries in establishing House Districts. Plaintiff demonstrated variance between census tract boundaries and commonly understood political boundaries of Banks County. Because the Stewarts and the Speeds were enumerated by the Census Bureau in Census tracts assigned to Franklin County, they were not included in the cohort of citizens which the General Assembly intended to compose House District 28.

evidence showed that Ms. Stewart's residence was located in Banks County, although it was not located in a census block designated to Banks County;

22.     Mr. Gasaway presented insufficient evidence to show that Mr. Billy Carlton Speed voted illegally in the Election. The Court finds that the General Assembly used the political boundary of Banks County in its description of HD 28 in 2011 H.B. 1EX and its subsequent amendments rather than the U.S. Census designation of the boundary of Banks County.  The evidence showed that Mr. Speed's residence was located in Banks County, although it was not located in a census block designated to Banks County;

23.     Mr. Gasaway presented insufficient evidence to show that Ms. Kristie E. Speed voted illegally in the Election. The Court finds that the General Assembly used the political boundary of Banks County in its description of HD 28 in 2011 H.B. 1EX and its subsequent amendments rather than the U.S. Census designation of the boundary of Banks County. The evidence showed that Ms. Speed's residence was located in Banks County, although it was not located in a census block designated to Banks County;

24.     Mr. Gasaway presented insufficient evidence to show that Mr. Connor O. Speed voted illegally in the Election. The Court finds that the General Assembly used the political boundary of Banks County in its description of HD 28 in 2011 H.B. 1EX and its subsequent amendments rather than the U.S. Census designation of the boundary of Banks County. The evidence showed that Mr. Speed's residence was located in Banks County, although it was not located in a census block designated to Banks County;

25.     At least four votes were illegal as a result of irregularities in the December 4, 2018 House District 28 Special Election.

**Conclusions of Law**

O.C.G.A. § 21-2-522 establishes that a result of a primary election may be contested if:

> (1)  [m]isconduct, fraud, or irregularity by any primary or election
> official or officials sufficient to change or place in doubt the result;
>
> …
>
> (3)  [w]hen illegal votes have been received or legal votes rejected
> at the polls sufficient to change or place in doubt the result.

To prevail under O.C.G.A. § 21-2-522, a party challenging an election result must show that a sufficient number of voters voted illegally or were irregularly recorded in the contest being challenged to make a difference or cast doubt on the outcome. *Taggart v. Phillips*, 242 Ga. 484, 487 (1978).  If that party carries this burden, the election should be voided and another one held. *See generally Bush v. Johnson*, 111 Ga. App. 702, 706 (143 S.E.2d 21) (1965).  A contestor does not have to show how the voters would have voted, only that they voted in the underlying election. *Howell v. Fears*, 275 Ga. 627, 628 (2002).   O.C.G.A. § 21-2-503 also states:

> [u]pon the final judgment of the proper tribunal having jurisdiction of a contested election
> which orders a second election or declares that another person was legally elected to the
> office, the person sworn into such office shall cease to hold the office and shall cease to
> exercise the powers, duties, and privileges of the office immediately.

**Judgment of the Court**

Having heard and considered the evidence in the record and the arguments by counsel, the Court hereby **GRANTS** Mr. Gasaway's First Amended Petition to Contest Election Results & Request for New Election and **ORDERS** as follows:

(a)      The evidence showed a sufficient numbers of illegal votes to change or cast in doubt the results of the December 4, 2018 Georgia House District 28 Special Election.  Illegal votes were received and there was irregularity by primary election officials. Three ineligible voters voted and one eligible voter cast more than one ballot in the Special Election;

(b)     The Special Election in which Respondent Chris Erwin was certified the winner is **HEREBY** declared invalid;

(c)     Having been sworn into office as Representative of Georgia House District 28, under O.C.G.A. § 21-2-503, Mr. Erwin **HEREBY** ceases to hold this office and ceases to exercise the powers, duties, and privileges of the office immediately;

(d)     The third 2018 Georgia House District 28 Republican General Primary Election **SHALL** take place on April 9, 2019 with all absentee ballots, early voting ballots, and other ballots to be administered in accordance with Georgia's Election Code;

(e)      Pursuant to O.C.G.A. § 21-2-291, because there is no eligible Democratic candidate or eligible candidates of a party other than the Republican party in the 2018 Georgia House District 28 race, the winner of the third 2018 Georgia House District 28 Republican General Primary Election taking place on April 9, 2019 **SHALL** be declared the winner of the 2018 Georgia House District 28 General Election to take office upon certification of the April 9, 2019 Election results and the corresponding specially-scheduled swearing-in;

