IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, et al.,<br><br>   Plaintiffs,<br><br>v.<br><br>Katie Hobbs, et al.,<br><br>   Defendants. | No. CV-20-01143-PHX-DLR<br><br>**AMENDED NOTICE REGARDING AUGUST 18, 2020 HEARING**[1] |

  In addition to any prepared remarks, arguments, or presentations the parties wish to make, the Court requests that the parties come to the August 18, 2020 hearing prepared to discuss the following matters.[2]

**For Plaintiffs:**

1. "An association has standing to bring suit on behalf of its *members* when its *members* would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual *members* in the lawsuit." *Friends of the Earth Inc. v. Laidlaw Envtl. Servs.*, 528 U.S. 167, 181 (2000) (emphasis added). The briefs argue that the Arizona Democratic Party ("ADP"),

---

[1] This notice amends the version at docket entry 99 by adding some additional questions to the parties.

[2] These questions are not exhaustive or intended to limit the parties' presentations. They are designed to focus attention on some of the Court's initial concerns based on a review of the briefs, with the goal of facilitating a more productive hearing.

the Democratic National Committee ("DNC"), and the Democratic Senatorial Campaign Committee ("DSCC") (collectively "Plaintiff organizations") each has "members or constituents" who would have standing to challenge the adequacy of Arizona's current cure procedures for unsigned mail ballots. Is there a difference between a "member" and a "constituent?" If so, what is that difference? What case allows associational standing to be derived from constituents (as Plaintiffs use that term) rather than members?

2. Who specifically are considered members of each of the Plaintiff organizations?

3. To be a "member" of the Plaintiff organizations must a person be registered with the Democratic Party in Arizona?

4. Is any voter who casts a vote for any Democratic candidate considered a member of any or all Plaintiff organizations? For example, if a registered Republican or Independent voter in Arizona votes for a Democratic candidate, is that person considered a member of any Plaintiff organization (and if so, which one(s))? If a registered Democratic voter chooses to vote for non-Democratic candidates, is that voter still considered a member of any Plaintiff organization? Is a split-ticket voter a member of both major parties?

5. Why are no voters (for example, voters who had mail ballots rejected because of missing signatures in *past* elections) joined as plaintiffs in this case?

6. Is it Plaintiffs' position that, based solely on the number of mail ballots rejected for missing signatures, at least some of those ballots must have been cast by registered Democratic voters, or that at least some of those ballots must reflect votes for Democratic candidates, regardless of the voters' party affiliations? If so, is there statistical evidence in the record that substantiates this position?

7. For purposes of organizational standing, would the organizational mission of the Plaintiff organizations (namely, to elect Democratic candidates to public office) be frustrated by Arizona's current signature regime if more ballots casting votes for non-Democratic candidates are rejected for missing signatures than ballots casting

votes for Democratic candidates?  Stated differently, in order to establish organizational standing, do Plaintiffs need to show that their preferred post-election cure period would net votes for Democratic candidates relative to their competitors? If not, why?

8. With respect to diversion of resources: (a) what specific resources will the Plaintiff organizations expend in the absence of their preferred post-election cure period, (b) from where will those resources be diverted, and (c) what will those resources be used for?

9. Plaintiffs argue that the challenged law is the "Inadequate Cure Period," which they define as "any requirement under Arizona law that election officials reject unsigned mail ballot envelopes without offering the voter the chance to correct the missing signature until five days after election day[.]" (Doc. 96 at 9.)  The current requirement under Arizona law is that election officials reject unsigned mail ballot envelopes that are not cured by 7:00pm on election day.  Therefore, Plaintiffs are necessarily challenging the requirement that voters sign their ballots within this timeframe.[3]  Assume (without arguing with the premise) that the burdens relevant to the Court's inquiry are the burdens on voters to comply with Arizona's current requirement of signing a mail ballot by no later than 7:00pm on election day.  What, if anything, about signing a mail ballot by no later than 7:00pm on election day is difficult or burdensome for voters?[4]

---

[3] Whether Plaintiffs choose to articulate their *Anderson/Burdick* claim as a challenge to the requirement placed on voters (sign by 7:00pm on election day), or to the State's enforcement of that requirement (reject ballots that do not comply) is of no moment.  To say that the State cannot enforce its current requirement is necessarily to say that the requirement itself, in its present form, is unlawful.  In either case, the fundamental nature of Plaintiffs' *Anderson/Burdick* claim is that what Arizona currently requires voters to do (sign by 7:00pm on election day) is constitutionally infirm.

