**MARK BRNOVICH**
**ATTORNEY GENERAL**
Joseph A. Kanefield (No. 15838)
  *Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
  *Division Chief*
Drew C. Ensign (No. 25463)
Michael S. Catlett (No. 25238)
  *Deputy Solicitors General*
Jennifer J. Wright (No. 27145)
Robert J. Makar (No. 33579)
Anthony Napolitano (No. 34586)
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for State of Arizona*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, et al.,<br><br>Plaintiffs,<br>vs.<br><br>Katie Hobbs, et al.,<br>Defendants,<br>and<br>State of Arizona, Republican National Committee, Arizona Republican Party, and Donald J. Trump for President, Inc.,<br><br>Intervenor-Defendants. | Case No: 2:20-cv-01143-DLR<br><br>**STATE'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO STRIKE CERTAIN OPINIONS OF LONNA ATKESON** |

The State of Arizona (the "State") hereby responds in opposition to Plaintiffs' Motion to Strike Certain Opinions of Lonna Atkeson ("Motion") [Doc. 101]. In the Motion, Plaintiffs request that the Court strike paragraphs 55-62, 72-76, and 94 of Professor Atkeson's expert report. The Court should deny that request. Not only do

Plaintiffs misapply Federal Rule of Evidence 702, their Motion is overbroad and their arguments against Professor Atkeson's report, at most, go to the weight of her opinions, not their admissibility.

I. **BACKGROUND.**

    A. **The Claims at Issue**.

For over 100 years, the State has allowed voters to cast their ballot by mail. Although over time the law has changed to allow more and more Arizonans to vote by mail and to make doing so easier, one thing has remained constant: if you want to cast a valid vote by mail, you must sign the affidavit accompanying your ballot. And, as the Court has recognized, "it has long been the law in Arizona that a mail ballot without a signature will not be counted." [Dkt. 103 at 5.]

For decades, a mail-in ballot missing a signature or reflecting a signature that did not match the voter signature that Arizona election officials had on file, could result in rejection of the mail-in ballot. And like all other ballots, mail-in ballots had to be received by election officials by the time polls close on Election Day. In 2019, the Arizona Legislature enacted A.R..S. § 16-550(A), which provides that "[i]f the signature is inconsistent with the elector's signature on the elector's registration record, the county recorder or other officer in charge of elections shall make reasonable efforts to contact the voter, advise the voter of the inconsistent signature and allow the voter to correct or the county to confirm the inconsistent signature." As to mismatching signatures, the Legislature created a narrow exception to the requirement that a valid vote must be cast by closing time on Election Day: "the county recorder or other officer in charge of elections shall allow signatures to be corrected not later than the fifth business day after a primary, general or special election that includes a federal office or the third business day after any other election." *Id.*

The Legislature exercised its discretion not to create a similar exception for mail-in ballots with a missing signature. Thus, like all ballots other than those with a mismatching signature, mail-in ballots with a missing signature must be corrected no

1  later than 7:00 p.m. on Election Day.  There are a number of ways a voter may do so.
2  And Attorney General Brnovich, Governor Ducey, and Secretary Hobbs amended the
3  Election Procedures Manual in late 2019 to require county recorders to make a good faith
4  effort to contact voters if they have failed to sign their mail-in ballots.

5  Despite the ease of signing and returning a mail-in ballot, and the multiple avenues
6  Arizona voters have for remedying a failure to do so, Plaintiffs claim that the State's
7  decision to require voters to sign their ballot by 7:00 p.m. on Election Day is
8  unconstitutional.  Plaintiffs ask the Court to overrule the Legislature's decision to require
9  an Election Day deadline for signatures and to extend that deadline through judicial
10 injunction.  And Plaintiffs assert that the 5-business-day post-election cure period in § 16-
11 550(A) is now constitutionally required for unsigned ballots because that is the period the
12 Legislature landed on for mismatching signatures.  Professor Atkeson's expert report
13 refutes Plaintiffs' constitutional claims and is therefore relevant and helpful to the Court's
14 resolution of those claims (and Plaintiffs do not argue otherwise).

