**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, et al., | No. CV-20-01143-PHX-DLR |
| Plaintiffs, | **ORDER** |
| v. | |
| Katie Hobbs, et al., | |
| Defendants. | |

Plaintiffs the Arizona Democratic Party ("ADP"), the Democratic National Committee ("DNC"), and the Democratic Senatorial Campaign Committee ("DSCC") seek to enjoin Arizona's election officials from rejecting vote-by-mail ("VBM") ballots[1] in unsigned envelopes without allowing non-signing voters the same five days after Election Day to correct their omissions as allowed to voters whose envelopes contain perceived mismatched signatures and in-person voters without proper identification. At issue are Plaintiffs' motions for a preliminary and permanent injunction (Doc. 2) and to preclude certain opinions offered by Professor Lonna Atkeson, an expert retained by Intervenor-Defendant the State of Arizona ("State") (Doc. 101). The Court consolidated the preliminary injunction hearing with the final bench trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). Having considered the parties' briefs (Docs. 2, 85, 86, 91, 96, 97, 101, 105), their evidence,[2] and their presentations at the consolidated hearing,

---

[1] Arizona law refers to VBM ballots as "early ballots." A.R.S. § 16-545.
[2] The parties stipulated to the admission of Plaintiffs' Exhibits 1-32 (Doc. 107), and

1    the Court partially grants Plaintiffs' motion to preclude and grants Plaintiffs' motion for a

2    permanent injunction.[3]

3    **I. Background**

4         Arizona allows no-excuse VBM during the twenty-seven days before an election.

5    A.R.S. §§ 16-541, -542(C).  Most voters choose this option.  (Pl. Exh. 6.)  VBM voters

6    must return their completed ballots in specially provided, postage-paid envelopes and sign

7    an affidavit printed on those envelopes.  A.R.S. §§ 16-547, -548.  Election officials

8    compare these signatures with signatures on record to verify that the ballot returned was,

9    in fact, cast by the voter to whom that ballot belongs. A.R.S. § 16-550.  A ballot that cannot

10   be verified will not be counted.  A.R.S. § 16-552(B).

11        Every election, officials receive some ballots in unsigned envelopes and some in

12   envelopes bearing signatures that appear not to match the signatures on those voters'

13   registration records.  Until recently, Arizona law was silent on what election officials

14   should do with such ballots, leading each county to institute its own policies.  (St. Exh. 101

15   ¶ 25.)   Some counties allowed voters to cure perceived mismatched signatures after

16   Election Day, others did not.  (*Id.*)  Some counties allowed voters to cure missing signatures

17   by Election Day, but no county—except Santa Cruz—allowed voters to do so after Election

18   Day.  (*Id.*; Pl. Exh. 7 at 3.)

19        This patchwork approach changed on August 27, 2019, when the Arizona legislature

20

21   to the State's Exhibits 101-114, except for paragraphs 55-62, 72-76, and 94 of State Exhibit
     101 (Doc. 108), which are the subject of Plaintiffs' motion to preclude.  This order cites
     Plaintiffs' exhibits as "Pl. Exh." and the State's exhibits as "St. Exh."

22        [3] Federal Rule of Civil Procedure 52(a)(1) requires the Court to "find the facts
     specially and state its conclusions of law separately," either on the record or in a separate

23   opinion or memorandum decision.  "One purpose behind Rule 52(a) is to aid the appellate
     court's understanding of the basis of the trial court's decision.  This purpose is achieved if

24   the district court's findings are sufficient to indicate the factual basis for its ultimate
     conclusions."  *Vance v. Am. Hawaii Cruises, Inc.*, 789 F.2d 790, 792 (9th Cir. 1986)

25   (internal citations omitted).  The Court has chosen to issue a written decision "in narrative
     form because a narrative format more fully explains the reasons behind the Court's

26   conclusions, which aids appellate review and provides the parties with more satisfying
     explanations.  Any finding of fact that constitutes a conclusion of law is hereby adopted as

27   a conclusion of law, and any conclusion of law that constitutes a finding of fact is hereby
     adopted as a finding of fact."  *Juan Pollo Franchising, Inc. v. B & K Pollo Enters., Inc.*,

28   No. EDCV 13-2010 JGB (SPx), 2015 WL 10695881, at *1 (C.D. Cal. Aug. 6, 2015).  Local
     Rule of Civil Procedure 52.1 is suspended.

amended the election code to provide a uniform cure period for ballot envelopes with perceived mismatched signatures.  Arizona law now allows voters to cure perceived mismatched signatures up to five business days after an election.[4]  A.R.S. § 16-550(A). This amendment mirrors Arizona's treatment of ballots cast in person by voters who arrive at the polls without proper identification.  Such voters are permitted to cast conditional provisional ballots, A.R.S. § 16-579(A), which will be counted if the voter presents an acceptable form of identification to the appropriate county recorder up to five business days after the election.  (Pl. Exh. 3 at 196.)  However, Arizona's election code does not expressly address whether ballot envelopes with missing signatures may be cured.

Defendant Arizona Secretary of State Katie Hobbs ("Secretary") sought to fill this gap.  The Secretary is Arizona's chief election officer and required by law to prescribe in the Election Procedures Manual ("EPM") "rules to achieve and maintain the maximum degree of correctness, impartiality, uniformity and efficiency on the procedures for early voting and voting, and of producing, distributing, collecting, counting, tabulating and storing ballots." A.R.S. §§ 41-121, 16-452(A).  To that end, the Secretary's October 2019 draft EPM instructed election officials to permit voters to cure a missing signature within the same post-election time frame applicable to perceived mismatched signatures.  (Pl. Exh. 2 at 77.)

