**MARK BRNOVICH**
**ATTORNEY GENERAL**
Joseph A. Kanefield (No. 15838)
  *Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
  *Solicitor General*
Drew C. Ensign (No. 25463)
Michael S. Catlett (No. 25238)
  *Deputy Solicitors General*
Jennifer J. Wright (No. 27145)
Robert J. Makar (No. 33579)
Anthony R. Napolitano (No. 34586)
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for State of Arizona*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona Democratic Party, et al., <br>     Plaintiffs, <br> vs. <br> Katie Hobbs, et al., <br>     Defendants, <br> and <br> State of Arizona, <br>     Intervenor-Defendant. | Case No: 2:20-cv-01143-DLR <br><br> **STATE'S EMERGENCY MOTION TO STAY THE COURT'S SEPTEMBER 10, 2020 INJUNCTION PENDING APPEAL** <br><br> **[EXPEDITED CONSIDERATION REQUESTED]** |

**INTRODUCTION**

The State of Arizona ("State") respectfully moves for a stay pending appeal of the permanent injunction entered by the Court on September 10, 2020 ("Permanent Injunction"), which enjoined enforcement of Arizona's election-day deadline for submitting executed ballot affidavits. The Permanent Injunction brushes aside a state-law, existent for decades, requiring absentee ballots to be completed and returned with a signature by close of polls on Election Day. The Court, through judicial pronouncement, has replaced that venerable deadline with a new deadline falling five business days after the election. It does so based on a hyper-critical analysis of the State's interests in having an Election Day deadline—interests the Court holds are important—and the Arizona Legislature's policy decision to extend cure periods for qualitatively different voting requirements. If not incorrect, the Court's conclusions are at, at a minimum, fairly contestable.

The Permanent Injunction also risks sowing confusion on the eve of an election, creating inconsistencies in application without statewide guidance, creating a new deadline in place for only a single general election, and harming one or more important state interests. On the other side of the coin, a stay will effect only those voters who (1) vote in the 2020 general election by mail, (2) intend to cast a valid vote, (3) forget to sign the ballot affidavit, and (4) are notified of such with insufficient time to cure, or who otherwise purposefully choose not to cure, by Election Day. As the Court repeatedly acknowledges in its Order, this is a very small population of voters, constituting roughly 0.10% of voters. The Plaintiffs' purported harms are also conjectural. Plaintiffs do not know how many of those 0.10% of voters actually intended to vote or how many of them actually desired to cure but were unable to because of the current deadline. Moreover, many of these issues could likely been avoided had Plaintiffs timely initiated this litigation, rather than waiting years—and late into this election cycle—to challenge the Election Day deadline.

For all these reasons, the Court should grant a stay pending appeal.

## ARGUMENT

In evaluating a request for a stay pending appeal, this Court must consider "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Lair v. Bullock*, 697 F.3d 1200, 1203 (9th Cir. 2012) (quoting *Nken v. Holder*, 556 U.S. 418, 434 (2009)). The State satisfies each of these four elements.

### I. The State Is Likely To Prevail In Its Appeal, Which Raises Serious And Difficult Questions of Law.

As this Court has recognized, "[c]ourts have interpreted th[e] first [stay-pending-appeal] criterion as requiring that the movant show that 'the appeal raises serious and difficult questions of law in an area where the law is somewhat unclear.'" *Overstreet v. Thomas Davis Med. Ctrs., P.C.*, 978 F. Supp. 1313, 1314 (D. Ariz, 1997). That standard is easily satisfied here.

Under the *Anderson/Burdick* framework, the Court correctly held that the burden challenged by Plaintiffs is the burden of submitting an executed ballot affidavit (i.e., a complete ballot) by 7:00 p.m. on Election Day, not the burden imposed by law if a voter fails to do so. [Dkt. 114 at 11-12.] The Court also correctly concluded that the burden of complying with an Election Day deadline is "minimal." [*Id.* at 12-13.] The Court correctly concluded that the State has important interests in preventing voter and election fraud, reducing administrative burdens on poll workers, ensuring the orderly administration of elections, and promoting voter participation and turnout. [*Id.* at 13, 14, 16, 18.] But the Court erred in holding that Arizona's Election Day deadline to submit a completed, signed ballot affidavit does not further at all any of those four interests. The Court further erred in holding that Plaintiffs met their burden to establish standing and that they had established the other elements required for permanent injunctive relief.