(f)     The individuals eligible to vote in the third 2018 House District 28 General Republican Primary Election taking place on <u>April 9, 2019</u> **SHALL** be all voters identified on the Approved Eligible Electors List (Electors List) created as follows.  The Electors List shall comprise all voters that were or should have been eligible to vote in the May 22, 2018 House District 28 General Primary that (1) did not request a Democratic ballot in that May 22, 2018 General Primary Election, and (2) did not become ineligible to vote in House District 28 in the November 6, 2018 General Election.  The Boards of Election and Registration for Banks, Habersham and Stephens Counties shall create a proposed Electors List and submit to Candidates Erwin and Gasaway no later than 5:00 P.M. on <u>March 1, 2019</u>; the Candidates shall have until

5:00 P.M. on <u>March 6, 2019</u> to file any and all objections to the proposed Electors List.  Each Board of Elections and Registration shall meet, consider and decide on each objection on or before <u>March 11, 2019</u>.  The resulting list of voters shall be the Approved Eligible Electors List.  Any voter for whom an objection is raised that is included in the Approved Eligible Electors List shall be permitted to submit a provisional ballot and their eligibility shall be examined in accordance with the Georgia Election Code.

 (g) The Court announced these findings in a hearing on February 1, 2019.

 **SO ORDERED**, this 8th day of February, 2019.

David R. Sweat

Judge David R. Sweat
Senior Judge of Superior Courts
State of Georgia

# EXHIBIT N



Support Local Journalism.
Subscribe today for 99¢.



### Do-over déjà vu: Georgia Republicans face a third vote for House seat

GEORGIA POLITICS | April 9, 2019

By Greg Bluestein, The Atlanta Journal-Constitution

Advertisement

Forgive Graham Hodgkins for being a bit irritated.

Advertisement

The Banks County retiree has already voted twice over the past year in a race to represent a slice of northeast Georgia in the state House. And on this crisp Friday afternoon, he's back a third time to cast yet another ballot.

"It's bizarre. It's expensive," Hodgkins said. "And I'm upset."

The ongoing electoral battle between Chris Erwin and Dan Gasaway has turned into Georgia's version of "Groundhog Day," except with bitter politicking, courtroom drama, claims of voter fraud and a Super Bowl ad.

Voters have already cast ballots twice in the race between the two Republicans to represent House District 28, and both times a judge threw out the results because they were marred by illegal votes.

Now officials are preparing what they hope will be the final election Tuesday to decide the seat, which was vacant for the last six weeks of the legislative session. And residents can only hope that this time — after tens of thousands of taxpayer dollars have been spent — it produces a clear result.

"You want to make sure the right person is in, but a lot of this is unnecessary," said Donald Harris, another retiree. "This should've been over with by now. To say there's voter fatigue — well, that's an understatement."

Advertisement



The do-over déjà vu began during the May GOP primary, when Erwin challenged Gasaway, a three-term incumbent whose district stretches from Georgia's border with South Carolina through Stephens and Banks counties and about half of Habersham County.

In that first vote, Erwin appeared to unseat Gasaway by a 67-vote margin — until Gasaway and his legal team discovered mapping mistakes that incorrectly placed dozens of Habersham voters in the wrong House district.

That prompted a superior court judge to order the first new election to be held in December. The margin of that vote was even closer: Erwin clung to a two-vote lead when the counting was finally finished after wrangling over provisional ballots. The certified vote count was 3,521 to 3,519.

But Gasaway filed a new legal challenge, this time claiming that 21 voters had illegally cast ballots. Among the residents listed in the complaint was Banks County Sheriff Carlton Speed, who was accused of living outside the district. He called that claim "insulting and humiliating."

After a four-day trial in February, the judge found that four of those voters were ineligible — enough to sway the outcome of the race. The results were nixed, again, and Erwin was removed from his House seat — leaving more than 55,000 people in the district without a representative.

'Torn people apart'

No matter what happens, the seat will stay in Republican hands. It's territory so conservative that no Democrat stood for election; Donald Trump carried the district with more than 80 percent of the vote in the 2016 presidential election. But Democrats have seized on the disputed vote to criticize how Republican Gov. Brian Kemp oversaw elections when he was secretary of state.

Stacey Abrams repeatedly brought up the Gasaway case during her campaign for governor as an example of how problems with state elections can cut across party lines, and her Fair Fight group ran local ads during the Super Bowl featuring a Republican commissioner from the district.

Kemp's office earlier blamed Habersham officials for putting voters in the wrong district, and in interviews with more than a dozen local voters, many of them echoed that criticism. Habersham officials did not immediately comment.