[4] The Court is looking for specific, concrete examples and not a generic reference to "disenfranchisement."  If the burden imposed by a challenged voting procedure were measured by the consequence of non-compliance, then every voting prerequisite would be subject to the same degree of scrutiny (presumably strict) because any time a voter fails to comply with a state's voting prerequisites, the result is the same—her vote does not count. But "not every voting regulation is subject to strict scrutiny." *Pub. Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016). Instead, the degree to which the Court scrutinizes the propriety of an election law changes depending on the nature and magnitude of the burdens imposed.  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992). It

10. Roughly one tenth of one percent of mail ballots are rejected because of missing signatures, meaning more than 99% of voters who vote by mail successfully comply with Arizona's current requirement without a post-election cure period. Why is this not probative evidence that it is easy to comply with Arizona's current law? If a voting procedure is significantly burdensome, it is not reasonable to expect that more than a fraction of one percent of voters would fail to overcome those burdens?

11. Is it Plaintiffs' position that the Constitution requires at least a 5-day post-election cure period for ballots missing signatures? If so, what authority establishes 5 days as the constitutional minimum?

12. Alternatively, is it Plaintiffs' position that the Constitution requires Arizona to treat ballots with missing signatures the same as ballots with mismatched signatures, but does not necessarily establish a minimum cure period duration? If so, does this claim sound in equal protection? Could Arizona provide a shorter post-election cure period so long as it extends the same cure period to ballots with missing and mismatched signatures alike? Could Arizona extend a longer cure period to ballots with mismatched signatures so long as it extends at least a 5-day post-election cure period to ballots missing signatures?

13. If a voter receives notice of a missing signature three weeks before the election yet fails to cure that error by election day, is that voter still entitled to an additional 5 days after the election to do so? If not, then isn't Plaintiffs' claim better characterized as an as-applied challenge?

14. Are there other voting requirements or prerequisites for which the Constitution requires a post-election cure period? For example, in an election for a single-

---

therefore is not appropriate to equate the burden of complying with a voting law to the consequences that follow when that burden is not overcome. For example, in *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 198 (2008), the Supreme Court characterized the burdens relevant to the challenged voter identification law as "the inconvenience of making a trip to the [Indiana Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph," to obtain the required identification. The Supreme Court did not characterize the relevant burdens as the consequence of not obtaining the required identification (which likewise would have been "disenfranchisement," as Plaintiffs use that term).

occupant office, a ballot typically instructs the voter to vote for only one candidate. If the voter mistakenly votes for more than one candidate, does the Constitution require Arizona to make a reasonable effort to contact the voter and provide a post-election period during which the voter can cure her improperly marked ballot?

15. Is it Plaintiffs' position that a ballot is a legally valid vote even if it is unsigned, or that an unsigned ballot is legally invalid but could easily be made legally valid with the introduction of additional procedural safeguards?  If the former, what other voting prerequisites or instructions may voters disregard and still have their votes be deemed legally valid?  At what point in a state's election regime does a vote become legally valid for constitutional purposes?

16. As a general matter, is a signature a constitutionally permissible method of verifying that an absentee ballot was cast by the voter to which that ballot belongs?

17. Although there have been recent changes to the way in which Arizona treats ballots with *mismatched* signatures, it has long been the law in Arizona that a mail ballot without a signature will not be counted.  Why are Plaintiffs only now challenging this practice?  Why doesn't the fact that Plaintiffs seemingly acquiesced to this practice in numerous prior elections undermine their claim that they will be irreparably harmed if the practice is not enjoined before this next election?  Stated differently, if ballots have been rejected because of missing signatures for decades, what has changed to make the harm suddenly irreparable?

18. Plaintiffs discuss the potential impact of the COVID-19 pandemic on the equities in this case.  Is this issue determinative, or would Plaintiffs' arguments be the same in the absence of the pandemic?