15 **B.    Professor Atkeson's Background and Experience.**

16 Professor Atkeson is well qualified to opine on Plaintiffs' claims that Arizona
17 election law imposes a substantial burden on the ability to vote in Arizona, as well as on
18 the State's interests in requiring mail-in ballots to be signed prior to poll closing on
19 Election Day.   Professor Atkeson has been a Professor of Political Science at the
20 University of New Mexico since 2006.  She earned a PhD from the University of
21 Colorado, Boulder in 1995.  She has directed the Center for the Study of Voting,
22 Elections, and Democracy since 2010 and the Institute for Social Research since 2016.
23 Professor Atkeson studies election science, election administration, survey methodology,
24 public opinion, political behavior, gender, and race and ethnicity.  She has written over
25 50 articles and book chapters and dozens of technical reports and other works on these
26 topics.  She is the co-author of books entitled *Evaluating Elections: A Handbook of*
27 *Methods and Standards* (Cambridge, 2013) and *Confirming Elections: Creating*
28 *Confidence and Integrity Through Election Audits* (Palgrave, 2012).   Professor Atkeson

1 has had her articles published in the *American Political Science Review*, the *American Journal of Political Science*, *Journal of Politics*, *Political Analysis*, *Electoral Studies*, *Election Law Journal*, *Political Research Quarterly*, *American Politics Quarterly*, *Political Behavior*, and *Social Science Quarterly*. Finally, Professor Atkeson has "spent countless hours observing elections since 2006 from start to finish, including attending poll worker training, observing voting, observing the [vote by mail] voter process, the provisional process, chain-of-custody process, and postelection audits."[1] [*See* Exh. 1 ¶¶ 2-6.] Plaintiffs do not challenge that Professor Atkeson is qualified to give the opinions contained within her expert report.

      **C.**     **Professor Atkeson's Report.**

Not only are the opinions contained in Professor Atkeson's report fully supported by her deep election experience and the data she reviewed, but her report strongly refutes Plaintiffs' claims. Professor Atkeson begins by discussing the history of mail-in voting in Arizona and the great lengths to which the State has gone to make mail-in voting an efficient option for its citizens. In order to vote by mail, Arizonans need only register to do so and then fill-out, sign, and return their ballot by closing time on Election Day. The State provides pre-paid postage and does not require signature notarization or witnessing. The State provides multiple options for returning a mail-in ballot: "VBM voters may return their ballot through the mail in time for its receipt by the time pols close on Election Day, or deliver it to an in-person vote center, precinct, or drop-box with the county by the close of voting on Election Day. . . . Voters also have the option of visiting an emergency vote center the 3 days before Election Day if life circumstances prevent them from being able to vote on Election Day." [*Id.* ¶ 19.]

Professor Atkeson then compares Arizona's mail-in ballot procedures to those in other states and concludes that Arizona has one of the least burdensome mail-in ballot regimes in the country. In fact, "Arizona's voting system provides more opportunities for

---

[1] Professor Atkeson's additional qualifications are summarized at the beginning of her expert report and in the curriculum vitae attached as Appendix A to her report.

4

voters to exercise the franchise than nearly all the states and provide[s] the same opportunities as a few other all or mostly VBM states." [*Id.* ¶20.] Similarly, "registered voters on the PEVL list have likely some of the lowest costs of voting relative to other states that do not have a permanent absentee VBM system and perhaps as cheap as Colorado, which is considered to have the most sophisticated all VBM operation in the country for casting absentee ballots." [*Id.*]