To become effective, the EPM must be approved by the Attorney General and Governor.  A.R.S. § 16-452(B).  The Attorney General objected to the Secretary's draft because, in his view, Arizona law implicitly prohibits a post-election cure period for missing signatures.  (Pl. Exhs. 24 (attached Excel spreadsheet), 26 at 11-13; St. Exh. 113.) Although the Secretary disagreed with the Attorney General's interpretation of Arizona law,[5] she acquiesced to removing the language in the interest of timely issuing an updated version of the EPM.  (Pl. Exh. 26 at 11-13.)  The finalized EPM provides:

---

[4] The five-day post-election cure period applies only to elections that include a federal office; a three-day post-election cure period applies to all other elections.  A.R.S. § 15-550(A).  For ease, the Court describes this post-election period as lasting "up to five days" after an election.

[5] This dispute over state law is immaterial.  What matters is, at present, voters may not cure unsigned ballot envelopes after Election Day.

If the early ballot affidavit is not signed, the County Recorder shall not count the ballot.  The County Recorder shall then make a reasonable and meaningful attempt to contact the voter via mail, phone, text message, and/or email, to notify the voter the affidavit was not signed and explain to the voter how they may cure the missing signature or cast a replacement ballot before 7:00pm on Election Day.  The County Recorder shall attempt to contact the voter as soon as practicable using any contact information available in the voter's record and any other source reasonably available to the County Recorder.  Neither replacement ballots nor provisional ballots can be issued after 7:00pm on Election day.

(Pl. Exh. 3 at 82-83.)

On June 10, 2020, Plaintiffs filed a two-count complaint against the Secretary and the recorders for each of Arizona's fifteen counties pursuant to 42 U.S.C. § 1983.[6]  (Doc. 1.)  Both counts allege that the Election-Day cure deadline for unsigned ballot envelopes violates the Fourteenth Amendment to the United States Constitution—in Count I, by unjustifiably burdening the right to vote; in Count II, by denying procedural due process.[7]  (*Id.* ¶¶ 59-63.)  Plaintiffs concurrently filed a motion for a preliminary and permanent injunction requiring Defendants to allow voters to cure missing signatures in the same post-election period applicable to perceived mismatched signatures.  (Doc. 2.)

The Court granted motions to intervene filed by the State (Docs. 16, 28) and the Republican National Committee, the Arizona Republican Party, and Donald J. Trump for President, Inc. (Docs. 35, 60).  At a June 23, 2020 scheduling conference, the Court granted, without objection, Plaintiffs' request to consolidate the hearing on their preliminary injunction motion with the final bench trial on the merits.  (Docs. 38, 39.)  On August 18, 2020, the Court held the consolidated hearing.  After the admission of evidence and oral argument, the matter was taken under advisement.

---

[6] Section 1983 creates a cause of action against any person who, under color of state law, deprives another of any rights, privileges, or immunities secured by the Constitution and laws of the United States. *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).

[7] Count I also cites the First Amendment.  Because Plaintiffs are challenging a state law, their claims arise under the Fourteenth Amendment, which applies the First Amendment's protections against states and their political subdivisions. *See City of Ladue v. Gilleo*, 512 U.S. 43, 45 n.1 (1994).

1

2

3

**II.  Motion to Preclude**

Federal Rule of Evidence 702, which governs the admissibility of expert opinion testimony, provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

The State retained Professor Atkeson to opine as an expert on matters related to election administration and voter behavior.   Professor Atkeson's report was stipulated into evidence, except paragraphs 55-62, 72-76, and 94, which Plaintiffs challenged as unreliable.   (Doc. 101.)

**A.  The First Challenged Opinion**

Professor Atkeson opined in paragraphs 55-62 and 94 that post-election cure periods, especially generous ones, might result in lower cure rates.   (St. Exh. 101.) Professor Atkeson reached this conclusion in two ways: empirically and theoretically.

For her empirical analysis, Professor Atkeson looked to the total number of VBM ballots rejected for a missing or mismatched signature in 2016 and 2018 across multiple jurisdictions with different cure periods.   She then calculated the percent of missing signature or mismatched signature rejections as a percent of total ballots counted.   These calculations showed that some states with longer post-election cure periods rejected a greater proportion of ballots with missing and mismatched signatures than other states with shorter cure periods.   In Professor Atkeson's opinion, this data indicates longer post-election cure periods might result in lower cure rates.

Professor Atkeson's opinion regarding the implications of the empirical data is the

product of unreliable principles and methods.  Rejection rates and cure rates are distinct, and there is no available statewide data on the number of ballots in each jurisdiction that initially were returned with missing or mismatched signatures and subsequently were cured.  Focusing solely on the number of ballots in each category that ultimately were rejected reveals nothing about relative cure rates between these jurisdictions.  Professor Atkeson also fails to control for other variables that could impact the relative rejection rates and does not assess whether the marginal differences between the examined jurisdictions are statistically significant.  Professor Atkeson's opinion regarding the empirical data therefore is inadmissible.

For her theoretical analysis, Professor Atkeson drew on her knowledge of and experience in political science to opine that voters might not be motivated to undertake the steps necessary to cure their ballots after an election unless a race is extraordinarily close. To the extent Professor Atkeson bases her opinion on her knowledge of and experience in political science, it is admitted.  Professor Atkeson has significant, relevant experience in political science and election administration.  She is a Professor of Political Science at the University of New Mexico, where she directs the Center for the Study of Voting, Elections and Democracy and the Institute for Social Research.  (*Id.* ¶ 2.)  Professor Atkeson has written extensively about election administration and political behavior, and she has spent significant time observing election administration processes.  (*Id.* ¶¶ 3-4.)   Based on her knowledge and experience in these areas, she may opine on the possible effects of post-election cure periods on voter behavior.  However, the Court will accept this opinion for what it is—a political science theory about voter behavior—and assigns it little weight because the opinion lacks empirical support and is equivocal.