This Court is one of only few, *if any*, courts to hold that a state may not require

2

submission of a complete ballot, including with a signature, by poll closing on Election Day. Not only does the Court's ruling displace a state-law requirement that has been in existence for decades, taken to its logical end, the Court's decision calls into question the State's other election deadlines. For example, does closing polls at 7 p.m. sufficiently relate to the State's strong interests when there are surely poll workers who would be willing to man the polls until midnight (or at least 8pm)? Does providing only a five-day cure period for completed ballots with mismatched signatures or for submission of proper identification sufficiently relate when election officials might be able to spend a few more days attempting to cure? If a voter can prove she waited in line at a poll but left because the line was too long or she had more pressing matters to tend to, does refusing her a few days after the election to cast her vote sufficiently relate to the State's strong interests? Of course, the answer to each question is "yes," which necessarily means the Court's decision regarding the Election Day deadline for signed ballots is inconsistent with *Anderson/Burdick* and the State's interests in enforcing Election Day deadlines. *See Republican Nat'l Committee v. Democratic Nat'l Committee*, —U.S.—, 140 S.Ct. 1205, 1207 (April 6, 2020) ("Extending the date by which ballots may be cast by voters—not just received by the municipal clerks but cast by voters—for an additional six days after the scheduled election day fundamentally alters the nature of the election.").

The State is mandated by federal law to hold elections for federal office on a date certain, *see, e.g.*, 2 U.S.C. § 7, and it otherwise has a sovereign right to legislatively select times and dates for state and local offices. That necessarily means that the State may require completed ballots be received on Election Day. The Court has now called that requirement into question. The Court has also called into question the laws of *numerous* other states that do not allow unsigned ballots to be cured *at all* or that allow a cure period but not beyond Election Day.

Ultimately, the Court holds that the State must extend a five-day cure period for unsigned ballots because it extended a five-day cure period for mismatched ballots and a

cure period for those who physically vote without identification. But in doing so the Court makes the same mistake that it says Plaintiffs make, treating the remedy for failure to comply with a voting requirement as the burden itself. The Constitution does not require states to treat all election requirements equally or authorize federal courts to micromanage those requirements. To the contrary, states have tremendous leeway in structuring the time and manner in which elections are conducted, which is why there is so much variation among state election requirements and deadlines, including the existence and duration of cure periods.

This is particularly true where, as here, the election requirements being compared are qualitatively quite different. The Court correctly acknowledges that it is "true" that "there is a meaningful difference between unsigned envelopes and those with perceived mismatched signatures." [Dkt. 114 at 17.] Unsigned ballots are incomplete, while signed ballots and ballots submitted in person without identification are complete (the State merely requires additional confirmation of the identity of the individual submitting the completed ballot). This is why an individual who submits an unsigned ballot may still vote through other means, because she has not yet submitted a valid vote. The Court acknowledges but then disregards this distinction along with the record evidence that the distinction matters in terms of administrative burden imposed and the orderly administration of elections through enforcement of Election Day deadlines.

The Court's conclusion that the Arizona Democratic Party ("ADP") has standing to assert the claims in this litigation is also incorrect. The Court wrongly held that ADP has both associational and organizational standing.

For associational standing, the Court held that ADP has standing because there is a statistical likelihood that at least one person registered as a democratic will mail in a ballot lacking a signed affidavit. To establish associational standing, however, ADP "must [establish] that its members, or any of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit." *Warth v. Seldin*, 422 U.S. 490, 511

(1975). ADP's "membership" does not consist of all voters who are merely registered as democrats. Rather, ADP has defined membership structures that do not include all democratic voters. [*See* Exh. 110 at 1, 6-7, 10, 14.] ADP does not allege, let alone establish, that any of its actual members have ever had a ballot rejected for failure to complete the ballot affidavit prior to poll closing. The Court's holding that ADP has associational standing based on some statistical likelihood that at least one unidentified democratic voter will have a legitimate ballot[1] rejected is inconsistent with recent decisions from the Eleventh Circuit and this Court. *See Jacobson v. Fla. Sec'y of State*, 957 F.3d 1193, 1204-05 (11th Cir. 2020); *Mecinas v. Hobbs*, —F.3d—, 2020 WL 3472552, *9 (D. Ariz. June 25, 2020) (Humetewa, J.) ("[T]he Court will not assume, based on a single affidavit, that 'millions' of Arizonans who vote for Democratic candidates "consider themselves" to be 'members' of the Democratic Party.").