"It's Habersham's fault we're in this situation, so they ought to pay for it," said Bo Garrison, the owner of a popular general store in Homer. "Neither one of the candidates caused this situation, but the sad part is, this race has torn people apart."

Along with the campaign signs that have sprouted up all over the district, so have resentments. Some of the harshest criticism is aimed at Gasaway, whose critics call him a sore loser and fault him for pursuing legal fees — his lawyer estimates the cost at $90,000 — against Habersham County.

"It's called politics," Carol Hodgkins said shortly after casting her ballot for Erwin during early voting in Homer. "Chris is a gentleman. But his opponent just won't give up. And we lost out on having a voice in the Georgia House."

Erwin, a former Banks County schools superintendent, has echoed those complaints in his campaign message, calling Gasaway's lawsuits "frivolous and ridiculous but not out of character." He described the drawn-out legal battle as "double taxation without representation."

"Not only did he sue me and the counties, he's asking for us to pay his legal fees," Erwin said. "What I'll tell you is that people are tired of this — they're tired of the accusations, and they're tired of having to go vote."

Gasaway, meanwhile, has cast himself as an underdog running against a powerful political establishment despite his three terms in the House. He pointed to campaign finance records that showed Erwin raised about $130,000 — roughly five times more than Gasaway.

Another indication of the vitriol: A doctored image making the rounds on social media shows a fake picture of Gasaway embracing Abrams, a reviled figure among many Republicans in the area. (Abrams was edited into the picture over an image of Gasaway's wife.)

"This has been extremely tough on my family," said Gasaway, who runs a commercial poultry business. "The forces against me, from the previous administration, have made this campaign extremely divisive."

For aggravated voters, Tuesday's election brings a dim hope that both sides can put their grievances behind them and unite behind a victor — if there is one. Steve Turpin, a potter, predicted more voters will turn out than expected.

"This one is going to end it all. It better," he said, as if trying to convince himself. "If not, there's going to be some serious consequences."

**Stay on top of what's happening in Georgia government and politics at www.ajc.com/politics.**

**Undefined** | Yesterday

2 women charged in beating of state senator

**Undefined** | Yesterday

Columbus woman charged with 27 felonies after stealing from employer, cops say

**Undefined** | Yesterday

Denial of Confederate group from Christmas parade upheld

**Undefined** | Yesterday

Former President Jimmy Carter not attending John Lewis funeral

**Undefined** | 6 days ago

ESPN expert reveals differences in new Georgia football offense

Wikibuy | Sponsored

Before you renew Amazon Prime, read this

# EXHIBIT O

**ELECTIONS**

# Georgia House District 28 race yields same results for the third time

Unofficial results on Tuesday showed Chris Erwin beating Dan Gasaway for a third time in the Republican primary for a state House seat in northeast Georgia.



Author: **Associated Press**
Published: **10:54 PM EDT April 9, 2019**
Updated: **11:55 PM EDT April 9, 2019**

 

Third time's a charm. At least that's what frustrated voters in one Georgia House district are hoping after two previous elections were thrown out by a judge.

Unofficial results on Tuesday showed Chris Erwin beating Dan Gasaway for a third time in the Republican primary for a state House seat in northeast Georgia.

Results from Georgia's secretary of state showed Erwin receiving about 75% of over 6,000 votes cast. There is no Democrat in the race, so the winner takes the seat spanning Banks, Stephens and Habersham counties.

**RELATED: Recount confirms election results: Chris Erwin wins House District 28 by 2 votes**

"It's kind of frustrating," Harold Scott said after casting his ballot for Erwin — the third time he had done so — at the First Baptist Church in Cornelia. "To spend the money three times to get a

guy elected, it's kind of silly."

The new vote came as Georgia continues to face scrutiny over its handling of the 2018 elections, during which voters reported a number of issues casting ballots — including long voter lines, malfunctioning voting machines and rejected absentee ballots.

**RELATED: House District 28 race: Georgia's 2-vote do-over highlights district boundary anomalies**



Erwin appeared to defeat Gasaway twice before, first in the original primary last May and then in a redo Dec. 4. But Superior Court Judge David Sweat found illegal votes tainted both results and ordered new elections.

Gasaway challenged May's primary results in court after losing to Erwin by 67 votes. Sweat, a senior judge based outside the district, ruled mapping errors allowed some who didn't live in the district to vote.