19. The State's expert, Lonna Atkeson, recites several facts upon which her opinions are based.  Do Plaintiffs object to the accuracy or admissibility of her underlying facts, or is their objection directed only to her opinions?

**For Defendants the Apache, Coconino, and Navajo County Recorders:**

1. Have the settlement agreements reached in *Navajo Nation v. Hobbs*, CV-18-083329-PCT-DWL been breached?  If so, are there efforts underway to compel compliance with those agreements?
2. The Apache, Coconino, and Navajo County Recorders are not plaintiffs in this case, nor is the Navajo Nation.  Consequently, are the settlement agreements reached in *Navajo Nation v. Hobbs* relevant to this case and, if so, how?

**For Defendant Arizona Secretary of State:**

1. From the record, it appears that the Secretary of State previously supported, as a matter of public policy, a 5-day post-election cure period for ballots with missing signatures.  There is a difference between sensible public policy (about which reasonable minds might disagree) and constitutionally mandated policy (which places the issue beyond debate by the political actors typically assigned responsibility for balancing competing interests and crafting elections procedures).  The Secretary has thus far declined to take a position on Plaintiffs' claims, but as Arizona's chief elections official, the Court would value her input and expertise if she is willing to provide it.  Does the Secretary believe Arizona's current procedure regarding mail ballots with missing signatures is unconstitutional?  If so, is it the Secretary's position that the Constitution requires a 5-day post-election cure period, or that the Constitution requires equal treatment of ballots with missing and mismatched signatures but does not establish a constitutional minimum cure period?

**For Defendant the State of Arizona:**

1. Who, in the State's view, would have standing to challenge the adequacy of Arizona's current cure procedures for mail ballots missing signatures?  Would any early mail voter have standing? What about an early mail voter who had her ballot

rejected due to a missing signature in a prior election? Could such a voter sue to enjoin the procedure on a prospective basis?

2. Do the State, Secretary of State, or County Recorders have data concerning the party affiliations of voters whose ballots have, in past elections, been rejected because of missing signatures?

3. What does the State consider to be a "signature" triggering the 5-day post-election cure period for mismatches?

4. What is the bare minimum type of mark a voter can make and still have that ballot be considered "signed?" For example, if a voter marks the ballot with an "X," will that mark be considered a mismatch or a missing signature?

5. Have the settlement agreements with the Navajo Nation reached in *Navajo Nation v. Hobbs* been breached?

6. Although the State now offers policy-based justifications for not extending the same post-election cure period to ballots with missing signatures, it appears from the record that the Attorney General's initial objection to the inclusion of such a post-election cure period in the Elections Procedures Manual was based on his interpretation of Arizona law, not policy disagreements. Specifically, the Attorney General believes that Arizona law prohibits a post-election cure period for ballots missing signatures. Please explain this interpretation of Arizona law. Has any Arizona court issued a decision interpreting Arizona law as it relates to this issue?

7. If Arizona law did not prohibit such a post-election cure period, would the Attorney General still have objected to its inclusion in the Elections Procedures Manual?

8. Why isn't the State's interest in preventing potential voter and election fraud not *advanced* by additional procedures to verify whether an unsigned mail ballot was submitted by the voter? For example, if the State offered a post-election cure period for unsigned ballots and received confirmation from some voters that they did not, in fact, submit the ballots in question, would that not *help* the State uncover potential instances of voter impersonation fraud? Under current law, the State would never

know whether those unsigned ballots were, in fact, cast by the voter herself. Doesn't that blindness hinder, rather than advance, the State's fraud-avoidance interests?

9. If a voter completes her ballot in red ink, contrary to the ballot instructions, do election officials offer a post-election cure period? If so, why?

10. The State argues that the *Anderson/Burdick* framework governs all constitutional challenges to election regulations, but Plaintiffs cite several cases applying the *Matthews v. Eldridge* procedural due process framework to election procedures related to absentee voting. How is this case different than those cited by Plaintiffs?

11. Does the State have an interest in denying a post-election cure period for ballots missing signatures that is distinct from the State's interest in requiring mail ballots to be signed, generally? If so, what is the State's distinct interest in denying a post-election cure period?

Dated this 14th day of August, 2020.

	Douglas L. Rayes
	United States District Judge