Professor Atkeson also discusses the history and mechanics of curing procedures for mail-in ballots with signature issues. [*Id.* ¶¶25-39.] Professor Atkeson explains the structural differences between a ballot with a missing signature and a ballot with a mismatching signature. Those ballots missing a signature "cannot simply receive a voter's verbal confirmation for continued processing, each absentee ballot must be signed and verified to be counted as the signature and signature verification are the only authentication process required by Arizona law." [*Id.* ¶ 27.] This structural difference is material: "[B]allots that have signature matching problems are complete they just cannot be verified. . . . A confirmation of a ballot that is already complete (signed, but no match) . . . is distinctly different from a ballot that is incomplete (unsigned) and consequently the ballots get treated differently both in law and in their administrative processes." [*Id.* ¶34.] Thus, the Plaintiffs are "wrong" in treating, and attempting to have the Court treat, missing and mismatching signatures the same. [*Id.* ¶39 ("The plaintiffs treat no signature and signature mismatch as the same type of ballot problem. But Arizona law, statute, administrative processes, and culture do not.").]

Professor Atkeson then explains that the signature requirement is necessary to protect election integrity. Professor Atkeson explains that "[t]o treat voter's consistently across modes, and to protect the system against VBM fraud, voters who VBM are also required to sign their ballots, which is then verified by election officials." [*Id.* ¶42.] The State has balanced the need to require a signature with any resultant burden by prominently explaining the signature requirement in multiple languages on ballots and in online and print advertising and by making the requirement easy to fulfill. [*Id.* ¶¶43-49.]

1 Professor Atkeson then compares Arizona's mail-in ballot procedures, deadlines,
2 and rejection rates with those of other states. Unlike Arizona, 19 states use methods
3 other than signature verification for voter authentication (e.g., witnesses or notaries, copy
4 of an ID, or requiring other information on the ballot); 31 states, like Arizona, use
5 signature verification. [*Id.* ¶50] Of those 31 states, 15 do not have any statutes requiring
6 voter contact to rectify rejected ballots; only 16 states, including Arizona, offer ballot
7 curing. [*Id.* ¶ 51.] In 3 of those 16 states, the cure period ends on Election Day for
8 missing and mismatching signatures. [*Id.* ¶52.] In the other 13 states, including Arizona
9 the cure periods vary widely—some are longer than others, some are pegged to Election
10 Day, and some are pegged to state certification.[2] [*Id.* ¶ 53.]

11 Professor Atkeson compares, analyzes, and comments upon mail-in ballot
12 rejection rates in Arizona and six other states for the 2016 and 2018 general elections.
13 [*Id.* ¶¶ 50-62.] Professor Atkeson concludes that Arizona's rejection rate for missing
14 signatures is extremely low—0.12% in 2016 and 0.10% in 2018. [*Id.* ¶ 62.] Professor
15 Atkeson further observes that Arizona and Montana, which had the shortest deadlines for
16 curing missing signatures, had rejection rates lower than most other states with longer
17 cure periods. [*Id.* ¶ 56.] The same goes for rejection rates for mismatching signatures—
18 states with longer cure periods for mismatching signatures generally have higher
19 rejection rates. [*Id.* ¶58.] Professor Atkeson concludes based on the data presented that
20 "the push to have post-Election Day curing periods may be misguided and may actually
21 lead to greater disenfranchisement." [*Id.* ¶59.] "Thus, it is not clear theoretically that
22 longer curing times will lead to more votes being counted and empirical results presented
23 above suggest otherwise." [*Id.* ¶60.]

24 Finally, Professor Atkeson discusses the State's interests in requiring a signature
25 to authenticate ballots to ensure election integrity and in limiting the administrative

---

[2] This variation is strong support that there is no constitutionally-imposed mandatory cure period for missing signatures, let alone one that is identical to the period for mismatching signatures.

6

burdens cause by extending the duration of post-election cure periods. [*Id.* ¶¶63-76.] Professor Atkeson concludes that, even in the midst of the COVID-19 pandemic, "Arizona is one of only a handful of states that is in a strong position to ensure both the safety of its voters, and a fair VBM system in the November 2020 election." [*Id.* ¶88.]