Accordingly, with respect to the first challenged opinion, the Court precludes the following portions of Professor Atkeson's report: the third sentence of paragraph 56; the second and third sentences of paragraph 57; the first and third sentences of paragraph 58; the first sentence of paragraph 59; the words "and empirical results presented above suggest otherwise" from paragraph 60; paragraph 61; and paragraph 94.  The remaining portions

1    of the challenged paragraphs are admitted but assigned little weight.

2        **B.  The Second Challenged Opinion**

3        Professor Atkeson opined that the addition of a five-day post-election cure period

4    for missing signatures likely would make it difficult or impossible for some counties to

5    complete the election process under Arizona's current statutory limits.[8]  (*Id.* ¶¶ 72-76.)

6    This opinion is inadmissible for two reasons.  First, Professor Atkeson bases her opinion

7    on an examination of Arizona's election code and the declaration of Pima County Deputy

8    Recorder and Registrar of Voters Christopher Roads (St. Exh. 107), but she does not

9    analyze specific data regarding county staffing resources and funding, or the amount of

10   time election officials would spend implementing a post-election cure period for unsigned

11   ballot envelopes.  Her opinion therefore is not based on data or facts.  Second, Professor

12   Atkeson's opinion will not help the Court understand the evidence or determine a fact at

13   issue.  The Court can review and interpret Arizona law and draw inferences from Mr.

14   Roads' declaration without the assistance of an expert.  Accordingly, the Court preludes

15   the following portions of Professor Atkeson's report: the second sentence of paragraph 73;

16   the first, second, sixth, and seventh sentences of paragraph 74; the second and sixth

17   sentences of paragraph 75; and paragraph 76.  The remaining portions of the challenged

18   paragraphs are admitted.

19   **III.  Motion for a Preliminary and Permanent Injunction**

20       Because the Court granted Plaintiffs' request to consolidate the preliminary

21   injunction hearing with the final bench trial on the merits, the standards for the issuance of

22   a permanent injunction govern.  *See Knox v. Brnovich*, 336 F. Supp. 3d 1063, 1067 (D.

23   Ariz. 2018).  Before the Court may grant a permanent injunction, Plaintiffs must succeed

24   on the merits of at least one of their claims and show that (1) they have suffered or

25   imminently will suffer an irreparable injury, (2) no remedy available at law can adequately

26

27       [8] This opinion is inconsistent with Professor Atkeson's opinion that post-election
     cure periods, especially longer ones, might result in lower cure rates.  If a generous post-
28   election cure period reduces cure rates, it should likewise reduce the administrative burdens
     associated with curing deficient ballots.  Thus, even if the second challenged opinion were
     admissible, the Court would assign it little weight given this internal inconsistency.

compensate for that injury, (3) the balance of hardships warrants equitable relief, and (4) a permanent injunction would not disserve the public interest. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

### A. Standing

Federal courts may exercise power only in the context of cases and controversies. U.S. CONST. art. III, § 2, cl. 1. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). By "limit[ing] the category of litigants empowered to maintain a lawsuit in federal court to seek redress for a legal wrong," the doctrine "ensure[s] that federal courts do not exceed their authority as it has been traditionally understood[.]" *Id.* (internal citations omitted). To have standing to litigate in federal court, a plaintiff "must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 125 (2014) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). Only one plaintiff needs standing when, as here, only injunctive relief is sought. *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181, 189 n.7 (2008).

Plaintiffs assert standing to sue on behalf of their members under a doctrine known as associational or representational standing. (Doc. 96 at 9.) To do so, Plaintiffs must show that (1) their members would otherwise have standing to sue in their own right, (2) the interests Plaintiffs seek to vindicate are germane to their organizational purpose, and (3) neither the claim asserted nor the relief requested requires individual members to participate in the lawsuit. *Smith v. Pac. Props. and Dev. Corp.*, 358 F.3d 1097, 1101-02 (9th Cir. 2004). Although Plaintiffs must establish that they have relevant members, they need not identify by name specific injured members if "it is relatively clear, rather than merely speculative, that one or more members have been or will be adversely affected" by the challenged law, and where Defendants "need not know the identity of a particular member to understand and respond to" Plaintiffs' claims. *Nat'l Council of La Raza v.*

1    *Cegavske*, 800 F.3d 1032, 1041 (9th Cir. 2015).

2        The Court finds that the ADP has standing to sue on behalf of its members.[9]  The

3    ADP is a formal membership organization whose members include Arizona voters

4    registered with the Democratic Party, of which there are 1,293,074 as of August 2020.  (Pl.

5    Exh. 30 ¶ 5.)  Roughly a third of Arizona voters are registered with the Democratic Party

6    (Pl. Exh. 1 at 10), and in past elections there has been at least one such voter whose ballot

7    was rejected due to a missing signature (Pl. Exh. 30 ¶ 16).  It therefore is relatively clear,

8    rather than speculative, that on a prospective basis members of the ADP will be adversely

9    affected by the Election-Day deadline for curing missing signatures.[10]   Moreover,

10   Defendants (including the Intervenor-Defendants) do not need to know the identities of

11   specific affected ADP members to understand or respond to Plaintiffs' claims.  The voting

12   rights of registered Democratic voters are germane to the ADP's organizational mission,

13   which is to elect Democratic Party candidates and promote Democratic ideals in Arizona.

14   (*Id.* ¶ 8.)  Lastly, neither the claims asserted, nor the relief requested require individual

15   members to participate in the lawsuit.