Regarding organizational standing, ADP was required to establish "(1) frustration of its organizational purpose; and (2) diversion of its resources to combat the adverse effects of the challenged law." [Dkt. 114 at 9.] ADP made neither showing. Again, ADP did not establish that any democratic voter had a legitimate vote rejected in prior elections. ADP cannot establish that its organizational purpose is somehow frustrated by an issue that affects no more than 0.10% of total voters. Moreover, ADP admitted that it did not even allege that more Democratic votes were affected than Republican votes. And if more Republican votes are affected, ADP's organizational purposes would actually be *furthered*—not frustrated—by the challenged laws. ADP cannot extract

---

[1] ADP did not prove that any ballot rejected for lack of signature in prior elections actually contained a legitimate vote. There are myriad situations where a ballot would be returned without an executed ballot affidavit because the individual returning the ballot did not intend to cast a legitimate vote. For example, a family member may receive the ballot for a deceased individual and seek to inform the State of the voter's passing on the ballot itself without also signing the deceased individual's name to the ballot affidavit. Or a voter may intend to protest the available candidates by sending back an unsigned protest ballot writing in sham candidates for office (e.g. Mickey Mouse or Harambe the gorilla). *See* https://www.bbc.com/news/blogs-trending-37925961 (last visited 09/11/2020).

Article III injury-in-fact from a potential benefit not even alleged to be an injury.

In addition, ADP cannot establish standing based on the timing of spending resources pre-election instead of post-election, particularly when those efforts regardless of timing are to obtain the <u>benefit</u> of additional democratic votes counted, which is consistent with its usual and routine organizational mission and practices. *See NAACP v. City of Kyle, Tex.*, 626 F.3d 233, 238 (5th Cir. 2010) (rejecting organizational standing because "Plaintiffs have not explained how the activities described . . . differ from the[ir] routine lobbying activities.").

Finally, regarding Plaintiffs' procedural due process claim, the Court was wrong to analyze that claim outside of the *Anderson/Burdick* framework. For the reasons explained above, the Election Day deadline for completed ballots easily passes muster under *Anderson/Burdick*. Even under the *Matthews* rubric, however, Plaintiffs' claim fails because Plaintiffs presented no evidence that the Election Day deadline itself has actually <u>deprived</u> any voter of the right to vote or that an additional five-day period would have any appreciable impact on the miniscule rejection rate for mail-in ballots lacking a signature.

At the very least, this case involves issues of first impression in both this District and the Ninth Circuit. Even nationally, this case is one of very few, if any other, cases holding that a State may not enforce an Election Day deadline for submission of a completed ballot. It also one of very few cases holding that a State election requirement, in place for decades, is not even rationally tailored to justify a minimal burden on the right to vote. At a bare minimum, the merits of Plaintiffs' standing and constitutional claims are fairly contestable and a stay is warranted to preserve the decades-long status quo pending the State's appeal to the Ninth Circuit.

**II.     The State Will Suffer Irreparable Harm Absent A Stay.**

The State is certain to suffer irreparable harm absent a stay. The Court's mandatory injunction alters Arizona's Election Procedures Manual and upends the requirement under Arizona law that signed ballots be received prior to 7 p.m. on Election

Day, and does so less than two months prior to the general election and only approximately one month prior to the mailing of absentee ballots. The State by definition suffers irreparable harm when it is precluded from carrying out the laws passed by its democratic processes. *See, e.g., Coalition for Economic Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997) ("[A] state suffers irreparable injury whenever an enactment of its people or their representatives is enjoined."); *Maryland v. King*, 122 S. Ct. 1, 3 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury."). Such harm is particularly acute here where county election officials will be required to implement the Court's injunction in extremely short order and without statewide guidance. Moreover, if the Ninth Circuit eventually reverses the Court's judgment—something Plaintiffs and the Court must acknowledge is at least a possibility—then the one-time exemption from the Election Day deadline for a single election will result in administrative and voter confusion.