**RELATED: House District 28 race: Georgia Secretary of State orders recount**

**RELATED: Chris Erwin's three-vote margin in Georgia's House District 28 race**

Erwin won again in December by just two votes, and was sworn in Jan. 14. But he was removed by a court order within a month, when Sweat threw out those results after finding that four voters cast illegal ballots — enough to have potentially tipped the race.

The cycle of elections and legal challenges left the district without a representative in the state House for much of the 2019 legislative session, which opened in January and ended last week.

Habersham County elections supervisor Laurel Ellison estimated the cost of the December do-over at about $5,800 and the cost of Tuesday's race at about $8,000.

**MORE NEWS |**

- **Critics say new voting system planned for Georgia is flawed**
- **Who is running for president in 2020 so far?**
- **Biden jokes about giving hugs in first appearance since complaints from women**

EXHIBIT P



By **Simone Pathé**
Posted February 21, 2019 at 3:07pm

The North Carolina State Elections Board voted unanimously Thursday afternoon to hold a new election in North Carolina's 9th District.

Their vote came after Republican [Mark Harris](#)'s stunning call for a new election following his admission that he misspoke during his testimony earlier in the day.

"It's become clear to me that public confidence in the 9th District has been undermined to an extent that a new election is warranted," Harris said.

Harris took the stand immediately after the evidentiary hearing resumed following an abruptly called lunch break and closed session. He read from a prepared statement explaining that confusion in his earlier testimony stemmed from illness he recently suffered.

Counsel for Harris agreed that a new election should be called, but attorney David Freedman argued that Harris did not know about any wrongdoing.

After last fall's voting, Harris led Democrat Dan McCready by 905 votes. But the State Board of Elections had refused to certify the results because of allegations of tampering

with absentee ballots. The state board announced on day one of the hearings on Monday that it found evidence of a "coordinated, unlawful and substantially resourced absentee ballot scheme operation," including efforts of a cover-up.

Taking the stand Thursday afternoon, Harris said he'd recently suffered two strokes and that he was "struggling" with his testimony. He had first testified in the morning that he couldn't remember telling anyone whether he expected emails between him and his son John to be presented during the hearing. Those emails were a central part of Wednesday's hearings, during which John Harris testified to having warned his father about Leslie McCrae Dowelss, Jr., the operative at the center of the ballot scheme.

But after the intermission on Thursday, Mark Harris clarified that he had in fact told his other son this week that he wasn't expecting those emails to come up during the hearing.

Attorneys for Harris' campaign committee were under fire from the board Thursday morning for not having turned over those emails until just before John Harris took the stand on Wednesday.  On Wednesday night, they turned over a previously undisclosed message in which Harris asked a local Republican for an introduction to Dowless and referred to him as "the guy whose absentee ballot project for Johnson could have put me in the US House this term."

Dowless had worked in the 9th District's 2016 GOP primary for Todd Johnson, who was the top vote-getter in absentee ballots in Bladen County.

**CAMPAIGNS**

# State board votes for new election in North Carolina's 9th District

## Republican Mark Harris called for a new election Thursday afternoon



Republican Mark Harris, center, announced on Tuesday that he won't run in the special election for North Carolina's 9th District. Above, Harris campaigns in Charlotte, N.C., in October 2018 with President Donald Trump and Rep. Ted Budd. (Sean Rayford/Getty Images file photo)

Having examined absentee ballot data from 2016, John told his father in April 2017 that Dowless had likely been collecting absentee ballots and that that was illegal, even offering to send him the statute to prove it to him.

The warnings John testified to having given his father would seem to contradict earlier interviews in which Mark Harris said no one had raised any red flags to him about Dowless.

But on Thursday, Mark Harris said he didn't even consider his communication with his son to be a warning.

"I just believed he was overreacting," Mark Harris said Thursday.

Mark Harris didn't question Dowless about his absentee ballot operation, and said he was impressed with Dowless' relationships in Bladen County and his status as a local elected official.

He admitted Thursday that his son's warnings in April 2017 were "prophetic," but said he dismissed them at the time since his son had never been to Bladen County and had never met Dowless.

"I'm his dad," Mark Harris said, adding, that he's known his son to have "a little taste of arrogance."

The state board has the power to set the date for the special election. There will also be a special election in the open 3rd District, which the governor will call, to fill the seat vacated by the late Walter Jones.

## AROUND THE WEB





**Does Your Dog Scratch Themselves & Lick Their Paws?**

Itch Relief Chews - Petlab



**The Horrifying Truth About CBD**

Tommy Chong



**Urologists: Men, Forget the Blue Pill! This "Destroys" ED (Do This Tonight!)**

Your Healthy News Today



**This "Destroys" ED**

Your Healthy News Today