## II. THE COURT SHOULD DENY THE MOTION TO STRIKE.

Plaintiffs' requested relief has no connection whatsoever to the arguments they actually make in the Motion. The entirety of Professor Atkeson's report easily satisfies Rule 702 under any circumstances. But her report especially does so here where there will be no jury, the primary relief sought is a an injunction, and the report at issue is based on personal experience and observation, not scientific or technical information. Plaintiffs' Motion is merely a written description of the points they would have hoped to make through the cross-examination they stipulated away, which is an improper use of Rule 702.

### A. Plaintiffs' Requested Relief Is Overbroad.

Plaintiffs' requested relief is not tailored to the objections actually contained in their Motion, which is reason alone for the Court to deny the Motion. Plaintiffs ask the Court to strike the entirety of paragraphs 55-62, 72-76 and 94 of Professor Atkeson's report. But Plaintiffs only actually raise issues about small portions of a few of those paragraphs.

For example, Plaintiffs ask the Court to strike paragraph 55 in its entirety, but that paragraph merely summarizes the data that Professor Atkeson analyzes and describes the reason for analyzing that data. Similarly, Plaintiffs ask the Court to strike paragraphs 56 and 57, which primarily summarize the data on state rejection rates and make straightforward observations about what that data suggests. The same goes for paragraph 62, which consists of nothing more than a summary of the low ballot rejection rates based on missing signatures in Arizona for the 2016 and 2018 elections.

Plaintiffs also move to strike paragraph 72, but that paragraph contains only Professor Atkeson's description of the benefits of a single cut-off date for signing ballot

7

affidavits. Paragraph 73 primarily describes Arizona's procedures and deadlines for processing early ballots and verifying signatures and provisional ballots and yet Plaintiffs would have the Court strike it in its entirety. Paragraph 76 discusses the potential financial implications of a post-election cure period; Plaintiffs say nothing about the content of this paragraph in their Motion and yet include it among those the Court should strike.

It is not the Court's duty, particularly in a case moving as quickly as this one, to dig through an expert report to determine those portions which are actually implicated by Plaintiffs' Motion. Because much of Plaintiffs' requested relief has no basis in the Motion itself, the Court should deny the Motion outright.

**B.** **Professor Atkeson's Report Complies With Rule 702.**

**1.** **Rule 702 Generally.**

Rule 702 provides the framework governing the admissibility of expert testimony. For expert testimony to be admissible under Rule 702, it must satisfy three basic requirements: (1) the expert witness must be qualified; (2) the testimony must be reliable, and; (3) the testimony must be relevant. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589–91 (1993). Under Rule 702, a court evaluating the reliability of expert testimony must consider whether: (1) the testimony was based on sufficient facts or data, (2) the testimony was the product of reliable principles and methods, and (3) the witness applied those principles and methods reliably to the facts of the case. Fed.R.Evid. 702. In evaluating proffered expert testimony, the trial court is "a gatekeeper, not a fact finder." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted). The judge is "supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent-A-Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). Simply put, "[t]he district court is not tasked with deciding whether the expert is right or wrong, just whether his testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

## 2. Rule 702 Applies With Less Force In This Case.

For at least three reasons, the standard under Rule 702 applies with less force in this case. First, the Court, and not a jury, will be the ultimate factfinder and decision maker. Thus, the Court need not serve a gatekeeping function to avoid confusion or misimpression by a jury. And there is little risk that the Court will be confused or led astray by anything in Professor Atkeson's expert report. The Ninth Circuit has acknowledged that Rule 702 does much less work when a case will be tried to the Court and even takes that reality into account when reviewing challenges on appeal: "When we consider the admissibility of expert testimony, we are mindful that there is less danger that a trial court will be 'unduly impressed by the expert's testimony or opinion' in a bench trial." *F.T.C. v. BurnLounge, Inc.*, 753 F.3d 878, 888 (9th Cir. 2014); *see also Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir.2004) ("The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial."); *F.T.C. v. DirectTV, Inc.*, 2017 WL 412263, \*2 (N.D. Cal. 2017) ("Since this is a bench trial, there is little risk that the expert testimony will prejudice the Court, and the arguments raised in the motion in limine can largely be addressed by giving expert testimony only the weight, if any, that it deserves.").