16       Plaintiffs also assert standing to sue on their own behalves because the challenged

17   law adversely impacts their organizational missions.  (Doc. 96 at 12.)  "[A]n organization

18   may satisfy the Article III requirement of injury in fact if it can demonstrate: (1) frustration

19   of its organizational mission; and (2) diversion of its resources to combat" the adverse

20   effects of the challenged law.  *Smith*, 358 F.3d at 1105.

21       The Court finds that the ADP has organizational standing.[11]  Rejection of ballots

22   reflecting votes for Democratic Party candidates frustrates the ADP's organizational

23   mission.[12]  (Pl. Exh. 30 ¶ 9.)  As a result, the ADP has diverted and anticipates further

24       [9] The Court does not address whether the DNC or the DSCC also have standing to
     sue on behalf of their members.
25       [10] The Court rejects the State's argument that the injury suffered by such voters is
     not cognizable because it is self-inflicted.  (Doc. 85-1 at 16.)  Voters who forget to sign
26   their ballots have not done so deliberately.  Forgetfulness is an involuntary state that any
     voter might reasonably experience, and therefore is not avoidable in a practical sense.
27       [11] The Court does not address whether the DNC or the DSCC have organizational
     standing.
28       [12] The Court rejects the State's argument that the ADP must prove more Democratic
     voters submit unsigned ballot envelopes than non-Democratic voters.  This sets an

diversion of resources to counteract these effects.  (*Id.* ¶ 24.)  For example, the ADP invests significant resources in helping Democratic voters fix signature issues.  The ADP refers to this process as "ballot chase."  Pre-election ballot chase requires the ADP to either divert resources from other pre-election work or to hire additional staff to focus on pre-election ballot chase.  Post-election ballot chase, on the other hand, could be accomplished with existing staff unburdened by pre-election work.  (*Id.* ¶¶ 19-22.)  Also, the ADP currently channels additional educational resources to areas with low English literacy rates to ensure that voters in those areas understand the signature rules for VBM ballots.  A post-election cure period for unsigned envelopes would liberate at least some of these resources for the ADP's pre-election organizational priorities, such as get-out-the-vote efforts and voter persuasion.  (*Id.* ¶¶ 25-28.)  These are sufficiently concrete and particularized injuries that are fairly traceable to the challenged law, and that could be redressed by a decision in Plaintiffs' favor.  *See Crawford*, 472 F.3d at 951 ("Thus the new law injures the Democratic Party by compelling the party to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law from bothering to vote."); *One Wis. Inst., Inc. v. Nichol*, 186 F. Supp. 3d 958, 967 (W.D. Wis. 2016) (finding expenditure of resources for educating voters about how to comply with new state voter registration requirements sufficient to establish standing).

### B.  Unjustified Burden on Voting Rights

The Constitution protects the right to vote, but not the right to vote in any manner one chooses.  *See Burdick v. Takushi*, 504 U.S. 428, 433 (1992).  "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections."  *Id.*; *see also Storer v. Brown,* 415 U.S. 724, 730 (1974) ("[T]here must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.").  Challenges to election regulations therefore are resolved under a flexible standard designed to balance

---

impossibly high standard, as it cannot be known in advance how many voters will neglect to sign their ballot envelopes, who they will vote for, or how close those elections will be.

the individual's right to vote with the need for rules ordering the process.  The Court "must weigh 'the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate' against 'the precise interests put forward by the State as justifications for the burden imposed by its rule,' taking into consideration 'the extent to which those interests make it necessary to burden the plaintiff's rights.'"  *Burdick*, 504 U.S. at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983)).  This framework commonly is called the *Anderson/Burdick* framework, after the two Supreme Court decisions from which it derives.

Under *Anderson/Burdick*, the degree to which the Court scrutinizes "the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Id*.  A law that imposes severe burdens is subject to strict scrutiny, meaning it must be narrowly tailored to serve a compelling state interest. *Id*.  "Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'"  *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) (quoting *Burdick*, 504 U.S. at 434).

### 1. Burdens

Plaintiffs do not challenge the requirement that voters sign their ballot envelopes; they challenge the deadline by which voters must comply.  They argue that the Election-Day cure deadline imposes severe, or at least "significant," burdens because voters are disenfranchised if they fail to meet the deadline.  (Doc. 2 at 12-13; Doc. 96 at 16.)

Plaintiffs' argument misguidedly conflates the burdens imposed by a challenged law with the consequences of noncompliance.  By definition, a voting prerequisite is something that voters must do before their votes will be counted.  Whenever voters fail to comply with a voting prerequisite, their votes are not counted and they are, as Plaintiffs use the term, disenfranchised.  If the burden imposed by a challenged law were measured by the consequence of noncompliance, then every voting prerequisite would impose the same burden and therefore would be subject to the same degree of scrutiny (presumably strict if

the burden is disenfranchisement).  But this cannot be true because "not every voting regulation is subject to strict scrutiny," *Pub. Integrity Alliance, Inc. v. City of Tucson*, 836 F.3d 1019, 1024 (9th Cir. 2016), and the *Anderson/Burdick* framework necessarily contemplates that election laws can impose varying burdens.  Although the number of voters whose votes are not counted can be evidence of the severity of the burdens imposed by a challenged law, the fact that those votes are not counted is not itself the burden.

*Crawford* is illustrative.  There, the Supreme Court considered whether Indiana's voter identification law, which required in-person voters to present photo identification, unconstitutionally burdened the right to vote.  553 U.S. at 185.  A voter who had photo identification but was unable to present it on Election Day, or a voter who was indigent or had a religious objection to being photographed, could cast a provisional ballot, which then would be counted if the voter traveled to the circuit court clerk within ten days after the election and either presented photo identification or executed an affidavit.  *Id.* at 185-86. In his controlling opinion, Justice Stevens explained "[t]he burdens that are relevant to the issue before us are those imposed on persons who are eligible to vote but do not possess a current photo identification that complies with the requirements of" the challenged law. *Id.* at 198.  The Court described these burdens as "the inconvenience of making a trip to the [Indiana Bureau of Motor Vehicles], gathering the required documents, and posing for a photograph," to obtain the required identification.  *Id*.  The Court did not characterize the burdens as disenfranchisement, even though failure to obtain the required identification or execute the appropriate affidavit would preclude the voter from casting a ballot that would be counted.