### III. The Remaining Factors Favor A Stay Pending Appeal.

While "[t]he first two factors of the traditional standard are the most critical," *Nken v. Holder*, 556 U.S. 418, 434 (2009), the balance of the remaining factors also favors granting a stay pending appeal. The public interest clearly favors a stay. Here, the Arizona Legislature has made the reasonable policy decision to require all mail-in ballots to be returned with a signature prior to close of polls on Election Day. The State has a strong interest in seeing the policy decisions of its elected representatives—particularly those dealing with the ordering of elections—carried out without interference. *Diaz v. Cobb*, 541 F. Supp. 2d 1319, 1335 (S.D. Fla. 2008) ("The public interest in the maintenance of order in the election process is not only important, it is compelling."). And the State has an interest in setting its own specific election deadlines. *See Thomas v. Andino*, —F. Supp. 3d—, 2020 WL 2617329, *26 (D. S.C. May 25, 2020) (citing *Mays v. LaRose*, 951 F.3d 775, 787 (6th Cir. 2020)) ("In terms of the state's interests: setting specific election deadlines is part and parcel of a state's

generalized interest in the orderly administration of elections."). The Court recognizes that the State has at least four important state interests at stake. While the Court ultimately concludes that an Election Day deadline for executed ballot affidavits does not sufficiently serve those interests, the Court surely recognizes that if the Court is ultimately determined to be incorrect, then the Court's ruling will negatively impact one or more of those interests. The Court should enter a stay pending appeal to avoid that risk.

Moreover, if the Court is determined to have ruled incorrectly, and the injunction is therefore dissolved, the extended deadline for ballot affidavit signatures will be a single-election anomaly. This will create significant voter and administrative confusion. *See Purcell v. Gonzales*, 549 U.S. 1, 4-5 (2006) ("Court orders affecting elections, especially conflicting orders, can themselves result in voter confusion and consequent incentive to remain away from the polls. As an election draws closer, that risk will increase.").

The balance of harms also tips sharply in favor of a stay. Plaintiffs' harms are not substantial and indeed are overwhelmingly theoretical. And this Court expressly held that the burden on voting was only "minimal." As explained, Plaintiffs have not identified a single "member" who has had a legitimate vote rejected because of the Election Day deadline. At most, only 0.10% of voters have had their ballots rejected for lack of signature in the last two general elections. Any stay will affect only the upcoming election, and voters will still be able to submit a complete ballot so long as they do so prior to poll close on Election Day.

Any hardship that Plaintiffs may suffer is the result of Plaintiffs' failure to timely initiate this litigation. As explained, the Election Day deadline has been in place for decades—indeed, since 1918. The Arizona Legislature passed the statute extending a cure period for mismatched signatures in 2019 and, by December 2019, the Election Procedures Manual had been finalized. In fact, the Secretary of State let ADP know on December 19, 2019 that litigation regarding the Election Day deadline for signatures

would be required. [*See* Exh. 113.] Yet Plaintiffs did not bring this lawsuit for another six months—guaranteeing that the laws they thought were unconstitutional would apply to their own voters in the August 2020 primaries. Thus, any potential hardship that Plaintiffs may suffer from a stay pending appeal is largely self-inflicted. Little harm, if any, will result from a stay of a deadline that has been in place for decades.

## CONCLUSION

The State respectfully requests that the Court grant a stay of the permanent injunction pending appeal. Given the impending election, the State also requests that the Court expedite the briefing schedule, to the extent the Court wants additional briefing, and expedite ultimate consideration of the State's request.

Respectfully submitted this 13th day of September, 2020.

MARK BRNOVICH
ATTORNEY GENERAL

By: s/ *Michael S. Catlett*
Joseph A. Kanefield (No. 15838)
  *Chief Deputy & Chief of Staff*
Brunn ("Beau") W. Roysden III (No. 28698)
  *Division Chief*
Drew C. Ensign (No. 25463)
Michael S. Catlett (No. 25238)
  *Deputy Solicitors General*
Jennifer J. Wright (No. 27145)
Robert J. Makar (No. 33579)
Anthony R. Napolitano (No. 34586)
  *Assistant Attorneys General*
2005 N. Central Avenue
Phoenix, Arizona 85004
Telephone: (602) 542-5200
Drew.Ensign@azag.gov

*Attorneys for State of Arizona*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 13th day of September, 2020, I caused the foregoing document to be electronically transmitted to the Clerk's Office using the CM/ECF System for Filing, which will send notice of such filing to all registered CM/ECF users.

 s/ Michael S. Catlett
Michael S. Catlett

*Attorney for State of Arizona*