Second, the Federal Rules of Evidence, including Rule 702, are typically relaxed when, as here, the primary issue is whether the Court will issue an injunction. *See Greenpeace Foundation v. Daley*, 122 F. Supp. 2d 1110, 1114 (D. Hawai'i 2014) (commenting in connection with preliminary injunction proceedings that "[e]ven assuming portions of Mr. Karnella's declaration are offered in violation of Rule 702, they need not be stricken. The Court considers the declaration in its entirety, and accords it the weight that is appropriate in light of Plaintiffs' objections."); *A.A. v. Raymond*, 2013 WL 3816565, \*4 (E.D. Cal. 2013) ("In line with this logic, a trial court may admit expert testimony for purposes of a preliminary injunction evidentiary hearing and conduct its *Daubert* analysis in tandem with its assessment of the evidence's weight.") (citing other cases).

Third, Rule 702 and *Daubert* have little application where an expert witness bases her report and opinion on personal knowledge and experience, as Professor Atkeson does, rather than on scientific or technical methods. As Chief Judge Snow has explained, "[w]hen non-scientific expert testimony is being offered, 'the *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.'" *Adams Craig Acquisitions LLC v. Atain Specialty Ins. Co.*, 2019 WL 3532115, *3 (D. Ariz. 2019) (*quoting Hangarter v. Provident Life and Acc. Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)); *see also Donahoe v. Arpaio*, 2013 WL 12419625, *2 (D. Ariz. 2013) (Wake, J.) ("[T]he factors explicitly identified in [*Daubert*] for evaluating reliability may be inapplicable where an expert's nonscientific testimony turns not on a particular methodology but on personal experiences and knowledge."). "So while *Daubert* and *Kumho Tire* still require the Court to act as gatekeeper and assess the reliability of [expert] evidence, 'the relevant reliability concerns . . . focus upon personal knowledge or experience.'" *Adams Craig Acquisitions LLC.*, 2019 WL 3532115 at *3.

### 3. <u>Professor Atkeson's Report Is Admissible</u>.

Plaintiffs do not attack Professor Atkeson's qualifications as an expert or the relevance of her opinions; Plaintiffs question only the reliability of certain portions of her report. Contrary to Plaintiffs' Motion, Professor Atkeson's report and opinions satisfy the reliability requirements of Rule 702. In compiling her report, Professor Atkeson compiled information from a number of sources—Arizona law, discovery materials produced in this case, news reports, survey materials, widely-available statistics about rejection rates, and information on the election procedures followed in other states. None of these sources of information is unreliable; to the contrary, these sources are the very type of information one would expect an election procedures expert to analyze. Plaintiffs do not suggest otherwise.

Professor Atkeson also provides detailed explanation, with supporting citations,

for each of her observations and conclusions. She applies the information in a manner that is straightforward and easy to understand. Where data is inconclusive or does not necessarily support an unequivocal opinion, she couches her opinions accordingly. She sets forth much of her data in tables that are easy to understand and from which the Court can draw its own conclusions. Professor Atkeson uses standard and accepted methods for analyzing the collected elections data. Finally, none of Professor Atkeson's opinions are highly technical or scientific in nature. They are based instead on the data observed and on her extensive experience with election procedures and administration. *See Valenzuela v. Equifax Info. Servs. LLC*, 2015 WL 6811585, *2 (D. Ariz. 2015) (Rayes, J.) (denying motion to exclude an expert witness because "[h]is method is simply an application of his experience with and understanding of the FCRA and the credit reporting industry to the facts at hand. Although his methods are not meticulously detailed for every conclusion, they can be understood and are reliable."). Because Plaintiffs have not challenged Professor's Atkeson's "knowledge and experience" in providing such experience-based opinions, their admissibility objection necessarily fails. *See Adams Craig Acquisitions LLC.*, 2019 WL 3532115 at *3.