Here, there is nothing generally or inherently difficult about signing an envelope by Election Day.  The small proportion of ballots regularly discarded due to a missing signature indicates that the challenged deadline imposes some degree of burden, particularly on voters who return their ballots too close to Election Day to receive notice of the problem or a meaningful opportunity to cure.  But over 99% of voters timely comply. (St. Exh. 101 ¶¶ 56-57.)  If the Election-Day cure deadline imposed significant burdens, it

is reasonable to expect that more voters would fail to overcome those burdens.[13]  The Court therefore finds that the challenged deadline imposes only minimal burdens.

### 2. Justifications

The State offers four interests it believes are served by the challenged deadline: (1) fraud prevention; (2) reducing administrative burdens on poll workers; (3) orderly administration of elections; and (4) promoting voter participation and turnout.  (Doc 85-1 at 34-35.)  The Court addresses each in turn.

### i. Fraud Prevention

The State's interest in preventing voter and election fraud is important.  *See Crawford*, 553 U.S. at 195.  This interest is served by Arizona's signature requirement, and all deadlines serve as an enforcement mechanism for the underlying requirements to which those deadlines correspond.  Thus, the State's fraud prevention interest is served by imposing a deadline by which voters must sign their ballots.  But the relevant question is not whether the State may impose a deadline.  It is whether the State has an interest in *this* deadline that outweighs or justifies the minimal burdens it imposes.  Because there is no evidence that the challenged deadline reasonably prevents fraud, the Court finds that fraud prevention does not justify the minimal burdens imposed.

To begin, Arizona provides a more generous post-election deadline for resolving at least two other voter identification issues—VBM ballots in envelopes with perceived mismatched signatures and conditional provisional ballots cast by in-person voters who arrive at the polls without identification.  Although these two identification issues differ in some respects from unsigned ballot envelopes, they pose the same fundamental problem: election officials cannot verify that the person who submitted the ballot is eligible to do so without additional information.  Moreover, the post-election cure periods applicable to perceived mismatched signatures and conditional provisional ballots show that the

---

[13] The Court is not suggesting that there is some minimum threshold of voters that must be affected before a voting rule can be deemed to impose a more substantial burden. But the number of voters who fail to comply with a challenged law is probative (though not necessarily dispositive) of the burdens imposed.

Election-Day deadline for curing missing signatures is not necessary to advance the State's fraud prevention interest.  Although the State is not required to apply the least restrictive deadline, the State has not explained how its fraud prevention interest would be harmed if voters could cure missing signatures in the same post-election timeframe applicable to these other identification issues.

Further, according to the State, most elections are not plagued by fraud, and fraud generally is not suspected based on the number of ballots returned without signatures. (Doc. 112 at 69:19-21, 72:1-4.)  In most cases, ballots in unsigned envelopes are not fraudulent ballots—they are ballots cast by otherwise eligible voters who neglected to sign the envelope.  The State is not preventing fraud by discarding these ballots without giving voters a meaningful opportunity to supply their missing signatures.

### ii.  Reducing Administrative Burdens

The State's interest in reducing administrative burdens on poll workers is important. *See Lemons v. Bradbury*, 538 F.3d 1098, 1105 (9th Cir. 2008).  On this record, however, that interest does not justify the minimal burdens imposed by the challenged deadline.

Most Arizona counties historically have implemented some form of a pre-election cure period for missing signatures, and the EPM now requires all counties to make reasonable efforts to contact impacted voters and afford them an opportunity to cure missing signatures by 7:00 p.m. on Election Day.  The State has not shown that continuing to implement these existing cure procedures for an additional five business days after an election is likely to impose meaningful administrative burdens on election officials given the relatively small number of ballots at issue.  For example, in 2016, Arizona rejected 3,079 ballots in unsigned envelopes.  In 2018, that number was 2,435.  (St. Exh. 101 at 26, Table 2.)  In any given election, such ballots constitute roughly one tenth of one percent of total ballots submitted, and available county-level data indicates that not all voters who are notified of a missing signature before Election Day cure the problem.  (Pl. Exhs. 8 at 3, 17 at 3-4, 20 at 3, 22 at 2.)  Thus, if Arizona were to provide a post-election cure period for unsigned ballot envelopes, likely only a subset of that fraction of a percent would take

advantage of the opportunity.

Further, in the Secretary's judgment, Arizona could implement a post-election cure period without imposing significant administrative burdens on election officials because counties already do so for other voter identification issues.  (Pl. Exh. 26 at 7-8.)  Coconino County Recorder Patty Hansen echoed this sentiment, declaring that a post-election cure period would not impose significant administrative burdens or impact Coconino County's ability meet Arizona's certification deadline.  (Pl. Exh. 29 ¶ 20.)  Apache County and Navajo County also support a post-election cure period for missing signatures.  (Doc. 90.) The Court assigns great weight to the Secretary's judgment, given her position as Arizona's chief election officer and corroboration from these county officials.

In contrast, Mr. Roads, Pima County's Deputy Recorder and Registrar of Voters, declared that a post-election cure period would impose significant administrative burdens on Pima County because the process for curing a missing signature is more labor intensive than curing a perceived mismatched signature:

> The only way that this can occur is for the voter to travel to the Ballot Processing Center, for our staff to locate the particular ballot in the ballot room, to bring the ballot to the voter in the lobby and have them sign it. Our procedures require that two workers with different political party affiliations be present whenever a ballot is being handled. This will result in substantially more effort than occurs for a voter to confirm their signature. A voter can simply call our office to confirm their signature.