### C.     Plaintiffs' Objections, At Most, Go To The Weight Of The Opinions.

One need only peruse the Motion to quickly discover what it actually is—a thinly-veiled substitute for the cross-examination Plaintiffs gave up by stipulating to written testimony in lieu of an evidentiary hearing. While Professor Atkeson's opinions are persuasive and fully supported, Plaintiffs' complaints about her report, at most, go to the weight that the Court will ultimately give her opinions. *See Democratic Nat'l Committee v. Reagan*, 2018 WL 10455202, *9-11 (D. Ariz. 2018) (Rayes, J.) (commenting while denying Attorney General Brnovich's motion to exclude expert testimony produced by Plaintiffs DNC and DSCC that "Defendants' criticisms again go to weight, not admissibility").

Plaintiffs' criticisms are also unfounded. Plaintiffs first complain that, when stating that longer cure periods do not necessarily lead to less rejected ballots, Professor

Atkeson looks to rejection rates for the states she analyzed (states with mail-in ballot regimes similar to Arizona). [Dkt. 101 at 6.] Plaintiffs would prefer that Professor Atkeson look to cure rates instead. Plaintiffs do not explain though why an opinion about rejection rates should be stricken for analyzing data about . . . rejection rates. Nor do Plaintiffs establish that a state's rejection rate is an unreliable statistic in determining how many ballots a state ultimately rejects for lack of signature, or why their preferred data (cure rates) is the only reliable indicator. Neither could they—a state's cure rate is merely one component of its ultimate rejection rate. But Professor Atkeson did not look to cure rates because that data does not exist, as Professor Atkeson explains in her report and Plaintiffs acknowledge. Plaintiffs' argument that an opinion about rejection rates and based on rejection rates should be stricken because Professor Atkeson did not also look at unavailable data on cure rates is overreach. *See Marsteller v. MD Helicopters, Inc.*, 2018 WL 3023284, *2 (D. Ariz. 2018) (Rayes, J.) ("The challenges to [the expert's] opinions and the weaknesses in his assumptions are issues to be explored on cross-examination.").

      Plaintiffs also gripe that Professor Atkeson did not analyze "access to and methods for cure" in other states. [*Id.* at 7-9] Plaintiffs essentially complain that Professor Atkeson did not consider that it might be easier to cure in Arizona than in other states and, therefore, that is why Arizona's ultimate rejection rate is lower than that in other states with longer cure periods. That, however, is the primary point of Professor Atkeson's report—Arizona's current cure periods are not problematic because Arizona makes it so easy for voters to cast a mail-in ballot and to cure. Additional time to cure is unnecessary from a policy perspective (let alone required as a matter of constitutional law). Of course, Plaintiffs' criticism of Professor Atkeson's report in this manner stands in stark contrast to their attempt to establish that Arizona's system for curing a missing signature imposes an unconstitutional burden on the right to vote. And, in any event, Professor Atkeson recognizes that factors other than duration of the cure period (*e.g.*, ease of cure) could impact rejection rates, which is why she couches her observations in equivocal terms.

Plaintiffs further claim that Professor Atkeson made "an important error" because she included data from Utah in one of her tables but did not include it in her calculations of average rejection rates. [*Id.* at 8.] Plaintiffs purport to re-do the calculations including the data from Utah, which results in Plaintiffs acknowledging that the new calculation results in statistics, for both 2016 and 2018, supporting that rejection rates in states without post-election cure periods are <u>exactly the same</u> as in states with post-election cure periods. In other words, Plaintiffs are asking the Court to constitutionally impose a post-election cure period that, based on Plaintiffs' own statistical calculations, would have no impact on the rate of vote rejection in Arizona. None of this is reason to strike any portion of Professor Atkeson's report; to the contrary, it is perfectly consistent with Professor Atkeson's conclusion that "it is not clear theoretically that longer curing times will lead to more votes being counted and empirical results presented above suggest otherwise." [¶60.]