(St. Exh. 107 ¶ 19.)  Later in his declaration, however, Mr. Roads stated that "[o]nly a very small percentage of voters in Pima County fail to sign their ballots."  (*Id.* ¶ 21.)  Indeed, in the 2018 General Election, Pima County rejected only 75 ballots due to a missing signature. This figure was 120 for the 2016 General Election, 64 for the 2014 General Election, and 72 for the 2012 General Election.  (Pl. Exh. 28 at 7.)  Although curing missing signatures after an election might impose marginally greater administrative burdens on Pima County, these additional burdens are not significant enough to justify the challenged deadline considering these minimal figures.

Accordingly, on these facts, the Court finds that a post-election cure period would

not impose meaningful administrative burdens on election officials and, therefore, the State's interest in alleviating administrative burdens does not justify the minimal burdens imposed by the challenged deadline. *Cf. Lemons*, 538 F.3d at 1104-05 (concluding that the state need not provide petition signers with notice that their signatures had been rejected and an opportunity cure where such procedures "would impose a *significant* burden" on election officials (emphasis added)); *see also Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1322-23 (11th Cir. 2019) ("In *Lemons*, the Ninth Circuit worried about the administrative difficulties associated with suddenly requiring state officials to provide notice and a chance to cure thousands of petition signers when no such requirement previously existed. . . . But here, Florida already had a cure mechanism for those with mismatched signatures."); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 216 (D N.H. 2018) (noting that, in rejecting the claims in *Lemons*, the Ninth Circuit "assigned great weight to the administrative burden of additional procedures").

### iii.  Orderly Administration of Elections

The State has an important interest in the orderly administration of elections, *Lemons*, 538 F.3d at 1104, but on this record that interest does not justify the minimal burdens imposed by the challenged deadline.

In the Secretary's judgment, there is no meaningful difference between an unsigned ballot envelope and one with a perceived mismatched signature. The voter's signature is a means of identity verification and in both scenarios the voter's identity cannot be verified. (Pl. Exh. 26 at 5.)  The Secretary also views VBM ballots in unsigned envelopes as functionally equivalent to conditional provisional ballots cast by in-person voters without identification, the latter of which benefit from a post-election cure period.  (*Id.*)  Contrary to the State's litigation position, the Secretary believes that a uniform cure period for all three of these identification issues would promote the orderly administration of elections by reducing voter confusion and ensuring that more eligible voters have their ballots counted.  (*Id.* at 5-6.)  The Court gives great weight to the Secretary's judgment, given her role as Arizona's chief election officer.

The State insists there is a meaningful difference between unsigned envelopes and those with perceived mismatched signatures.  For example, the State emphasizes that an unsigned envelope is almost always the result of voter error.  In contrast, a poll worker determines whether an envelope contains a mismatched signature, and that determination easily can be erroneous because signature matching is not an exact science, poll workers are not handwriting experts, people's signatures change over time, and the quality of a signature can vary depending on external factors, such as the writing surface or instrument.  (Doc. 85-1 at 26-27.)  This is true.  But the State does not contend that the shorter deadline for curing unsigned envelopes is intended to penalize voters for their errors.  Moreover, the differences between envelopes with missing and perceived mismatched signatures do not explain Arizona's different and better treatment of conditional provisional ballots cast by in-person voters without identification.  Failure to bring identification to the polls is generally an error of the voter not a poll worker.  Yet, Arizona permits those in-person voters to cure the problem up to five days after an election.

The State's position is further undermined by Arizona's generous interpretation of what constitutes a signature.  No uniform policy governs whether a mark qualifies as a signature triggering an entitlement to the post-election cure period, but the State encourages election officials to take a broad view.  (Doc. 112 at 54:15-16, 55:13-15.)  For example, Pima County officials are instructed that any mark could be a signature.  (Pl. Exh. 28 at 4.)  A system in which a voter who makes even the most minimal of marks receives the benefit of a post-election cure period while a voter who makes no mark does not is unreasonable.

Indeed, this differential treatment makes Arizona an outlier.  According to Professor Atkeson, not all states rely on signatures or signatures alone to verify voters' identities, and of those that do, not all provide cure periods.  Among the states that provide cure periods, there is no consensus on the appropriate duration.  Some states require voters to cure signature issues by Election Day, others permit post-election curing.  Some have more generous cure periods than Arizona's, and others less.  But Arizona currently is the only state that sets a different deadline for curing a missing signature than a perceived

mismatched signature.  (St. Exh. 101 at 9-10, Table 1.)  Arizona's outlier status in these cross-state comparisons suggests that setting different deadlines for curing these two identification problems is not rational or orderly.

On this record, treating unsigned envelopes worse than those with perceived mismatched signatures or in-person conditional provisional ballots undermines, rather than serves, the State's interest in the orderly administration of elections.  The Court therefore finds that the State's interest does not justify the minimal burdens imposed by the challenged law.

### iv.  Promoting Voter Participation and Turnout

The State's interest in promoting voter participation and turnout is important, *Tedards v. Ducey*, 951 F.3d 1041, 1067 (9th Cir. 2020), but that interest is not served by the challenged law, nor does it justify the minimal burdens imposed.  There is no credible evidence or empirical support for the proposition that a post-election cure period will reduce cure rates.  The State relies on Professor Atkeson's report.  (Doc. 85-1 at 34.)  But Professor Atkeson's empirical analysis is inadmissible and her opinion that voters might not be motivated to cure ballot defects after an election is given little weight.  Further, the State's contention is undermined by the accommodations Arizona provides for ballots in envelopes with perceived mismatched signatures and conditional provisional ballots cast by in-person voters without identification.  In these situations, the State is willing to tolerate the risk that voters will forego curing their ballots after an election.  Yet the State offers no cogent explanation for why this highly speculative risk justifies differential treatment of unsigned envelopes.  The State's litigation position also is undermined by its chief election officer, who believes a uniform post-election cure period for all VBM signature issues will result in more eligible voters having their votes counted.  (Pl. Exh. 26 at 6.)  Accordingly, on this record, the State's voter participation interest is not reasonably served by the challenged law and does not justify the minimal burdens imposed.