Plaintiffs also criticize Professor Atkeson for saying that longer cure periods "may" create a disincentive for some voters to cure their ballots, instead of saying that they "absolutely will" have that result. [Dkt. 101 at 9.] But Professor Atkeson's opinion that longer cure periods "may" have that result is fully supported and explained in detail in her report. The Court is more than capable of reviewing that portion of the report and drawing its own conclusions based on the data provided. Rule 702 does not contain an absolute certainty requirement for expert witness testimony. *Stutzman v. CRST, Inc.*, 997 F.2d 291, 296 (7th Cir.1993) (expert's lack of absolute certainty goes to weight of his or her testimony, not its admissibility); 29 CHARLES A. WRIGHT & VICTOR J. GOLD, FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6264 (1997) (noting that courts generally will "defer to the jury's ability to weigh the evidence where an expert's opinion is equivocal"); 3 CHRISTOPHER B. MUELLER & LAIRD C. KIRKPATRICK, FEDERAL EVIDENCE, § 350 (2d Ed. 1994) ("The fact that an expert cannot be categorical, and admits some uncertainty in his conclusions, does not mean that his testimony fails the helpfulness requirement.").

1 Finally, Plaintiffs move to strike Professor Atkeson's opinion that a post-election cure period for ballots missing signatures will make it difficult for "some counties" to complete the election process within statutory time limits. Plaintiffs assert that Professor Atkeson has no support for this statement. Plaintiffs are wrong. Not only did Professor Atkeson draw upon her deep experience with election administration and procedures, and her own review of Arizona law, but she relied upon a declaration from Christopher Roads, the Deputy County Recorder in Pima County, which is the second most-populous county in Arizona. In that declaration, Mr. Roads explains the additional procedures that Pima County would be required to put in place in connection with a post-election cure period and explains that "[t]his will result in substantially more effort than occurs for a voter to confirm their signature." [Defendants' Trial Exh. 107 ¶ 19.] Plaintiffs move to strike primarily because a different county recorder, the Coconino County Recorder, who helps oversee elections in a county materially less populous than Pima County, has concluded that she could timely certify the election results even with a five-day cure period. At most, this means that some counties might still be able to complete the election process even with a five-day cure period. But Professor Atkeson did not say that "no county" will be able to complete the process; she said "some counties" would not be able to complete the process. Thus, the Coconino County Recorder's declaration is irrelevant to Professor Atkeson's opinion. Plaintiffs have not established that Professor Atkeson's opinion about the administrative burden of a new cure period is incorrect, let alone that the Court should strike that opinion.

## III. CONCLUSION.

The State respectfully requests that the Court deny the Motion.

14

1  Respectfully submitted this 17th day of August, 2020.

                                    MARK BRNOVICH
                                    ATTORNEY GENERAL

                                    By: *Michael S. Catlett*
                                    Joseph A. Kanefield (No. 15838)
                                      *Chief Deputy & Chief of Staff*
                                    Brunn ("Beau") W. Roysden III (No. 28698)
                                      *Division Chief*
                                    Drew C. Ensign (No. 25463)
                                    Michael S. Catlett (No. 25238)
                                     *Deputy Solicitor General*
                                    Jennifer J. Wright (No. 27145)
                                    Robert J. Makar (No. 33579)
                                    Anthony Napolitanp (No. 34586)
                                      *Assistant Attorneys General*
                                    2005 N. Central Avenue
                                    Phoenix, Arizona 85004
                                    Telephone: (602) 542-5200
                                    Drew.Ensign@azag.gov


                                    *Attorneys for State of Arizona*

15

**CERTIFICATE OF SERVICE**

I hereby certify that on this August 17, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing and transmittal of a Notice of Electronic Filing to all counsel of record at the email addresses designated in the Court's CM/ECF system:


 *Michael S. Catlett*
Michael S. Catlett

*Attorneys for State of Arizona*

1