### 3.  Conclusion

Because a signature is Arizona's method of verifying that a person who returns a

ballot is the person to whom that ballot belongs, it necessarily follows that Arizona may set a deadline by which voters must provide that signature.  Deadlines come with an inherent arbitrariness, *see United States v. Locke*, 471 U.S. 84, 94 (1985), but that does not shield them from judicial review, *see, e.g.*, *Anderson*, 460 U.S. at 805-06 (invalidating a state deadline for filing nominating petitions); *Nader v. Brewer*, 531 F.3d 1028, 1039 (9th Cir. 2008) (same).  *Anderson* and *Nader* involved more burdensome deadlines, but even at its most deferential, the *Anderson/Burdick* framework is not a rubber stamp.  Layers of minimal burdens can compound and, in the aggregate, prevent or deter otherwise eligible citizens from successfully voting.  *Anderson/Burdick* therefore directs the Court in all cases to consider the extent to which a state's regulatory interests make it necessary to impose additional burdens on voting rights.  On the facts of this case, the challenged deadline fails to withstand the most deferential level of scrutiny.  The Court therefore finds in favor of Plaintiffs on Count I.

### C.  Denial of Procedural Due Process

The Fourteenth Amendment prohibits state governments from depriving people of "life, liberty, or property without due process of law."  U.S. CONST. amend. XIV, § 1.  To succeed on a procedural due process claim, a plaintiff must establish "(1) a deprivation of a constitutionally protected liberty . . . interest, and (2) a denial of adequate procedural protections."  *Franceschi v. Yee*, 887 F.3d 927, 935 (9th Cir. 2018) (internal quotation and citation omitted).

As an initial matter, the State argues that Plaintiffs may not bring a procedural due process challenge to an election regulation outside the *Anderson/Burdick* framework.  (Doc. 85-1 at 19-20.)  True, the Ninth Circuit has noted that First Amendment, equal protection, and due process claims are each "folded into the *Anderson/Burdick* inquiry."  *Soltysik v. Padilla*, 910 F.3d 438, 449 n.7 (9th Cir. 2018).  But the Ninth Circuit made these remarks in cases that did not involve procedural due process claims.  *See, e.g., Id.*; *Ariz. Libertarian Party v. Reagan*, 798 F.3d 723, 729 n.7 (9th Cir. 2015); *Dudum v. Arntz*, 640 F.3d 1098, 1106 n.15 (9th Cir. 2011).  Multiple district courts, both within and outside the

Ninth Circuit, have considered procedural due process challenges to election regulations under ordinary procedural due process principles. *See, e.g., Saucedo*, 335 F. Supp. 3d at 214-17; *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1337-1340 (N.D. Ga. 2018); *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646, at *6-9 (N.D. Ill. Mar. 13, 2006); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1355-58 (D. Ariz. 1990). The cases cited by the State, then, might be best understood as placing all *substantive* due process and equal protection challenges to election regulations under the *Anderson/Burdick* framework.

Regardless, the Court does not need to resolve this legal question. If procedural due process claims are analyzed under the *Anderson/Burdick* framework, as the State argues, then Plaintiffs prevail for the reasons discussed in Part III(B) of this decision. If, as Plaintiffs argue, ordinary procedural due process principles apply, then Plaintiffs prevail for the reasons discussed below.

### 1. Constitutionally Protected Liberty Interest

Voting is a fundamental right, *Reynolds v. Sims*, 377 U.S. 533, 560-562 (1964), and the right to vote necessarily includes the right to have one's legitimately cast vote counted, *see Lee*, 915 F.3d at 1315. There is no corresponding right to vote absentee. *See McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807-08 (1969); *Crawford*, 553 U.S. at 209 (Scalia, J., concurring in the judgment); *Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004). "But once the State permits voters to vote absentee, it must afford appropriate due process protections . . . before rejecting an absentee ballot." *Zessar*, 2006 WL 642646, at *5; *see also Saucedo*, 335 F. Supp. 3d at 217 ("Having induced voters to vote by absentee ballot, the State must provide adequate process to ensure that voters' ballots are fairly considered and, if eligible, counted."); *Martin*, 341 F. Supp. 3d at 1338 ("Having created an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide absentee voters with constitutionally adequate protection."); *Raetzel*, 762 F. Supp. at 1358 (concluding that the privilege of absentee voting, once granted, is "deserving of due process"). Accordingly, the Court finds that

Plaintiffs—specifically, the ADP member voters on whose behalf Plaintiffs sue—have a constitutionally protected liberty interest in having their ballots counted.

## 2. Adequacy of Procedural Protections

The Court assess the adequacy of Arizona's procedural protections by balancing three factors:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Matthews v. Eldridge*, 424 U.S. 319, 335 (1976).

The first factor favors Plaintiffs. "[T]he private interest at issue implicates the individual's fundamental right to vote and is therefore entitled to substantial weight." *Martin*, 341 F. Supp. 3d. at 1338; *see also Saucedo*, 335 F. Supp. 3d. at 218 (according "significant weight" to the plaintiffs' interest in having their absentee ballots counted).

The second factor is mixed. "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Mathews*, 424 U.S. at 344. Only 0.10% of total ballots were disqualified for lacking signatures in the 2018 General Election, a figure that stays roughly consistent from election to election. Generally, then, the risk that one's ballot will be rejected because of a missing signature is low. *See, e.g., Veterans for Common Sense v. Shinseki*, 678 F.3d 1013, 1035-36 (9th Cir. 2012) (agreeing that "the risk of error was low" where "only 4% of veterans who filed for benefits claims are affected"). Moreover, unlike signature matching, which can be fraught with error, the risk that a poll worker will erroneously conclude that a ballot envelope is unsigned is negligible.

On the other hand, Arizona does not require a signature for its own sake; the signature serves as a means of identity verification. The risk that election officials will erroneously conclude that a ballot in an unsigned envelope was not, in fact, cast by the person to whom that ballot belongs is more significant, as most of these ballots likely are

returned by eligible voters rather than impostors.  For these voters, a post-election cure period likely would be valuable.  For example, although there is no statewide data on cure rates, available county-level data suggests that some (though not all) voters who receive adequate pre-election notice of a missing signature correct the problem.  (*See, e.g.*, Pl. Exhs. 7 at 2, 8 at 3, 19 at 4.)  It is reasonable to expect such trends to continue after the election.  Further, voters who return their ballots too close to Election Day, especially those without phone numbers who must be notified of a problem via mail, often do not receive adequate pre-election notice of a missing signature or a meaningful opportunity to cure.  A post-election cure period would increase the likelihood that such voters learn of and fix such deficiencies.

The final factor favors Plaintiffs.  For reasons explained in Part III(B)(2) of this decision, the State's interests in maintaining its Election-Day deadline for curing unsigned envelopes are weak.  There is no reason to believe that an Election-Day cure deadline is any better at preventing fraud (to the extent it exists) than the post-election cure deadlines applicable to envelopes with perceived mismatched signatures or conditional provisional ballots cast by in-person voters without identification.  The State's abstract voter participation concerns are speculative, equivocal, and lacking in empirical support.  A post-election cure period would not impose meaningful administrative burdens on election officials.  And Arizona's chief election officer believes that a uniform cure period would promote the orderly administration of elections.

### 3.  Conclusion

Because the second *Matthews* factor is mixed, Plaintiffs' procedural due process claim largely comes down to balancing the ADP member voters' interest in having their ballots counted against the State's interest in preserving its Election-Day cure deadline.  The balance might be different if implementing a post-election cure period would impose significant administrative burdens or otherwise impair important state interests.  But no such showing has been made by the State here.  The Court therefore finds in favor of Plaintiffs on Count II.

### D.  Equitable Factors

In every election, the ballots of some otherwise eligible voters inevitably will be rejected due to missing signatures, and some of those voters certainly will be members of the ADP.  This is more likely to occur if those voters return their ballots close to or on Election Day.  The loss of one's vote constitutes an irreparable harm for which there is no adequate remedy available at law, and which could be mitigated with the implementation of post-election cure procedures.  The State argues that Plaintiffs' delay in bringing this lawsuit implies a lack of irreparable harm (Doc. 85-1 at 39), but it was not until the EPM was finalized near the end of 2019 that the State's unjustified differential treatment of unsigned ballot envelopes became apparent.  Though Plaintiffs could have brought this suit sooner than they did, the Court does not find their delay so substantial as to undermine the harms alleged.

Given the weightiness of the rights at stake and the negligible administrative burdens a post-election cure period would impose on the State, the balance of equities favors injunctive relief.  The evidence does not support the State's argument than an injunction would "divert scarce resources at a time when they are sorely needed for tabulation." (Doc. 85-1 at 39.)  The challenged deadline impacts a fraction of a percent of voters, and only a subset of those voters would likely take advantage of a post-election cure period.  Election officials therefore are not likely to be overwhelmed with additional post-election cure duties if the Court were to issue an injunction.

Nor would an injunction disserve the public interest.  The evidence demonstrates that a post-election cure period would better achieve the orderly administration of elections and likely result in more eligible voters having their ballots counted, all without imposing meaningful burdens on election officials.  Citing *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), the State argues that an injunction altering election rules this close to an election disserves the public interest by confusing voters.  (Doc. 85-1 at 40.)  But Plaintiffs are not asking election officials to devise new rules out of whole cloth.  They are asking those officials to continue applying the same procedures they have in place now, but for a little longer.  This

change is not likely to confuse voters, especially when the injunction would replace arbitrary differential treatment with uniformity, and when the change is welcomed by Arizona's chief election officer.

### E. Conclusion

On the facts of this case, Arizona's Election-Day deadline for curing unsigned ballot envelopes imposes minimal but unjustifiable burdens on the right to vote and is an inadequate procedural safeguard, particularly for voters who return their ballots too close to Election Day to receive adequate pre-election notice of a missing signature and an opportunity to cure.  Plaintiffs have succeeded on the merits of their claims and shown that the equities favor injunctive relief.  Accordingly,

**IT IS ORDERED** that Plaintiffs' motion to preclude certain opinions of Professor Atkeson (Doc. 101) is **GRANTED IN PART** and **DENIED IN PART** as explained in Part II of this order.

**IT IS FURTHER ORDERED** that Plaintiffs' motion for a preliminary and permanent injunction (Doc. 2) is **GRANTED**.  Defendants, their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, must allow voters who are determined to have submitted an early ballot (referred to in this order as a VBM ballot) in an envelope without a signature the opportunity to correct the missing signature until 5:00 p.m. on the fifth business day after a primary, general or special election that includes a federal office or the third business day after any other election.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment in favor Plaintiffs and against Defendants and terminate this case.

Dated this 10th day of September, 2020.

Douglas L. Rayes
United States District Judge